2022-2181

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,

*Plaintiff-Appellee,*

v.

UNITED STATES,

*Defendant,*

WHEATLAND TUBE COMPANY,

*Defendant-Appellant.*

Appeal from The United States Court of International Trade in
Case No. 1:20-cv-00133-SAV, Judge Stephen A. Vaden

**OPENING BRIEF OF**
**DEFENDANT-APPELLANT WHEATLAND TUBE COMPANY**

Roger B. Schagrin
Christopher T. Cloutier
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Wheatland Tube Company*

Dated: November 21, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-2181

**Short Case Caption** Saha Thai Steel Pipe Public Company Limited v. US

**Filing Party/Entity** Wheatland Tube Company

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/21/2022

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Wheatland Tube Company | | Zekelman Industries, not publicly traded |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Paul Jameson, formerly of Schagrin Associates | | |
| John Bohn, formerly of Schagrin Associates | | |
| Geert De Prest, formerly of Schagrin Associates | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Blue Pipe Steel Center Co., Ltd. v. US (CIT No. 21-81). | Saha Thai Steel Pipe Public Company Limited. v. US (CIT 21-49) | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................ 1

II. STATEMENT OF RELATED CASES ............................................ 1

III. STATEMENT OF JURISDICTION ................................................ 1

IV. STATEMENT OF ISSUES ............................................................ 2

V. STATEMENT OF THE CASE ........................................................ 3

VI. STATEMENT OF FACTS .............................................................. 5

A. Pipe Classifications ........................................................................ 5

B. The Original Proceedings and Order ............................................. 6

C. The Scope Proceeding .................................................................... 9

D. The Remand ................................................................................. 11

1. *Saha Thai I* ................................................................................. 11

2. Commerce's Remand Redetermination ...................................... 14

3. *Saha Thai II* ................................................................................ 15

VII. SUMMARY OF THE ARGUMENT ........................................... 16

VIII. ARGUMENT .............................................................................. 19

A. The Standard of Review ............................................................... 19

B. Commerce's Original Scope Ruling Should Be Upheld for Being Supported by Substantial Evidence and Otherwise in Accordance with Law ........................................ 20

C. The CIT Impermissibly Relied on (k)(1) Factors to Reject Commerce's Scope Determination ........................................21

1. The CIT should not have considered so-called (k)(1) factors.............................................................................................21

2. Saha Thai's dual-stenciled pipe is simultaneously standard pipe and line pipe ..............................................................23

3. The CIT's finding that dual-stenciled pipe is and can only be "line pipe" is not based on substantial evidence..................25

a. The withdrawal of the petition with respect to line pipe from Thailand did not create an exclusion for dual-stenciled pipe ...................................................................25

b. CBP rules do not alter Commerce's published scope definitions.............................................................................27

c. Safeguard proceedings do not alter Commerce's published scope definitions...........................................................28

d. Characterizations of scope definitions in ITC reports do not alter Commerce's published scope definitions...................29

D. The ITC Made A Valid Injury Determination Based On The Scope Of The Investigation.........................................................34

IX. CONCLUSION.........................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Ad Hoc Shrimp Trade Action Committee v. United States*,
637 F.Supp.2d 1166 (Ct. Int'l Trade 2009) ..................................26

*Allegheny Ludlum Corp. v. United States*,
116 F. Supp. 2d 1276 (Ct. Int'l Trade 2000) ..........................30-31, 35

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed. Cir. 2003) ..............................................19

*Diversified Prod. Corp. v. United States*,
572 F. Supp. 883 (Ct. Int'l Trade 1983) ......................................26

*Duferco Steel Inc. v. United States*,
296 F.3d 1087, 1097 (Fed. Cir. 2002)..........................................22

*Fedmet Resources Corp. v. United States*,
755 F.3d 912 (Fed. Cir. 2014) ........................................... 20, 26

*Global Commodity Group LLC v. United States*,
709 F.3d 1134 (Fed. Cir. 2013) ............................................. 20

*Hosiden Corp. v. United States*,
85 F.3d 1561 (Fed. Cir. 1996) .............................................. 35

*King Supply Co. LLC v. United States*,
674 F.3d 1343 (Fed. Cir. 2012) ............................................. 20

*Meridian Prod. v. United States*,
890 F.3d 1272 (Fed. Cir. 2018) ............................................. 12

*Mid Continent Nail Corp. v. United States*,
725 F.3d 1295 (Fed. Cir. 2013) ............................................. 20

*NTN Bearing Corp. of Am. v. United States*,
747 F. Supp. 726 (Ct. Int'l Trade 1990) .................................... 26

*Novosteel SA v. U.S., Bethlehem Steel Cor.*,
284 F.3d 1261 (Fed. Cir. 2002) ………………………………………..… 27

*OMG Inc. v. United States*,
972 F.3d 1358 (Fed. Cir. 2020) ………………………………………..… 21

*Peer Bearing Co.-Changshan v. United States*,
766 F.3d 1396 (Fed. Cir. 2014). ……………………………………..…19

*Saha Thai Steel Pipe Public Company, Ltd. v. United States*,
2022 WL 3681263 (Ct. Int'l Trade Aug. 25, 2022)…………………..…*passim*

*Saha Thai Steel Pipe Public Company, Ltd. v. United States*,
547 F.Supp.3d 1278 (Ct Int'l Trade 2021)……………………….…… *passim*

*Sandvik Steel Co. v. United States*,
164 F.3d 596 (Fed. Cir. 1998) ..…………………………………….…… 20

*Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*,
961 F. Supp. 2d 1291 (Ct. Int'l Trade 2014), *aff'd,* 776 F.3d 1351
(Fed. Cir. 2015) ……….………………………………………….…… 34, 35

*Smith Corona Corp. v. United States*,
915 F.2d 683 (Fed. Cir. 1990) ..…………………………………….…… 27

*Tak Fat Trading Co. v. United States*,
396 F.3d 1378 (Fed. Cir. 2005) ………………………………………..… 21

*Torrington Co. v. United States*,
747 F. Supp. 744 (Ct. Int'l Trade 1990) ……………………………..…35

*United Steel and Fasteners, Inc. v. United States*,
947 F.3d 794 (Fed. Cir. 2020) ...…………………………………….…20

**Statutes**

28 U.S.C. § 1295(a)(5) …..……………………………………………..…1

19 U.S.C. § 2252 …...………………………………………………..… 14

19 U.S.C. § 1516a(b)(1)(B)(i) ……………………………………………..… 19

**Administrative Materials**

*Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*,
59 Fed. Reg. 12,068 (Dep't Commerce Mar. 27, 1985) ..…………………..…6

*Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand, Inv.*,
No. 701-TA-253 (Final), USITC Pub. 1810 (Feb. 1986) ………………..…8

*Certain Welded Carbon Steel Pipes and Tubes From Thailand and Venezuela,*
Inv. Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary),
USITC Pub. 1680 (April 1985) …………………………………………..…5-6

*Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*,
51 Fed. Reg. 8,384 (Dep't Commerce Jan. 27, 1986) ……………………..… 7

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300
(Dep't Commerce Sept. 20, 2021) ……………….…………………..… 12, 32

**Regulations**

19 C.F.R. § 351.225 ……………………………………………………..… *passim*

## I. <u>INTRODUCTION</u>

On behalf of Defendant-Appellant Wheatland Tube Company ("Defendant-Appellant" or "Wheatland"), we respectfully submit this opening brief in accordance with Federal Rule of Appellate Procedure 28, Federal Circuit Rule 28.

## II. <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, counsel for Defendant-Appellant is unaware of any other appeal in or from the same civil action in the U.S. Court of International Trade ("CIT") that was previously before this Court or any other appellate court. Counsel is aware of two cases pending before the CIT that could be affected by this appeal: *Blue Pipe Steel Center Co., Ltd. v. United States* (CIT No. No. 21-00081) and *Saha Thai Steel Pipe Public Company Ltd. v. United States* (CIT No. 21-00049).

## III. <u>STATEMENT OF JURISDICTION</u>

Pursuant to 28 U.S.C. § 1295(a)(5), this Court possesses subject matter jurisdiction over the appeal from the final judgment of the CIT entered on August 25, 2022. *Saha Thai Steel Pipe Public Company, Ltd. v. United States*, No. 20-00133, 2022 WL 3681263 (Ct. Int'l Trade Aug. 25, 2022) ("*Saha Thai II*").

Appx00003-00028.[1] On September 2, 2022, Defendant-Appellant Wheatland timely filed a notice of appeal. Appx00074.

## IV. STATEMENT OF ISSUES

1. When an imported product unambiguously meets the physical characteristics and industry specifications for the subject merchandise as defined in the scope of an antidumping duty order, can the CIT consider the additional materials specified in 19 C.F.R. § 351.225(k)(1)?
2. Is an imported product that unambiguously meets the description of subject merchandise in an antidumping duty order, in terms of both physical characteristics and the specified industrial standard, nonetheless excluded from that order if that product is concurrently certified as meeting a second industrial standard, where the scope contains no exclusion for products made to both standards?
3. Can characterizations of antidumping and countervailing duty scope definitions in U.S. International Trade Commission ("ITC") publications create an exclusion to a particular antidumping duty order where the scope definition for that order as published by the U.S. Department of Commerce ("Commerce") contains no such exclusion?

[1] "Appx__" refers to pages of the Joint Appendix.

4. Whether the rules of U.S. Customs and Border Protection ("CBP") regarding the appropriate tariff classification of a product can remove that product from the scope of an antidumping duty order if CBP's designated classification does not appear in the scope definition, but the product otherwise meets the physical characteristics in the scope definition?
5. Does a President's decision to include products certified as meeting multiple industrial standards in safeguard relief under the Trade Act of 1974 determine whether that product is covered by the scope of an antidumping duty order that specifies only one industrial standard but contains no exclusion for products meeting multiple standards?

## V. STATEMENT OF THE CASE

Following a scope inquiry, Commerce found that certain steel pipes exported by Saha Thai Steel Pipe Public Company Limited ("Saha Thai") were covered by the scope of the order on Circular Welded Pipe ("CWP") from Thailand (the "Order"). *See* Final Scope Ruling, Appx40762-40780. In doing so, Commerce found that Saha Thai's pipe met the physical characteristics of the scope description. In addition, Saha Thai's products were certified as "standard pipe" as specified in the scope. Commerce found the fact that the pipe was also being concurrently certified as "line pipe" did not remove the pipe from the scope

because there was no exclusion for such dual-certified pipe in the Order on CWP from Thailand – unlike the explicit exclusions for such dual-certified pipe in orders on CWP from certain other countries.

Saha Thai appealed. The CIT disagreed with Commerce. While the CIT did not dispute that Saha Thai's products met the physical characteristics of the scope description, the CIT relied on the factors in 19 C.F.R. § 351.225(k)(1) to find the pipe was excluded from the scope. *See Saha Thai Steel Pipe Public Company, Ltd. v. United States*, 547 F. Supp. 3d 1278 (Ct Int'l Trade 2021) ("*Saha Thai I*"). The CIT remanded the case to Commerce to issue a ruling consistent with the CIT's reasoning. *Id*.

On remand, under protest, Commerce found that Saha Thai's CWP certified as meeting an industry standard for "standard pipe" and meeting the physical characteristics of the scope of the Order on CWP from Thailand was nonetheless excluded from the scope of the Order because that same pipe was concurrently certified to an industrial standard for "line pipe." *See* Final Results of Redetermination Pursuant to Court Remand, Oct. 16, 2021 ECF No. 58 ("Remand Results") Appx00046-00073. The CIT upheld Commerce's Remand Determination. *See Saha Thai II*. This appeal followed.

## VI. STATEMENT OF FACTS

### A. Pipe Classifications

In the United States, steel pipes and tubes are classified in various ways. *See generally Certain Welded Carbon Steel Pipes and Tubes From Thailand and Venezuela,* Inv. Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary), USITC Pub. 1680, at A-5 (April 1985) ("ITC Preliminary Determination"), Appx10121. One way to classify pipe is by the method of manufacturing, which divides steel pipes and tubes into two categories: welded and seamless. *See id*. Each of those two categories can be further divided based on grades or properties of the material: carbon, heat-resisting, stainless, or other alloy. *See id*. Another way is to classify pipes and tubes is based on their shapes: circular, square, or rectangular cross section. *See id*. at A-6, Appx10122. Yet another way of classification is to categorize based on end uses:

> (1) Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to [American Society for Testing & Materials (ASTM)] specifications A-120, A-53, and A-135.
>
> (2) Line pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to [American Petroleum Institute (API)]

specification 5L.

*See id.*[2]

Certain pipe products with the exact same method of manufacture, materials, shape, dimensions, and other physical characteristics may be certified for both standard pipe end uses and line pipe end uses. Thus, a single pipe may be stenciled with both the ASTM specifications for standard pipe and the API specification for line pipe. This case concerns such "dual-stenciled" pipe. Dual-stenciled pipe, sometimes referred to as dual-stenciled standard and line pipe, conforms to the industry standards for both standard pipe and line pipe.

**B. The Original Proceedings and Order**

In 1985, a coalition of domestic producers filed antidumping petitions targeting, *inter alia*, "Certain Welded Carbon Steel Pipe and Tube Products from Thailand." *See* Saha Thai Scope Comments (Att. 2: *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Dep't Commerce Mar. 27, 1985)), Appx40038-40040. The scope proposed in the petition initially included all "small diameter circular welded carbon pipes and tubes," which encompassed both

[2] Classifying pipes and tubes based on their end uses yields other categories as well, such as mechanical tubing and pressure tubing. *See generally* ITC Preliminary Determination, USITC Pub. 1680, at A-6, Appx10122. This case does not involve those categories.

standard pipe and line pipe, but the domestic industry "withdrew" the portion of the petition relating to "line pipe" from Thailand in light of the lack of line pipe production in Thailand at that time. *See* Saha Thai Scope Comments (Att. 14: Letter dated March 14, 1985 from Petitioners Regarding Partial Withdrawal of Petition (Mar. 14, 1985)), Appx40612-40613. Notably, while the petition was withdrawn with respect to "line pipe," it was not withdrawn with respect to any standard pipe made to ASTM specifications that may also be dual-stenciled as meeting API line pipe specifications. Furthermore, while the domestic industry withdrew the petition as it related to line pipe, the physical description of the subject merchandise in the scope remained unchanged. Moreover, the scope was *not* amended to exclude line pipe or dual-stenciled pipe that otherwise meets the physical description of the scope.

Commerce eventually determined that CWP from Thailand was being, or was likely to be, sold in the United States at less than fair value. *See Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8,384 (Dep't Commerce Jan. 27, 1986). Appx40047-40050. Commerce defined the scope as follows:

> certain circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254,

> 610.3256, 610.3258, and 610.4925 of the Tariff Schedule of the United States Annotated (TSUSA).

*Id.* at 40047. For its part, the ITC found that standard pipe and line pipe constituted separate domestic like products (although the portions of the petition relating to line pipe from Thailand were withdrawn, similar line pipe provisions were not withdrawn for the other respondent country) and made an affirmative injury determination with respect to imports of "standard pipes" with the requisite dimensions from Thailand. *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand,* Inv. No. 701-TA-253 (Final), USITC Pub. 1810 (Feb. 1986), Views at 5. Appx40064.

Following the 1989 conversion from the TSUSA to the Harmonized Tariff Schedule of the United States, Commerce revised certain aspects of the scope definition so that it reads as follows:

> Imports covered by this review are certain circular welded carbon steel pipes and tubes with an outside diameter of 0.375 inch or more but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30,5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

*See Saha Thai I,* 547 F. Supp. 3d at 1284, Appx00034. Thus, the updated scope:

- changed the phrase “also known as ‘standard pipe’” to “commonly referred to in the industry as ‘standard pipe,’”
- updated the tariff classifications, and
- added language explaining that the tariff classifications were for the convenience of CBP and not dispositive.

The updated definition did not alter the description of the physical characteristics of subject pipe.

**C. The Scope Proceeding**

Saha Thai has historically shipped large volumes of steel pipe to the United States that fell within the scope of the Order. *See* Commerce Memorandum Placing Documents on Record (Dec. 6, 2021) at Att. 1 p. 3, Appx10172. In the final results of the administrative review of the Order for the 2016-2017 review period, Saha Thai’s dumping margin increased from the low single digits to approximately 28 percent. *Id.* at 6, Appx10176. Around the same time, Saha Thai ceased shipping steel pipe bearing a single stencil for standard pipe to the United States and began shipping pipe that was dual-stenciled as complying with specifications for both standard pipe and line pipe. *Id.* at Att. 1, p. 5. Appx10175.

After the shift in Saha Thai’s exports to the United States, certain domestic producers requested that Commerce examine whether Saha Thai was circumventing the Order with dual-stenciled pipe. On July 29, 2019, instead of pursuing a circumvention inquiry, Commerce self-initiated a scope inquiry under

19 C.F.R. § 351.225(b) to determine whether Saha Thai's "dual-stenciled" pipe is within the scope of the Order. Commerce Initiation of Scope Inquiry (July 29, 2019), Appx40000-40001. Following certain complaints from Saha Thai, Commerce issued a second initiation notice on November 22, 2019. *See* Memorandum from Commerce re: Scope Inquiry Self-Initiation (Nov. 22, 2019), Appx40631-40635.

On February 24, 2020, Commerce preliminarily determined that standard pipe that is also certified as complying with specifications for line pipe is subject to the Order. *See* Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe (Dep't Commerce Feb. 24, 2020) ("Preliminary Scope Ruling"), Appx40679-40686. There was no dispute that Saha Thai's pipe met the physical characteristics of the scope. The ruling instead focused on whether the fact that the pipe was dual-stenciled removed it from the scope of the Order. *Id*. at 6-7, Appx40684-85. In making its determination, Commerce noted that the Thai Order was unlike later orders on CWP from other countries, where dual-stenciled pipe had been an issue in the underlying investigations. *Id*. In those later cases, the scope contained explicit exclusions for such dual-stenciled pipe: "standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is not included in these orders." *Id*. at 7 n. 40, Appx40685. Commerce also noted that whether an importer classified the

merchandise under the HTS codes for line pipe for Customs purposes "has no bearing" on whether that pipe was subject to the Thai Order. *Id.*

Commerce's determination remained unchanged in the final scope ruling issued on June 30, 2020. *See* Final Scope Ruling, Appx40762-40780. Commerce again explained:

> Commerce further rejects Saha Thai's assertion that "all" line pipe, including dual-stenciled standard and line pipe, is not covered by the scope of the Order. Unlike the AD orders covering similar merchandise (e.g., from Mexico or Venezuela), the CWP from Thailand Order does not explicitly exclude dual-stenciled standard and line pipe. Moreover, in contrast to the investigations which resulted in the 1992 Standard Pipe Orders, and contrary to Saha Thai's claims, neither the Final LTFV Determination nor the ITC Final Injury Determination address dual-stenciled standard and line pipe. Commerce finds that Saha Thai's construct that dual-stenciled standard and line pipe are not covered by the scope of the Order because line pipe is not covered by the scope of Order lacks merit. Simply because a certain product is certified as line pipe does not result in it being not certified as standard pipe. Stated differently, if a certain product is certified as standard pipe, then it is standard pipe regardless of whether it is also certified as line pipe.

*See* Final Scope Ruling, Appx40775 (internal citations omitted).

**D. The Remand**

*1. Saha Thai I*

Saha Thai appealed Commerce's Final Scope Ruling to the CIT. In its initial opinion, the CIT held that Commerce's determination "constitutes an unlawful expansion of the scope of the underlying order" and remanded that issue to Commerce for reconsideration. *Saha Thai I*, 547 F. Supp. 3d at 1281, Appx00032.

In its analysis, the CIT did not question Commerce's finding that Saha Thai's pipe met the physical characteristics of the scope of the Order. Instead, the CIT found that the written scope of the Order was ambiguous with respect to whether pipe stenciled to two industrial standards was covered because the order did not define standard pipe or reference dual-stenciled pipe. *Id*. at 1294, Appx00039. Because the CIT found that the language of the scope itself was not dispositive, the CIT proceeded to examine the scope's language within the context of the guidelines contained in 19 C.F.R. § 351.225(k)(1) (2020).[3] *Id*. *See also Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018).

The CIT observed, among other things, that the original petition was withdrawn with respect to line pipe from Thailand, and the tariff classifications relevant to line pipe were removed from the scope definition. *Saha Thai I*, 547 F.

---

[3] In 2021, Commerce finalized changes to its regulations that govern antidumping and countervailing duty proceedings. *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't Commerce Sept. 20, 2021). These changes included modifications to 19 C.F.R. § 351.225, the regulation that covers Commerce's procedures and analytical framework for scope inquiries. However, the modifications to 19 C.F.R. § 351.225 do not apply to this case because they went into effect *after* Commerce self-initiated the scope inquiry on Saha Thai's dual-stenciled pipe prior effective date of the final rulemaking. *Id.* at 52,300.19 C.F.R. § 351.225(k)(1)(i) currently says that certain sources "may be taken into account" by the Secretary. At the time of the agency's scope determination, however, the applicable regulation said the sources "*will* be taken into account." *See* 19 C.F.R. § 351.225(k)(1)(i) (2020) (emphasis added).

Supp. 3d at 1295, Appx00041. The CIT also noted that the ITC's injury determination did not reference dual-stenciled pipe, and stated that "the ITC has never conducted an injury investigation, nor made an injury determination, on pipes imported from Thailand that are dual-stenciled, or obtain an API stencil, regardless of whether those pipes also have an ASTM stencil." *Id.* at 1295, Appx00042. In addition, the CIT noted that the ITC in the original determination treated standard pipe and line pipe as separate domestic like products (although the petitioners withdrew line pipe from the petition with respect to Thailand, there was no such withdrawal for another country subject to the Commission's investigation). *Id*. at 1296, Appx00042.

The CIT also reviewed statements made in reports accompanying the ITC's five-year "sunset" reviews involving antidumping and countervailing duty orders on various types of steel pipe from various countries, which were combined into single ITC proceedings for administrative efficiency. *Id*.; *see also id*. at 1285-1286, Appx00034-00035. In so doing, the CIT cited discussion in one review indicating that the Order on CWP from Thailand was unusual because it contained no express exclusion for line pipe or other pipe varieties commonly excluded in later cases. *Id*. at 1285, Appx00034. The CIT also took note of several statements in the ITC reports that dual-stenciled standard and line pipe would be entered into the United States under tariff classifications for line pipe. *See, e.g., id*. at 1292, 1294

Appx00039, 00041. In addition, the CIT noted statements that Korean exporters avoided antidumping duties under the order on CWP from Korea by exporting dual-stenciled pipe. *Id*. at 1297, Appx00043.

The CIT further observed that, in the third and fourth sunset reviews of the orders on pipe from countries including Thailand, the ITC stated that dual-stenciled pipe is not within the scope of the orders. *Id*. at 1286, Appx00035. The CIT also referenced statements in ITC reports that dual-stenciled standard and line pipe had been considered line pipe for purposes of the "safeguard" duties President Clinton imposed in 2000 under section 202 of the Trade Act of 1974, as amended (the "Trade Act") (19 U.S.C. § 2252). *Id*. at 1285, Appx00035.

Finally, the CIT rejected as "not (k)(1) materials" the "isolated examples" provided by Wheatland and the Defendant United States of instances in which Commerce referred to dual-stenciled pipe as standard pipe in the exclusionary language from other CWP scope definitions. *Id*. at 1298-1299, Appx00043-00044.

2. <u>Commerce's Remand Redetermination</u>

In its remand determination, Commerce found, under protest, that dual-stenciled pipe was not subject to the Order. *See* Remand Results, Appx00046-00073. Notwithstanding its decision, Commerce observed that several of the documents and arguments on which the CIT relied were not submitted in the administrative proceeding below and thus not part of the record on which

Commerce based its original decision. *Id*. at 14-16, Appx00058-00059. Commerce also observed that while the CIT's decision focused on the absence of an injury determination for dual-stenciled standard and line pipe, the pipe at issue was certified as standard pipe and met the physical description of that product in the scope definition, and was thus the same as the standard pipe underlying the ITC's injury determination. *Id*. at 17-18, Appx00059-00061. Commerce also disputed that the cited statements in the later ITC reviews that line pipe was excluded from the scopes of multiple CWP orders could be anything more than a generalization in light of the lack of exclusionary language in certain orders, including the one at issue here. *Id*. at 19, Appx00064.

### 3. *Saha Thai II*

The CIT affirmed Commerce's Remand Redetermination, stating that the ITC "consistently identifies dual-stenciled pipe as line pipe, not standard pipe." *Saha Thai II*, Appx00024. The CIT continued that, as explained in one ITC review, "dual stenciled pipe meets both line pipe and CWP specifications but enters as line pipe for customs purposes." *Id*. at Appx00023. The CIT also reasoned that, if "dual-stenciled pipe were standard pipe … then it would not have been subject to President Clinton's safeguard tariffs" on line pipe. *Id*. at Appx00024. In closing, the CIT again repeated that "dual-stenciled pipe is line pipe not standard pipe." *Id*. at 10026.

This appeal followed.

## VII. SUMMARY OF THE ARGUMENT

Commerce's original scope ruling was supported by substantial evidence and otherwise in accordance with law. The scope of the Order defines the physical characteristics of subject merchandise and specifies that it should be "standard pipe." Unlike orders on CWP from certain other countries, the Thai Order does not provide any exclusion for standard pipe that also meets industry specifications for line pipe. There is no dispute that the pipe at issue met the physical characteristics specified in the scope of the Order and was made to an industrial specification for standard pipe. Consequently, Commerce was correct in finding Saha Thai's product to be within the scope of the Order.

The CIT nonetheless found ambiguity in the scope and proceeded to examine a variety of sources other than the written scope language to determine whether dual-stenciled pipe was covered by the Order. In particular, the CIT considered CBP rules providing that dual-stenciled pipe should be entered under the more specific tariff classifications for line pipe to mean that a pipe certified as meeting industry specifications for both standard and line pipe could no longer be considered standard pipe. It is well-settled, however, that CBP's classification of an imported good has no bearing on whether that good is subject to an antidumping duty order, which is determined by the written scope of the order.

The CIT also observed that petitioners in the original investigation initially asked for an investigation of both standard and line pipe, but withdrew their allegations with respect to line pipe due to the apparent absence of line pipe production in Thailand. The CIT considered that this withdrawal created an exclusion for line pipe – including otherwise subject standard pipe that is also certified to a line pipe standard. To reach this conclusion, the CIT ignored that it is Commerce, not petitioners, that defines the scope, and that the withdrawal did not result in any change to the written scope defining the physical characteristics of the subject pipe. The CIT was also wrong that the absence of references to tariff classifications pertaining to line pipe in the scope of the Order means that line pipe cannot be subject merchandise if it otherwise meets the terms of the scope. The Order is, in fact, explicit that the tariff classifications in it are for the "convenience and purposes" of CBP and that the written description of the scope "is dispositive."

The CIT also relied on the inclusion of dual-stenciled pipe in a safeguard proceeding targeting line pipe under the Trade Act of 1974 to support its conclusion that dual-stenciled pipe was no longer standard pipe and could only be considered line pipe. In the same way that CBP rules do not affect an antidumping duty order's definition of scope, however, how a product is treated in a safeguard proceeding says nothing about whether that product is subject to a particular antidumping duty order.

The CIT also erred when it elevated characterizations of the scope of multiple orders on CWP from various countries, which had varying scopes, over the actual language of the Order on CWP from Thailand. In particular, the CIT relied on statements in the two most recent ITC five year "sunset" reviews covering multiple pipe products from various countries that all orders on CWP excluded pipe that is dual-stenciled. These statements by the ITC were either intended as generalizations or were simply inaccurate. While many orders on CWP do exclude dual-stenciled pipe, the written scope of the Order at issue here, Commerce's original scope ruling, and earlier ITC publications make clear that the Order on CWP from Thailand is not one of them. ITC's characterizations of multiple pipe orders are demonstrably inaccurate and, regardless, cannot create an exclusion in a particular order that contains no such exclusion.

The CIT's dismissal of scope definitions from orders on CWP from other countries showing that (1) standard pipe also certified to a line pipe specification can be referred to as "standard pipe," and (2) certain orders contain explicit exclusions for dual-stenciled pipe not present in the Thai Order demonstrate that the CIT failed to adequately consider information detracting from its conclusions.

Finally, the CIT's conclusion that the ITC's original investigation did not consider dual-stenciled pipe and therefore dual-stenciled pipe cannot be subject to the Order ignores that dual-stenciled pipe is made to a standard pipe specification

and is thus identical to the pipe considered by the ITC. It also ignores that the scope of an antidumping duty order need not enumerate every possible permutation of merchandise that falls within the definition of the scope. Moreover, the CIT's observation that the ITC considered standard pipe and line pipe to be separate like products is also of no moment. The ITC's consideration of domestic like products serves a different statutory purpose than a scope inquiry, and the results of the distinct inquiries may differ.

For all of these reasons, This Court should reverse the judgment of the CIT.

## VIII. ARGUMENT

### A. The Standard of Review

This Court will "review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014). "Thus, without affording any deference to the Court of International Trade, this court reassesses the administrative record for 'substantial evidence' and for consistency 'with law.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003); 19 U.S.C. § 1516a(b)(1)(B)(i).

In reviewing Commerce's scope determinations, the Court grants "'significant deference to Commerce's interpretation of a scope order.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). This deference is appropriate because scope rulings are "'highly fact-intensive and case-specific,'" *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (quoting *King Supply Co. LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)), and "the meaning and scope of antidumping orders are issues 'particularly within the expertise' and 'special competence' of Commerce." *King Supply*, 674 F.3d at 1348 (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)). "{P}arties challenging Commerce's scope determinations under substantial evidence review confront a high barrier to reversal." *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 798 (Fed. Cir. 2020) (citing *King Supply*, 674 F.3d at 1348) (additional citation omitted).

### B. Commerce's Original Scope Ruling Should Be Upheld for Being Supported by Substantial Evidence and Otherwise in Accordance with Law

In its original scope ruling, Commerce correctly found that dual-stenciled pipe is covered by the scope of the Order. The scope covers circular welded carbon steel pipes and tubes from Thailand with an outside diameter of 0.375 inches or

more, but not exceeding 16 inches. *See* Final Scope Ruling, Appx40763. The dual-stenciled pipe manufactured by Saha Thai in Thailand is circular in shape, welded, made of carbon steel, and has an outside diameter of 0.375 inches or more, but does not exceed 16 inches. *Id.,* Appx40764. Furthermore, there is no exclusionary language in the Order for standard pipe that meets the description of the subject merchandise but that is also dual-stenciled to standard pipe and line pipe specifications. Thus, the plain language of the Order covers dual-stenciled pipe.

### C. The CIT Impermissibly Relied on (k)(1) Factors to Reject Commerce's Scope Determination

#### 1. The CIT should not have considered so-called (k)(1) factors

The first step in a scope inquiry is to consider the language of the antidumping order itself. *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382-83 (Fed. Cir. 2005). If the language governing the scope of the order is unambiguous, the "plain language of the order governs." *OMG Inc. v. United States*, 972 F.3d 1358, 1364 (Fed. Cir. 2020).

Saha Thai's dual-stenciled pipe is clearly covered by the plain language of Order. The pipe is made of welded steel, circular, has an outside diameter between 0.375 and 16 inches, and is certified as "standard pipe." *See Saha Thai I*, 547 F. Supp. 3d at 1284, Appx00034. The plain language of the scope contains no exclusions for pipe that may also be certified as line pipe. In the absence of any

such exclusion, Saha Thai's pipe is covered by the unambiguous scope and there was no need for any further analysis or interpretation.

The CIT nonetheless found that the written scope of the Order was ambiguous with respect to whether pipe stenciled to two industrial standards was covered, based on its finding that the order did not define standard pipe or explicitly reference dual-stenciled pipe. *Saha Thai I*, 547 F. Supp. 3d at 1294, Appx00039. On this basis, the CIT proceeded to examine the scope's language within the context of the guidelines contained in 19 C.F.R. § 351.225(k)(1) (2020). *Id*. Extrinsic aids such as the "(k)(1)" sources may aid Commerce's interpretation of its own order, but such aids "cannot substitute for the language in the order itself." *Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). In this case, the plain language of the Order, which contains no exclusions for dual-stenciled pipe, covers Saha Thai's pipe.

The CIT's reliance on extrinsic (k)(1) factors to find that the pipe was excluded was thus in error because the CIT interpreted the scope language to create an exclusion for dual-stenciled pipe that did not exist. *See Duferco*, 296 F.3d at 1095 ("However, Commerce cannot interpret an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." (internal quotations omitted)). On this basis alone, this Court should reverse the CIT's judgment. Regardless, even if this Court finds that reliance on

the (k)(1) factors was permissible, the CIT's analysis of those factors was fundamentally flawed and also warrants reversal, as explained in more detail below.

2. Saha Thai's dual-stenciled pipe is simultaneously standard pipe and line pipe

As discussed in Section C.1., above, Saha Thai's dual-stenciled pipe meets all of the criteria set forth in the scope of the Order in terms of material, manufacturing method, size, and conformance with the industry specifications for "standard pipe." The CIT, however, mistakenly found that standard pipe loses its identity as standard pipe if it is also stenciled as compliant with an industrial standard for line pipe. *See, e.g.*, *Saha Thai I*, 547 F. Supp. 3d at 1299, Appx00044, *Saha Thai II* at 25, Appx00027.

Notwithstanding the CIT's insistence that dual-stenciled pipe cannot be standard pipe, the fact remains that Saha Thai certified that its exports complied with an industrial specification for standard pipe, and a consumer could use that pipe in any standard pipe application without issue. That a purchaser could also use the same pipe in a line pipe application does not negate its utility or identity as standard pipe.

In its final scope ruling, Commerce referenced a Venn diagram originally prepared by Saha Thai that it indicated was helpful in conceptualizing the overlap

between the industrial standards for standard and line pipe. That diagram is re-created below:




*See* Final Scope Ruling, Appx40752.

The scope of the Order is defined to cover all standard pipe meeting certain physical characteristics. The scope contains no exclusions, unlike later orders on CWP that exclude dual-stenciled pipe. Consequently, by the terms of the Order, everything within the blue circle on the right should be subject merchandise, including the area of intersection between the two circles. Yet, under the CIT's interpretation of the scope, the area where the two circles intersect can only be part of the yellow circle on the left. In the absence of an exclusion for dual-stenciled pipe, which the Order at issue here does not contain, this interpretation defies logic and is contrary to the plain language of the scope.

3. The CIT's finding that dual-stenciled pipe is and can only be "line pipe" is not based on substantial evidence

The CIT's conclusion that dual-stenciled pipe is irrefutably line pipe—and line pipe only—appears to derive from: (a) Petitioners' withdrawal of the petition with respect to line pipe from Thailand, (b) CBP rules that require dual-stenciled pipe to enter the United States under the more specific tariff classifications for line pipe, rather than the less specific classifications for standard pipe, (c) President Clinton's decision to include dual-stenciled pipe in a safeguard action on line pipe, and (d) ITC references to items (b) and (c), as well generalized and inaccurate statements by the ITC that dual-stenciled pipe is excluded from all orders on CWP made in the course of two reviews involving multiple products from multiple countries.

a. The withdrawal of the petition with respect to line pipe from Thailand did not create an exclusion for dual-stenciled pipe

In *Saha Thai II*, the CIT observed that petitioners withdrew the petition as it related to line pipe from Thailand, and that "their withdrawal letter specifically covered the categories under which all dual-stenciled line pipe would have been imported." *Saha Thai II*, at 9, Appx00011. The CIT also observed that Commerce's Final Scope Determination "included a product that was explicitly withdrawn from consideration in 1985." *Id*. at 10, Appx00012.

Contrary to the CIT's reasoning, declining to pursue a case on line pipe did not create an exclusion for dual-stenciled pipe that otherwise meets the express terms of the scope of the Order. As an initial matter, Commerce, not petitioners, defines the scope of an antidumping duty order. Indeed, Commerce had the authority to depart from the scope proposed in the petition, so the petition and the letter indicating partial withdrawal by themselves do not show Commerce's understanding of the scope of its own antidumping duty order. *See Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F.Supp.2d 1166, 1174 (Ct. Int'l Trade 2009); *NTN Bearing Corp. of Am. v. United States*, 747 F. Supp. 726, 731 (Ct. Int'l Trade 1990); *Diversified Prod. Corp. v. United States*, 572 F. Supp. 883, 887 (Ct. Int'l Trade 1983). Thus, even though Commerce may consider the intent of the petitioners from the original proceeding, the best evidence of Commerce's intent as to the agency's own antidumping order is the language of the order itself. *See Fedmet Res. Corp.*, 755 F.3d at 918 (noting that language of order is "paramount").

In addition, the withdrawal did not add any language excluding line pipe. The scope continued to cover standard pipe with certain physical characteristics, just as it had before the withdrawal. If a pipe meets the remaining scope definition, which covers standard pipe in certain sizes, it is subject to the order.

The removal of the tariff classifications for line pipe from the scope definition is also of no moment, as it has always been the narrative description of the merchandise that defines a scope, not the tariff classifications. *See, e.g., Novosteel SA v. U.S., Bethlehem Steel Cor*., 284 F.3d 1261, 1264 (Fed. Cir. 2002) ("As a matter of law, a petition need not list the entire universe of products or the numbers assigned to them under the HTSUS in order to cover those products"); *Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990) (reasoning that reference to TSUS classification number is not dispositive). Moreover, as the scope currently states, the enumerated tariff classifications are not dispositive. *See Saha Thai I* at 1284, Appx00034.

Thus, the CIT was incorrect when it substituted its judgment for that of Commerce to conclude that the petitioners' withdrawal of the petition with regard to certain tariff categories created an exclusion for dual-stenciled pipe that otherwise meets the unaltered physical characteristics of the scope.

b. <u>CBP rules do not alter Commerce's published scope definitions</u>

The CIT makes much of the fact that dual-stenciled pipe would enter the United States under a tariff classicization for line pipe, as opposed to standard pipe, contributing to its conclusion that dual-stenciled pipe must be considered line pipe only and not standard pipe. *See Saha Thai II* at 22, 24 Appx00024, Appx00026; *Saha Thai I* at 1286, Appx00035. It is worth noting here that the ITC references on

which the CIT relies make clear that the reason dual-stenciled pipe enters as line pipe is for "U.S. customs purposes." *See Saha Thai II* at 22, 24 Appx00024, Appx00026; *Saha Thai I*, 547 F. Supp. 3d at 1286, Appx00035. The most that these statements indicate is that because there is no specific tariff code for dual-stenciled pipe, CBP prefers dual-stenciled pipe to be classified as line pipe for CBP's purposes. It says nothing about the scope of the Order or how Commerce should interpret it. As Commerce explained in its Final Scope Determination, CBP's preference for the

> more specific TSUSA line pipe categories, rather than the less-specific TSUSA standard pipe categories, has no bearing on the fact that the dual-stenciled pipe meets the definition of the TSUSA standard pipe categories, and that product is certified to be used as standard pipe.

Final Scope Order at 7, Appx40685. How CBP instructs importers to classify dual-stenciled pipe has no effect on whether that pipe meets the Order's definition of the scope. The CIT's reliance on CBP classification preferences was thus in error.

c. <u>Safeguard proceedings do not alter Commerce's published scope definitions</u>

The CIT also cites as support for its conclusion discussion in an ITC report indicating that "when President Clinton imposed temporary safeguard duties on line pipe, dual-stenciled line pipe was included in the safeguard duties, but standard pipe was not." *Saha Thai II* at 23, Appx00025. Again, however, what a former President decided in a safeguard proceeding says nothing about the scope

of the Order at issue here. The inclusion of dual-stenciled pipe in a line pipe safeguard does not in any way affect the scope of the Order of CWP from Thailand.

If anything, it indicates that in trade proceedings involving products where dual-stenciling is possible, foreign interests will have an incentive to start shipping a dual-stenciled product if the dual-stenciled product is not included within the scope of the relief. Thus, to ensure the safeguard measures on line pipe had their intended remedial effect, it was logical for the President to direct explicitly that dual-stenciled pipe be subject to the safeguard relief. Otherwise, importers could evade the safeguard by dual-stenciling otherwise subject pipe.

In short, the CIT's reliance on the President's safeguard determination was misplaced. The President's safeguard determination was needed to avoid circumvention of the remedy on line pipe imports in that case. That fact does not change the plain language of the scope here, which contains no exclusion for dual-stenciled pipe.

d. Characterizations of scope definitions in ITC reports do not alter Commerce's published scope definitions

The CIT also cites as support for its position a statement in the ITC's third and fourth sunset reviews that "[d]ual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."

*Saha Thai I*, 547 F. Supp. 3d at 1297-98*,* Appx00026. In doing so, the CIT dismissed the possibility raised by both Commerce and Wheatland that the ITC either (1) made a mistake in its characterization of the multiple individual scope definitions at issue, many of which do exclude dual-stenciled pipe, or (2) intended the statement as a generalization based on the fact that most, but not all, of the orders it was reviewing contained an explicit exclusion for dual-stenciled pipe. *Id*. at 25, Appx00027.

The CIT's reliance on the ITC's mistaken characterizations of the scope at issue here is unjustified. For example, Commerce – the agency responsible under the statute for defining and interpreting scope – noted in its Final Scope Ruling that "{u}nlike the AD orders covering similar merchandise (*e.g.*, from Mexico or Venezuela), the CWP from Thailand Order does not explicitly exclude dual-stenciled standard and line pipe." Final Scope Ruling at 14, Appx40775. A simple review of the scope of the Thai Order confirms that it does not include any exclusion for dual-stenciled pipe.

The ITC's mistaken, or at least imprecise, characterization of multiple orders where most have exclusions for dual-stenciled pipe but some do not cannot create an exclusion that is not already contained in a particular scope definition. It is well-settled that Commerce is the agency that defines the scope of an antidumping duty order. *See, e.g., Allegheny Ludlum Corp. v. United States*, 116 F. Supp. 2d 1276,

n.6 (Ct. Int'l Trade 2000). The CIT was thus in error when it relied on these ITC statements to re-write the plain language of the Thailand Order.

The CIT's Judgment also overlooks a reference to the first sunset review in its first opinion, where the ITC stated that "the orders on CWP from Thailand and Turkey (CVD) have no express exclusions for products excluded from the scopes in all later cases, including line pipe … ." *Saha Thai I*, 547 F. Supp. 3d at 1285, Appx00034. If Commerce had granted an exclusion for dual-stenciled pipe sometime between the ITC's first and third sunset reviews, either this proceeding would not be happening, or the exclusion would appear in the administrative record. The record does not, however, contain any such exclusion because it does not exist.

While Wheatland's position is that the language of the scope itself is dispositive in this case and there was no need to rely on extraneous (k)(1) factors, as long as the CIT was relying on (k)(1) factors it should have reviewed all of the evidence before it. Yet the CIT failed to give appropriate weight to other information that detracted from its findings. For example, the CIT dismissed as "not (k)(1) materials" the "isolated examples" provided by Wheatland and the United States in response to the CIT's request for instances where dual-stenciled pipe was referred to as standard pipe. *Id*. at 1298, Appx00042 (discussing orders referencing "standard pipe that is dual or triple certified/stenciled").

Despite dismissing the scope definitions from other CWP cases as "not (k)(1) materials" and "isolated examples," they are highly probative of whether a dual- (or triple-) stenciled pipe product immutably becomes line pipe and can never be referred to as standard pipe.[4] These examples also help to explain how the ITC may have made inadvertent misstatements in the third and fourth sunset reviews regarding the scopes of the multiple and inconsistent orders it was reviewing. These scope definitions for the orders on Brazil, Mexico, and Korea provide:

> Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in the orders.

*See Saha Thai I*, 547 F. Supp. 3d at 1288, Appx00037. Similarly, the scope definition for the order on Taiwan provides:

> Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind or used for oil and gas pipelines is also not included in the scope of the order.

*Id*.

---

[4] In fact, Commerce has explained that it considers the (k)(1) sources to include prior determinations under other orders with similar scope language and that cover the same or similar merchandise from other countries. *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,323 (Dep't Commerce Sept. 20, 2021).

In light of these explicit exclusions, it is remarkable that the CIT used the example of Korean exporters shipping dual-stenciled line pipe to the United States without the imposition of antidumping duties as support for its conclusion that dual-stenciled pipe can only be considered line pipe. *See Saha Thai II* at 23, Appx00025. The scope of the order on CWP from Korea not only refers to dual-stenciled pipe as standard pipe, it contains an exclusion for dual-stenciled pipe. Clearly, the reason Korean exporters could export dual-stenciled pipe without the imposition of antidumping duties was the explicit exclusion in the Korean order.

In contrast to the scope definitions for CWP from the four countries identified above, there is no provision that dual-stenciled pipe is "not included in the scope of the order" in the scope of the Order on CWP from Thailand. This, combined with other evidence including Commerce's statements that the various orders on CWP were inconsistent in excluding dual-stenciled product (*see* Final Remand Determination at 4, Appx00049), demonstrate that dual-stenciled pipe was treated differently in different proceedings based on the language of the particular order. There is thus no uniform rule that dual-stenciled pipe is always treated as line pipe and never as standard pipe. As long as the CIT was considering (k)(1) factors, its refusal to also consider this evidence was in error.

### D. The ITC Made A Valid Injury Determination Based On The Scope Of The Investigation

The CIT also questioned whether the ITC's injury determination would cover dual-stenciled pipe. *Saha Thai I*, 547 F. Supp. 3d at 1296, Appx00042. In doing so, the CIT again conflates dual-stenciled pipe and line pipe and adds that, because Thailand did not produce any line pipe at the time of the investigation, the ITC could not have examined imports of dual-stenciled pipe. *Id.*

As discussed above, it is not the case that dual-stenciled pipe can only be considered line pipe. This Court has also held that the ITC need not reference a specific product in its injury analysis to have that product covered by the scope of an order, so long as that product is covered by the physical description of the merchandise in the scope of the order. *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 961 F. Supp. 2d 1291, 1299 (Ct. Int'l Trade 2014), *aff'd,* 776 F.3d 1351, 1355-56 (Fed. Cir. 2015). Any dual-stenciled pipe imported from Thailand in the relevant sizes would be produced in accordance with the industry specifications for standard pipe and would therefore possess the physical characteristics identified in the scope, and thus would be covered by the physical description of the merchandise in the scope of the order.

The CIT also cites the ITC's decision to consider standard pipe and line pipe as separate like products as another reason that dual-stenciled pipe cannot be subject to the Order. *Saha Thai I*, 547 F. Supp. 3d at 1296, Appx00042. Again,

however, the CIT's concern stems from its mistaken conclusion that dual-stenciled pipe can only be line pipe, and ignores that a dual-stenciled pipe entering the United States would need to also be certified as standard pipe and match the physical characteristics of subject pipe set forth in the scope – thus matching the pipes that were the subject of the ITC's original inquiry. *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 961 F. Supp. 2d 1291, 1299 (Ct. Int'l Trade 2014), aff'd, 776 F.3d 1351, 1355-56 (Fed. Cir. 2015).

It is also well settled that Commerce's definition of the scope and the ITC's determination of the domestic like product are distinct inquiries. *See Torrington Co. v. United States*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) ("It is settled law that the Commission's like product determination is separate and distinct from the ITA's determination of the class or kind of merchandise."); *see also Allegheny Ludlum Corp. v. United States*, 116 F. Supp.2d 1276, 1297 (Ct. Int'l Trade 2000) ("Although the ITC must accept Commerce's determination as to the scope of the imported merchandise found to be subsidized or sold at less than fair value, the Commission determines what domestic product or products is like the imported articles Commerce identified."); *see also Hosiden Corp. v. United States*, 85 F.3d 1561, 1567 (Fed. Cir. 1996) ("Both the Court of International Trade and this court have long recognized that for injury determinations the 'class or kind' and 'like product' determinations required by the statute need not be consistent.").

For all of these reasons, this Court should reject the CIT's conclusion that dual-stenciled pipe were not the subject of an appropriate injury inquiry and therefore cannot be subject to the Order.

## IX. CONCLUSION

For the foregoing reasons, Defendant-Appellant requests that this Court reverse the judgment of the CIT that standard pipe also stenciled as line pipe is not covered by the scope of the Order on Circular Welded Pipe from Thailand.

Respectfully submitted:

*/s/* Roger B. Schagrin, Esq.
Roger B. Schagrin, Esq.
Christopher T. Cloutier, Esq.
Luke A. Meisner, Esq.
**SCHAGRIN ASSOCIATES**
900 7th Street NW #500
Washington, DC 20001
(202) 223-1700

*Counsel to Wheatland Tube Company*

Dated: November 21, 2022

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-2181

**Short Case Caption:** Saha Thai Steel Pipe Public Company Limited v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,068 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 11/21/2022

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

Save for Filing

Saha Thai Steel Pipe Public Company Limited v. U.S.,
CAFC Ct. No. 2022-2181

# ADDENDA

| No. | Title | Public/BPI | Index No. (PR/CR) | Appx Pages |
|---|---|---|---|---|
| 1 | Saha Thai Steel Pipe Public Company Limited v. U.S., CIT Ct. No. 20-0133 (Aug. 25, 2022); Judgment for Slip-Op. 22-99 | Public | | Appx00001-Appx00002 |
| 2 | Saha Thai Steel Pipe Public Company Limited v. U.S., CIT Ct. No. 20-0133, Slip-Op. 22-99 (Aug. 25, 2022) | Public | | Appx00003-Appx00028 |
| 3 | Saha Thai Steel Pipe Public Company, Ltd. v. United States, 547 F.Supp.3d 1278 (Oct. 6, 2021) | Public | | Appx00029-Appx00045 |
| 4 | USDOC Final Results of Redetermination Pursuant to Court Remand, Slip Op. 21-135 (Jan. 6, 2022) | Public | | Appx00046-Appx00073 |
| 5 | Memo from USDOC to DAS for Operations Pertaining to Interested Parties Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe (June 30, 2020) | Public | 76 | Appx40762-40780 |

# Addendum 1

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY, LTD.,<br>*Plaintiff*,<br>v.<br>UNITED STATES,<br>*Defendant*,<br>and<br>WHEATLAND TUBE COMPANY,<br>*Defendant-Intervenor*. | Before: Stephen Alexander Vaden, Judge<br>Court No. 1:20-cv-00133 |

**JUDGMENT**

In accordance with the Opinion issued this day, and after due deliberation, it is hereby

**ORDERED** that the original scope ruling, *see Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe* (June 30, 2020), J.A. at 2,041–59, ECF No. 42, is sustained except for the matters remanded by the Court's order of October 6, 2021, ECF No. 54, *see Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (CIT 2021); and it is further

**ORDERED** that the U.S. Department of Commerce's Amended Final Results of Redetermination Pursuant to Court Remand, ECF No. 69, in the final scope ruling on the antidumping duty order for steel pipe from Thailand, *see Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8,341 (Dep't of Commerce Mar. 11, 1986), is **SUSTAINED** as supported by substantial evidence and in compliance with the Court's opinion in *Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (CIT 2021); and it is further

**ORDERED** that judgment is entered for the Defendant.

**SO ORDERED.**

/s/ Stephen Alexander Vaden
Judge

Dated: August 25, 2022
New York, New York

# Addendum 2

Slip Op. No. 22-99

**UNITED STATES COURT OF INTERNATIONAL TRADE**

SAHA THAI STEEL PIPE PUBLIC COMPANY, LTD.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant,*

and

WHEATLAND TUBE COMPANY,

*Defendant-Intervenor*.

Before: Stephen Alexander Vaden, Judge

Court No. 1:20-cv-00133

**OPINION**

[Sustaining Commerce's remand redetermination results].

Dated: August 25, 2022

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Plaintiff. With him on the brief was *James C. Beaty*.

*Claudia Burke* and *In K. Cho*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With them on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, and *JonZachary Forbes*, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Luke A. Meisner*, Schagrin Associates, of Washington, DC, for Defendant-Intervenor. With him on the brief were *Roger B. Schagrin* and *Kelsey M. Rule*.

**Vaden, Judge:** Before the Court is the U.S. Department of Commerce's (Commerce) remand redetermination in the scope inquiry examining the 1986 antidumping duty order (Thailand Order). The Thailand Order concerns circular welded carbon steel pipes and tubes (CWP) imported from Thailand (Case No. A-549-502), filed pursuant to the Court's remand order in *Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 547 F. Supp. 3d 1278 (CIT 2021) (*Saha Thai I*). *See* Final Results of Redetermination Pursuant to Ct. Remand, Oct. 16, 2021, ECF No. 58 (Remand Results). For the following reasons, the Court sustains Commerce's remand redetermination.

**BACKGROUND**

The Court presumes familiarity with the facts of this case as set out in its previous opinion ordering a remand of this scope inquiry to Commerce and now recounts those facts relevant to the review of the Remand Results.

The order underlying the scope inquiry in this case traces its roots to 1985, when the domestic industry filed a petition requesting that Commerce examine the injury caused by steel pipe imports from Thailand. J.A. at 1,090, ECF No. 42. In the initial investigation leading to those final determinations, petitioners requested the imposition of antidumping duties on standard and line pipes but later submitted a letter withdrawing their petition "insofar as [it] concern[ed] line pipe, TSUS numbers 610.3208 and 3209." *Saha Thai I*, 547 F. Supp. 3d at 1282; *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1,781, ECF

Case: 22-2181 Document: 14 Page: 54 Filed: 12/02/2022



No. 42. The original petitioners, which included Wheatland Tube, acknowledged that no line pipe — mono or dual-stenciled — was being produced in Thailand at the time. J.A. at 1,781; *see also* Tr. of Oral Argument (First Tr.) 6:2–7:3 (July 15, 2021), ECF No. 53. Thus, the petitioners had no information to submit in response to Commerce's questions regarding Thai line pipe's potential to harm domestic manufacturing. *See* AD & CVD Investigations of Pipes and Tubes from Thailand & Venezuela, J.A. at 1,753 (requesting that petitioners provide "[d]ocumentation which demonstrates that line pipe is manufactured in Thailand" and "[d]ocumentation which supports the allegation that line pipe from Thailand is being sold at less than fair value.").

In January 1986, Commerce issued a final determination that standard pipe from Thailand was being, or was likely to be, sold in the United States at less than fair value. *Antidumping: Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 3,384 (Jan. 27, 1986), J.A. at 1,216. The International Trade Commission (ITC) released its final material injury determination and report the next month. *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986) (ITC Final Determination), J.A. at 1,221. In its report, the ITC distinguished the injury caused by standard pipe from Thailand from the injury caused by standard and line pipe from Turkey, making no material injury determination for line pipe, dual-stenciled or otherwise, from Thailand. *Id.*

The contents and scope described by these final determinations are discussed at length in *Saha Thai I*. In this subsequent adjudication, it suffices to say that dual-stenciled line pipe was never explicitly included in the scope language of either the antidumping determination or material injury determination. *Saha Thai I*, 547 F. Supp. 3d at 1282–84. After Defendant-Intervenor Wheatland Tube and other petitioners requested a determination of whether Saha Thai's sales of dual-stenciled pipe constituted a "minor alteration" of the original product, Commerce instead self-initiated a scope inquiry. *Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe*, J.A. at 1,800; *see* 19 U.S.C. § 1677j(c) (providing that merchandise "altered in form or appearance in minor respects" should still be considered within the scope of the relevant antidumping order). It ultimately issued a Final Scope Ruling finding that dual-stenciled line pipe is within the scope of the Thailand Order on June 30, 2020. *See* Final Scope Ruling, J.A. at 2,041. On July 17, 2020, Saha Thai sued Commerce, challenging the scope decision. ECF No. 6.

The Court issued a decision in *Saha Thai I* on October 6, 2021. *Saha Thai I*, 547 F. Supp. 3d 1278. In that opinion, the Court found that "Commerce's determination that dual-stenciled pipe is covered by the Thailand Order [wa]s not supported by substantial evidence . . . [and] that Commerce's Final Scope Ruling constitute[d] an unlawful expansion of the scope of the underlying order." *Id.* The Court's decision was based on the undisputed facts that (1) Wheatland Tube explicitly

withdrew line pipe from Commerce's consideration because Thailand did not manufacture line or dual-stenciled pipe in 1985–86 when the Thailand Order was finalized and (2) the ITC made no material injury determination for line pipe from Thailand. *Id.* at 1299. As a result, the Court remanded the Final Scope Ruling back to Commerce, instructing Commerce to render a redetermination consistent with the Court's opinion. *Id.* at 1281.

Commerce has now undertaken a redetermination following the instructions provided by the Court and brought forward a renewed statement of its position. To assist the parties, the Court will briefly summarize both the process undertaken by Commerce and the arguments it has articulated. Commerce filed its Remand Results on January 4, 2022. ECF No. 58. Commerce reconsidered record sources "in light of the reasoning, analysis, and conclusions of the Court," and determined, under respectful protest,[1] that "dual-stenciled standard pipe and line pipe are **not** covered by the scope of the *Thailand Order*." Remand Results at 1–2, ECF No. 58 (emphasis added). In the original Remand Results, Commerce raised four concerns with the decision it felt it must return based on the Court's opinion. *Id.* at 13–20. First, Commerce takes issue with the Court's reliance on what Commerce asserts are "[e]xtra-[r]ecord [s]ources." *Id.* at 14–15. The disputed sources are the *ITC First Sunset Final Report* (*First Sunset Review*); the *ITC Second Sunset Final Report*

[1] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376–77 (Fed. Cir. 2003) (holding that, when Commerce takes a position "under protest," it preserves its right to appeal).

(*Second Sunset Review*); and an executive order, *Presidential Proclamation 7274*, discussed in those reports. *Id.* at 14–15. Second, Commerce claims that the Court misunderstood Commerce's interpretation of 19 C.F.R. § 351.225(k)(1) and the extent to which Commerce "may (and frequently does)" find the text and materials of other petitions or orders informative in its scope analysis, as long as those materials are placed on the record. *Id.* at 16. Third, Commerce believes that the Court is mistaken about the ITC's findings. *Id.* at 16. It adduces this conclusion by noting, once again, that the Commission did make an injury determination for standard pipe, that dual-stenciled pipe is certified as standard pipe, and that Commerce understands Federal Circuit precedent to impose no requirement that the ITC analyze a particular product for that product to be covered by the scope of the order. *Id.* at 16–18. Fourth and finally, Commerce argues that the Court failed to give proper weight to some of the limiting context surrounding statements in the *ITC Third Sunset Final Report* (*Third Sunset Review*) and *ITC Fourth Sunset Final Report* (*Fourth Sunset Review*). *Id.* at 18–20. Commerce later amended the Remand Results to exclude the "extraneous legal argument[s]" detailing those four concerns but left the scope decision in the Remand Results unchanged. Amended Remand Results, ECF No. 69.

The parties disagree stridently regarding Commerce's Remand Results. On February 3, 2022, Saha Thai filed comments encouraging the Court to sustain the new outcome. Pl.'s Comments in Support of Remand Redetermination Results, ECF No. 61. On February 18, 2022, the Government invited the Court to sustain the

Remand Results because the Results complied with the Court's remand order, fulfilling Commerce's legal obligations in every respect. Def.'s Resp. to Comments on Remand Redetermination, ECF No. 63. Wheatland Tube, however, objected to the logic and outcome of the Remand Results. *See* Def.-Int.'s Comments on Remand Redetermination (Def.-Int.'s Comments), ECF No. 62. It cited four reasons that largely mirror the concerns expressed by Commerce: (1) the Remand Results are not supported by evidence on the record, instead impermissibly relying on information outside the record; (2) the Remand Results ignore relevant information on the record; (3) the Remand Results are based on a misunderstanding of the ITC's final determination in the original investigation; and (4) the Remand Results fail to properly account for all of the ITC's statements in the *Third* and *Fourth Sunset Reviews*. *See id.* For those reasons, Wheatland Tube again asks this Court to remand the scope inquiry for Commerce to reconsider its determination and find that dual-stenciled pipe is covered by the scope of the order. *Id.* at 9.

The Court held oral argument on May 17, 2022. ECF No. 72. At oral argument, both Commerce and Wheatland Tube insisted that, regardless of whether a party failed to object to the mention of extra-record evidence before the Court, Commerce and the Court would still be barred from considering such evidence. *See* Transcript of Second Oral Argument (Second Tr.) 48:22–24, 49:20–21, ECF No. 73 (Commerce counsel stating that "just because you talk about something in a proceeding doesn't mean that . . . the actual document is on the record." Commerce

counsel elaborated, "I don't' [*sic*] think [Wheatland Tube] can waive the question of what's on the record."); Second Tr. 43:15–16 (counsel for Wheatland Tube arguing that "just because we failed at that time to object does not expand the universe of the record"). Ultimately, Commerce asserted that the discussion of what was or was not before the Court on the record initially was largely academic, as the issue was "overtaken by events" and Commerce's subsequent Remand Results. Second Tr. 74:18.

## JURISDICTION AND STANDARD OF REVIEW

As in *Saha Thai I*, the Court has jurisdiction over Plaintiff's challenge to the Scope Ruling under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting scope determinations described in an antidumping order. The Court will sustain Commerce's remand redetermination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *6 (CIT Mar. 23, 2021). Additionally, "[t]he results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259

(CIT 2014) (quoting *Nakornthai Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303, 1306 (CIT 2008)).

## DISCUSSION

### I. Summary

The facts support Commerce's Remand Results. No line pipe was manufactured in Thailand when Commerce undertook its initial investigation almost forty years ago, and the ITC's report made no harm finding for line or dual-stenciled pipe from Thailand. Moreover, petitioners explicitly withdrew their petition as it pertained to line pipe and have admitted that their withdrawal letter specifically covered the categories under which *all* dual-stenciled line pipe would have been imported. First Tr. 7:8–22. These facts lead to the conclusion that the scope of the Thailand Order cannot now be read to include dual-stenciled line pipe. Despite these facts, Commerce (in its respectful protest) and Wheatland Tube argue that the procedural record in other cases involving other countries overcomes the procedural record in this case; they object that Commerce's new results both rely on evidence outside the record and ignore evidence on the record. Remand Results at 14–16, ECF No. 58; Def.-Int.'s Comments at 2, 4, ECF No. 62. The record does not support these contentions, and the objections to Commerce's and the Court's evaluation of sources are unavailing.

The following facts are not in dispute. First, the scope inquiry at issue began as a circumvention ruling request in which Wheatland Tube alleged that Saha Thai

"was circumventing the Thailand Order through minor alterations to Saha's merchandise." *Saha Thai I*, 547 F. Supp. 3d at 1287; *Circumvention Ruling Request*, J.A. at 1,807. Second, instead of undertaking the circumvention process, Commerce self-initiated a scope inquiry. *Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe* (Nov. 22, 2019), J.A. at 1,800. Third, in that scope ruling, Commerce found that the scope of the Thailand Order included a product that was explicitly withdrawn from consideration in 1985 without citing to any change in the record of the Thailand Order but by instead citing to orders governing the same product in other countries. *See generally Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe* (June 30, 2020), J.A. at 2,041.

The record simply does not support Commerce's original scope results. "[W]hile Commerce has 'substantial freedom to interpret and clarify its antidumping [and countervailing duty] orders,' it may not do so in a way that changes them." *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020) (internal citations omitted) (alteration in original). However, the record does support Commerce's new results. The concerns raised by Commerce and Wheatland Tube are ultimately unpersuasive. Commerce's new results are sustained.

## II. Forfeiture

Wheatland Tube objects to three documents the Court and Commerce consulted in the Remand Order and Remand Results: the *First Sunset Review*, the *Second Sunset Review*, and *Presidential Proclamation 7274*. Def.-Int.'s Comments at 2–4, ECF No. 62. Wheatland Tube's objections, however, are forfeited. Saha Thai referenced the documents in question in both its briefing before the agency and the Court, yet Wheatland Tube and Commerce failed to object during any stage of the prior proceedings. They have therefore forfeited their ability to contest Saha Thai's citation to those documents.

Like the Supreme Court and the Federal Circuit, this Court distinguishes waiver and forfeiture. Forfeiture is "the failure to make the timely assertion of a right," whereas waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *In re Google Tech. Holdings*, 980 F.3d 858, 862 (Fed. Cir. 2020). When a case is appealed from a previous proceeding, each party has a responsibility to assert all its relevant arguments; if the case returns to an appellate court after remand, any issues not raised previously are foreclosed, as demonstrated in *Vivint v. Alarm.com Inc.*, 856 F. App'x 300 (Fed. Cir. 2021). In *Vivint*, a home security company appealed initial unpatentability determinations from the Patent Board. *Id.* at 302. The Federal Circuit remanded the determination on various grounds; and the Board rendered a new decision, which Vivint likewise appealed. *Id.*

Six weeks after Vivint filed its second appeal, the Federal Circuit issued a decision in another case, finding that the appointment of certain Administrative Patent Judges was unconstitutional. *Id.* at 302–03. Vivint then moved to vacate the Board's remand decision, arguing that the judges who decided the remand results had been unconstitutionally appointed. *Id.* However, the Federal Circuit "found that Vivint had forfeited its constitutional argument by failing to raise an Appointments Clause challenge in its first appeal." *Id.* at 303. The court explained that "it was Vivint's obligation to raise its Appointments Clause challenge before the first court who could have provided it relief" and that "[o]nce its first appeal was decided, all matters which could have been raised then—but were not—were foreclosed. The remand after that first appeal was on one very narrow ground, and that ground is all that remains to be litigated in this subsequent appeal." *Id.* at 304; *accord Customedia Techs., LLC v. Dish Network Corp.*, 941 F.3d 1174 (Fed. Cir. 2019); *NEXTEEL Co., Ltd. v. United States*, 461 F. Supp. 3d 1336, 1343–46 (CIT 2020) (holding arguments that could have been raised during proceedings in front of Commerce, but were not, waived and refusing to consider them on appeal); *see also United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328, 1336 (Fed. Cir. 2013) (affirming a CIT decision that denied a party's post-judgment attempt to add an argument not raised in initial briefing because the argument was forfeited). Failing to raise an argument in a previous proceeding thus forfeits the argument after the matter has been remanded and is back on appeal.

This is precisely what occurred here. In Saha Thai's opening Motion for Judgment on the Agency Record, it repeatedly refers to "the ITC's four sunset reviews" collectively. Pl.'s Mot. for J. on the Agency R. at 36, ECF No. 26 (Pl.'s Mot.); *id.* at 2 ("the ITC has repeatedly confirmed in sunset reviews"); *id.* at 39 ("the ITC's determination in the underlying investigation, and the following sunset reviews"). It was not a new argument. Saha Thai had done the same in its briefing before Commerce. *See, e.g.*, Saha Thai Steel's Comments on Scope Inquiry, J.A. at 1,930 (discussing the "determinations in the original investigation in 1985 and in *all subsequent sunset reviews*") (emphasis added); Saha Thai Steel's Scope Inquiry Case Brief, J.A. at 1,992–93 (stating in a bolded section heading that "ITC Sunset Reviews of The Very CWP from Thailand AD Order Confirm That All Line Pipe – Including Dual-Stencil Pipe – Is Excluded From The Scope Without Qualification"; stating separately in text that "[t]he ITC's explanation in the most recent sunset review (i.e., the fourth review) is unsurprising as it is *consistent with the previous sunset reviews*.") (emphasis added); Wheatland Tube's Rebuttal Brief, J.A. at 2,015 (referring to the first sunset review as "the 2000 sunset review" and citing to sections of Saha Thai's briefing before the agency that refer to all four sunset reviews). Neither the Government nor Wheatland Tube objected to Saha Thai's references to and reliance on all four sunset reviews. *See* Def.'s Resp. to Pl.'s Mot., ECF No. 37 (Def.'s Resp.); Def.-Int.'s Resp. in Opposition to Pl.'s Mot., ECF No. 34 (Wheatland Tube Resp.). Instead, they engaged with the argument on the merits and argued that the sunset

reviews supported their position. Wheatland Tube Resp. at 16, ECF No. 34 ("The records of the initial investigation and five-year sunset reviews before the Commission further support Commerce's conclusion that standard pipe which is dual-stenciled as line pipe is included within the scope of the order."); Def.'s Resp. at 20–23, ECF No. 37 (discussing in detail Saha Thai's arguments regarding the sunset reviews and advancing opposing arguments, but not objecting to Saha Thai's references to all the sunset reviews collectively). Neither the Government nor Wheatland Tube made any distinction about the applicability of the first and second reviews as opposed to the third and fourth.[2] *See* Def.'s Resp., ECF No. 37 (silent on the issue); Wheatland Tube Resp., ECF No. 34 (same).

Saha Thai's arguments were fully briefed and debated before the Court, including with oral argument,[3] when the Court issued its remand opinion in *Saha Thai I*. 547 F. Supp. 3d 1278 (CIT 2021). Like Vivint, Wheatland Tube had an opportunity during the Court's initial review to raise the argument it now propounds

[2] Furthermore, Saha Thai specifically cites to a prehearing brief filed by Wheatland Tube in the *First Sunset Review* proceedings, yet another connection with and reference to the *First Sunset Review*. Pl.'s Mot. at 18–19, ECF No. 26 ("Petitioner Wheatland Tube itself in a subsequent sunset review of the AD order . . . ."). All agree that the brief is part of the record, but Saha Thai's references to it also indicate the importance of the *First Sunset Review*. When responding to Saha Thai's characterization of Wheatland Tube's brief in the *First Sunset Review*, neither Wheatland Tube nor Commerce objected. Wheatland Tube Resp. at 19–20, ECF No. 34; Def.'s Resp. at 23, ECF No. 37. Instead, both Commerce and Wheatland Tube simply respond to Saha Thai's arguments and advance opposing points. *Id.*

[3] At the first oral argument, the Court repeatedly discussed language from the *First Sunset Review*, *Second Sunset Review*, and *Presidential Proclamation 7274*. Neither Wheatland Tube nor Commerce objected to those materials as constituting extra-record evidence. *See* First Tr. 34:2–4 (mentioning that "in that first sunset review . . . the International Trade Commission discussed the different products" and then going on to cite specific page numbers in the *First Sunset Review*); *id.* at 34:22–23 ("Fast-forward to the second review, which took place and was issued in July of 2006"); *id.* at 34:17–18 ("President Clinton's proclamation").

— that the *First* and *Second Sunset Reviews* are not on the record. Despite Saha Thai's referring repeatedly to all "four sunset reviews," Wheatland Tube made no such objection. *See* Wheatland Tube Resp., ECF No. 34. As with Vivint, "[o]nce its first appeal was decided, all matters which could have been raised then—but were not—[a]re foreclosed." 856 F. App'x at 304. The case is now before the CIT after a remand decision, and Wheatland Tube's challenge to the record is forfeited because of its failure to raise the challenge during the Court's first consideration of this case.

## III. Record Evidence

Even if Commerce and Wheatland Tube did not forfeit these objections, the first two *Sunset Reviews* and *Presidential Proclamation 7274* were fairly construed as part of the administrative record.

To dispense with *Presidential Proclamation 7274*: The Court must take judicial notice of it, and its inclusion in the record is therefore proper. 44 U.S.C. § 1507 ("The contents of the Federal Register *shall* be judicially noticed.") (emphasis added); *To Facilitate Positive Adjustment to Competition from Imports of Certain Circular Welded Carbon Quality Line Pipe*, 65 Fed. Reg. 9,193 (Feb. 23, 2000) (*Presidential Proclamation 7274*); *see also Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 940 (Fed. Cir. 1990) ("The short answer . . . is that [the document] is on the record, having been published in the Federal Register."); *Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1151 (Fed. Cir. 2021) (citing various authorities for the proposition that judicial notice of "government

documents . . . 'whose accuracy cannot reasonably be questioned'" is appropriate and granting a motion to take judicial notice of documents not on the agency record and consider constitutional challenges raised relating to them). *Presidential Proclamation 7274* is also cited and discussed in the *First* and *Second Sunset Reviews*. *First Sunset Review* at 30 n.186; *Second Sunset Review* at Overview-5 n.16. Although the first two *Sunset Reviews* are not published in the Federal Register, they are "government documents . . . 'whose accuracy cannot reasonably be questioned'" so that the Court may take judicial notice of them. *Compare* 44 U.S.C. § 1507 ("The contents of the Federal Register *shall* be judicially noticed."), *with Mobility Workx*, 15 F.4th at 1151 n.1 (noting that "this court *could* take judicial notice of the existence of a trademark") (emphasis added).

The first two *Sunset Reviews* and their discussion of *Presidential Proclamation 7274* are also included in the record because "the record is not limited to documents 'relied on or used' by the agency . . . the agency cannot ignore relevant information which is before it, and the reviewing court must be in a position to determine if it ha[s] done so." *Floral Trade Council v. United States*, 709 F. Supp. 229, 230 (CIT 1989). Contrary to Commerce's and Wheatland Tube's protestations, here "the dispute may be resolved by applying some common sense." *Id.* The Court need only ask "whether the decision can be reviewed properly without" the first two *Sunset Reviews*. *Id.* It cannot. Those two documents are so integral to Commerce's analysis that not only are they "sufficiently intertwined with the relevant inquiry," *id.*, but

also "[a]ll of the information in [them] was in front of Commerce during the investigation, regardless of whether or not Commerce chose to ignore it." *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp. 485, 487 (CIT 1997).

Because the later reviews constantly reference the earlier reviews, their inclusion in the record is necessary for judicial review. Here, no party disputes that the *Third* and *Fourth Sunset Reviews* are part of even the most restrictive "four-corners" understanding of the administrative record. *See* Second Tr. 17:11–13 (The Court: "So everyone agrees that -- I assume, if anyone doesn't, please speak now -- that the third and fourth reviews are on the administrative record." No party objected, and counsel for Saha Thai and Wheatland Tube answered in the affirmative. *See id.* at 17:15, 54:13–14.). The *Third Review* cites the *First Review* forty-three times; the *Second Review* fifty times. *See Third Sunset Review*. The *Fourth Review* cites the *First Review* forty times; the *Second Review* forty-four times. *See Fourth Sunset Review*. In total, the latter two *Reviews* cite the former two *Reviews* an astounding one hundred seventy-seven times. Additionally, the specific portions of the *First Review* and the *Second Review* this Court cited in *Saha Thai I* are all cited by the *Third* and *Fourth Review*. *See Saha Thai I*, 547 F. Supp. 3d at 1285–87 (citing to portions of the *First Review* cited in footnotes 49 and 77 of the *Third Review*,

portions of the *Second Review* cited to in footnote 81 of the *Third Review* and footnote 54 of the *Fourth Review*).[4]

The Court here is on solid ground to consider such pervasively referenced documents from prior investigations of the same order as part of the administrative record. *See Floral Trade Council*, 709 F. Supp. at 230–31; *see also, e.g.*, *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 27 C.I.T. 1827, 1854 n.40 (2003) (citing *Floral Trade Council* for the proposition that a document that "was before Commerce" during an investigation "may fairly be considered part of the record," especially when the "the issue was argued before this court in the parties' briefs"); *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1352 n.11 (CIT 2003) (permitting Commerce's use of evidence a party decried as not in the record and noting three compelling reasons: (1) the disputed document was in front of Commerce during the investigation, (2) it was cited by a document Commerce created during the investigation, and (3) the disputed document was in the public record); *AG der Dillinger Huttenwerke v. United States*, 193 F. Supp. 2d 1339, 1350 (CIT 2002) (declaring a document from a prior sunset review part of the record, despite Commerce having rejected its submission as untimely); *Intrepid v. Int'l Trade Admin.*, 787 F. Supp. 227, 229 (CIT 1992) (applying the same "sufficiently intertwined" standard to Commerce's concurrent reviews of AD and CVD scopes).

[4] The Court additionally notes that the *Third Review* cites the entirety of the *Second Review* twice, in footnotes 12 and 31. Although the *Second Review's* Overview is not directly cited, it is obviously included in the *Third Review*'s citation of the entire *Second Review*.

Separate from the frequent references that the *Third* and *Fourth Sunset Reviews* make to the *First* and *Second Reviews*, Saha Thai referred to them repeatedly in its briefing to Commerce. *See, e.g.*, *AG der Dillinger Huttenwerke*, 193 F. Supp. 2d at 1350 (finding that a document was part of the record where "the issue [it presented] was raised with sufficient clarity to put Commerce reasonably on notice in a timely manner"). For example, Saha Thai wrote that "based on the Commission's determinations in the original investigation in 1985 and in *all subsequent sunset reviews*, it is clear that the Commission's position is that line pipe and dual stenciled pipe are not included within the scope of the Order." J.A. at 1,930 (emphasis added). All the parties discuss and quote language from a brief that Wheatland Tube filed in the *First Sunset Review* proceeding, demonstrating a familiarity with that proceeding. *See* J.A. at 1,913–14, 1,920, 2,015. The relevance of the first two *Sunset Reviews* to the scope inquiry hardly comes as a surprise. Moreover, those reviews specifically analyze the language and scope of the antidumping orders: The *First Sunset Review* discusses "the express exclusion of line and dual-stenciled pipe from relevant antidumping orders," and the *Second Sunset Review* likewise analyzes those distinctions. *Saha Thai I*, 547 F. Supp. 3d at 1285–86 (citing *First Sunset Review* at 13 n.53; *Second Sunset Review* at 11 n.55). Because Saha Thai repeatedly referenced all four sunset reviews and because the reviews themselves cross-reference each other nearly two hundred times, all four *Reviews* are "sufficiently intertwined with the relevant inquiry" so that "the decision can[not] be reviewed [properly] without" them.

*Floral Trade Council*, 709 F. Supp. at 230. They are fairly included in the record, and Commerce may not choose to ignore them.[5] *Id.*

In fact, because "Commerce chose to ignore" them, *F. Lli De Cecco*, 980 F. Supp. at 487, it was in dereliction of its duty to review all of the materials listed under 19 C.F.R. § 351.225(k)(1) (June 17, 2020).[6] Counsel for Saha Thai and Wheatland Tube agree that sunset reviews are (k)(1) materials, meaning Commerce was obligated, by regulation, to review them. *See* Second Tr. 14:21–23, 59:20–25; *Quiedan Co. v. United States*, 294 F. Supp. 3d 1345 (CIT 2018) (including sunset reviews among the (k)(1) materials), *aff'd*, 927 F.3d 1328 (Fed. Cir. 2019). The argument Wheatland Tube is forced to advance here is that the same documents Commerce is required by regulation to have considered in making its determination cannot be referenced by the Court in deciding if substantial evidence supports Commerce's determination.[7]

Saha Thai cited all four sunset reviews to Commerce. Commerce chose to rely only on the final two reviews. However, those two reviews pervasively cite the *First*

---

[5] This is a position with which Commerce may now appear to agree, given its statement at the most recent oral argument that "Commerce had reconsidered the issue and reconsidered these documents. They are all on the record." Second Tr. 74:19–20.

[6] 19 C.F.R. § 351.225(k)(1)(i) currently says that certain sources "may be taken into account" by the Secretary. At the time of the agency's scope determination, however, the applicable regulation said the sources "*will* be taken into account." *See* 19 C.F.R. § 351.225(k)(1)(i) (June 17, 2020) (emphasis added); *Saha Thai I*, 547 F. Supp. 3d at 1289–91.

[7] Commerce appears to disagree with Wheatland Tube and agree with the Court on this issue, as it states in the Final Scope Ruling. *See* J.A. at 2,046, ECF No. 42 ("Importantly, the Court of International Trade (CIT) has stated that 'when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but *must consider those sources*.'") (emphasis added). Commerce further quoted the CIT, noting that "[w]hether the order is ambiguous or not, Commerce's regulations are unambiguous–it '*will* take into account' the (k)(1) criteria in conducting a scope determination. No case has invalidated this regulatory requirement." *Id.* (alteration and emphasis in original).

and *Second Review* as well as *Presidential Proclamation 7274*. Commerce cannot choose to ignore information that is (1) cited to it, (2) part of the (k)(1) materials, and (3) "sufficiently intertwined with the relevant inquiry." *See Floral Trade Council*, 709 F. Supp. at 230–31 (holding documents from earlier investigations that become "sufficiently connected to the current investigation [are] to be considered to be before the agency for purposes of the decision at issue"); *accord Zhejiang Native Produce*, 27 C.I.T. at 1854 n.40. *Cf.* 19 C.F.R. § 351.104(a) ("The Secretary will maintain an official record of each antidumping and countervailing duty proceeding. The Secretary will include in the official record all factual information, written argument, or other material developed by, presented to, *or obtained by the Secretary* during the course of a proceeding that pertains to the proceeding.") (emphasis added). Commerce therefore properly considered these documents in its remand redetermination.

## IV. ITC Statements

Commerce and Wheatland Tube finally dispute the Court's characterization of the ITC's final determination in the original investigation, as well as the Court's characterization of the ITC's statements in the *Third* and *Fourth Sunset Reviews*. Def.-Int.'s Comments at 5, ECF No. 62; Remand Results at 18–20. But their arguments are based on one central conceit: that the ITC does not understand the scope of the orders it reviews. The ITC has spoken with one consistent voice, repeatedly emphasizing that dual-stenciled line pipe is not within the scope of the

Thailand Order. The primary problem in this case is not a tricky comparison between the product characteristics of standard and dual or mono-stenciled line pipe;[8] rather, the primary problem presented by this case is that Commerce wishes to blind itself to the ITC's repeated pronouncements. Because the Court must "hold unlawful any determination, finding, or conclusion . . . unsupported by substantial evidence on the record," 19 U.S.C. § 1516a(b)(1)(B)(i), and because that includes evidence that "fairly detracts" from Commerce's conclusions, the Court cannot allow Commerce to do so. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

A reference to the language in the *First* and *Second Sunset Reviews* demonstrates why Wheatland Tube and Commerce are fighting so vigorously to keep those statements out of the record. In those reviews, the ITC consistently identifies dual-stenciled pipe as line pipe, not standard pipe. The *First Sunset Review* describes "dual-stenciled line pipe" as "pipe that meets both line pipe and CWP specifications but enters as line pipe for customs purposes." *See Certain Pipe and Tube from*

[8] Wheatland Tube argues that whether or not line pipe was produced in Thailand when the ITC issued its initial injury determination is immaterial because 19 U.S.C. § 1677j provides a separate avenue to cover dual-stenciled line pipe. Def.-Int.'s Comments at 7, ECF No. 62. But neither 19 U.S.C. § 1677j(c) nor § 1677j(d) change the analysis. Commerce had the opportunity to investigate Saha Thai's products for minor alterations under § 1677j(c) and declined to do so. *Saha Thai I*, 547 F. Supp. 3d at 1286–87. Wheatland Tube did not appeal Commerce's denial of its petition to conduct a minor alteration analysis. Section (d) is also inapplicable; dual-stenciled and line pipe are not "later-developed" merchandise. Rather, line pipe was initially included in the original petition and was voluntarily withdrawn by petitioners after they determined that it was not being produced in Thailand at the time. *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1,781–82. Wheatland Tube also did not argue before Commerce that dual-stenciled line pipe constituted later developed merchandise. *See* Wheatland Tube's Scope Comments, J.A. at 1,002 (no discussion of line pipe as later developed merchandise); Wheatland Tube's Case Br., J.A. at 1,962 (same); Wheatland Tube's Rebuttal Br. at 10, J.A. at 2,036 (same).

*Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532–534, 536, and 537 (*First Sunset Review*), USITC Pub. 3316 at 6 (July 2000); *see also Saha Thai I*, 547 F. Supp. 3d at 1285. The *First Sunset Review* explains that, when President Clinton imposed temporary safeguard duties on line pipe, dual-stenciled line pipe was included in the safeguard duties, *but standard pipe was not*. *First Sunset Review* at 28 ("In the case of Korea . . . until safeguard duties on line pipe went into effect on March 1, 2000, they enjoyed unlimited access to the U.S. CWP market by exporting dual-stenciled line pipe"); *see also Saha Thai I*, 547 F. Supp. 3d at 1297. The *Second Sunset Review* similarly stated that President Clinton's safeguard duties were imposed on "line pipe imports . . . including 'dual-stenciled' pipe." *See Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 409, 410, 532–534, and 536 (*Second Sunset Review*), USITC Pub. 3867 at 4–5 (July 2006) at Overview-5 n.16; *see also Saha Thai I*, 547 F. Supp. 3d at 1286, 1297 (elaborating that "dual-stenciled pipe *was* treated as falling under the safeguard duties imposed by President Clinton, even though the proclamation only mentions 'line pipe.'") (emphasis in original). If dual-stenciled line pipe were standard pipe, as Wheatland Tube claims, then it would not have been subject to President Clinton's safeguard tariffs, which solely applied to "line pipe." For Wheatland Tube to be right, one must find that the ITC and President Clinton were wrong.

It is the same story regarding the later sunset reviews. Wheatland Tube and Commerce's original determination would have us believe that the ITC misspoke. In collectively describing the scopes of all the orders at issue in the *Fourth Sunset Review*, the ITC found that "[d]ual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders." *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (*Fourth Sunset Review*), USITC Pub. 4754 (Jan. 2018) at 4. Commerce and Wheatland Tube were left to argue that "the Commission's statement was not addressing the language of each individual order but rather providing a generalized statement 'applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe.'" *See* Def.-Int.'s Resp. at 18, ECF No. 34 (quoting Final Scope Ruling at 15); *see also Saha Thai I*, 547 F. Supp. 3d at 1294–95. Commerce and Wheatland Tube claim this despite the ITC's having made the very same statement in *the Third Sunset Review*: "[D]ual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders." *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (*Third Sunset Review*) at 6, USITC Pub. 4333 (June 2012).

Whether one examines all four sunset reviews or only the *Third* and *Fourth Reviews*, the ITC spoke with one consistent voice: Dual-stenciled pipe is line pipe, not standard pipe, and is not covered by the scope of any relevant order it reviewed over nearly four decades. Commerce and Wheatland Tube wish to say that the ITC does not speak with specificity and does not know what it is talking about. The record reveals otherwise because the ITC's position never wavered from 1985 to the present. Indeed, the only ITC statement equating line pipe, dual-stenciled or otherwise, with standard pipe was the original 1986 *dissent*. *See* ITC Final Determination, J.A. at 1,277–83 (dissenting Commissioner's views). Just as Commerce may not use a scope determination to rewrite the scope under review, it may also not use a scope determination to rewrite the history of the ITC's underlying determinations. The Remand Results properly find that dual-stenciled line pipe is not covered within the Thailand Order's scope. The record before the agency — from Wheatland Tube's decision to withdraw line pipe from consideration in the original investigation to the most recent ITC sunset review — support that determination.

**CONCLUSION**

Commerce and Wheatland Tube have tried to argue that the full record of this proceeding should not be considered while the record in other proceedings is outcome determinative. Focusing on the record of the Thailand Order reveals that not to be the case. Commerce has returned a decision that adequately complies with the Court's Remand Order, finding on reconsideration that dual-stenciled pipe is not

included in the scope of the Thailand Order. The Court's rationale in the Remand Order remain sound, and Commerce's Remand Results are supported by substantial evidence on the record. Accordingly, it is hereby:

**ORDERED** that the Remand Results are **SUSTAINED**.

Judgment shall be entered accordingly. A separate order will issue to reflect that the contested documents are properly considered part of the administrative record in this matter.

/s/ Stephen Alexander Vaden
Stephen Alexander Vaden, Judge

Dated: August 25, 2022
New York, New York

# Addendum 3

547 F.Supp.3d 1278
United States Court of International Trade.

SAHA THAI STEEL PIPE PUBLIC COMPANY, LTD., Plaintiff,
v.
UNITED STATES, Defendant,
and
Wheatland Tube Company
Defendant-Intervenor

Slip Op. No. 21-135
|
Court No. 1:20-cv-133
|
October 6, 2021

**Synopsis**
**Background:** Thai pipe manufacturer sought review of final scope ruling issued by United States Department of Commerce assessing antidumping duties on importation of dual-stenciled pipe imported as line pipe from Thailand pursuant to scope inquiry into Commerce's earlier antidumping duty order on circular welded carbon steel pipes and tubes imported from Thailand. Domestic manufacturer intervened. Thai manufacturer moved for judgment on the agency record.

**Holdings:** The Court of International Trade, Vaden, J., held that:

[1] plain language of antidumping order was ambiguous;

[2] insufficient evidence supported finding that antidumping order applied to dual-stenciled pipe from Thailand;

[3] absence of injury determination on dual-stenciled pipe precluded Commerce from issuing antidumping order regarding such pipe; and

[4] documents relating to antidumping orders involving other countries could not be considered as administrative documents produced during process leading to order at issue.

Motion granted; remanded with instructions.

West Headnotes (18)

[1] **Customs Duties** Scope of inquiry or review

On a challenge to a scope ruling issued by the United States Department of Commerce, the question is not whether the Court of International Trade would have reached the same decision on the same record; rather, it is whether the administrative record as a whole permits Commerce's conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. §§ 1516a(a)(2)(B)(vi), 1516a(b)(1)(B)(i); 28 U.S.C.A. § 1581(c).

[2] **Customs Duties** Scope of inquiry or review

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court of International Trade assesses whether the agency action is reasonable given the record as whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

[3] **Customs Duties** Proceedings

Under one method for analyzing the scope of an antidumping order, if the governing language of the antidumping order is not ambiguous, the plain meaning of the language governs, but if the language is ambiguous, the administrative documents produced during the agency process that led to the antidumping order must be considered next. 19 C.F.R. § 351.225(k)(1).

[4] **Customs Duties** Proceedings

Under the method for evaluating the scope of an antidumping order that requires an analysis of the scope's language within the context of the administrative documents produced during the agency context that led to the antidumping order, the plain language of the antidumping order is paramount, but the United States Department

of Commerce must consider the administrative materials. 19 C.F.R. § 351.225(k)(1).

**[5] Customs Duties** Proceedings

If an analysis of the language of an antidumping order within the context of the administrative documents produced during the agency context that led to the antidumping order does not dispositively answer the question of the antidumping order's scope, the United States Department of Commerce may consider the physical characteristics of the product, the expectations of the ultimate purchasers, the ultimate use of the product, the channels of trade in which the product is sold, and the manner in which the product is advertised and displayed. 19 C.F.R. §§ 351.225(k)(1), 351.225(k)(2).

**[6] Customs Duties** Scope of inquiry or review

Regardless of the method for determining the scope of an antidumping order, the question of whether the scope's language is ambiguous is reviewed by the Court of International Trade de novo.

**[7] Customs Duties** Proceedings

So-called "sunset reviews" of active antidumping and countervailing orders conducted pursuant to the Uruguay Round Agreements Act are administrative documents produced during the process leading to an antidumping order, as may be used to evaluate the scope of such an order. Tariff Act of 1930 § 751, 19 U.S.C.A. § 1675; 19 C.F.R. § 351.225(k)(1).

**[8] Customs Duties** Injury, material and negative

A fundamental requirement of both United States and international law is that an antidumping duty order must be supported by an International Trade Commission (ITC) determination of material injury covering the merchandise in question.

**[9] Customs Duties** Countervailing or Dumping Duties

The law permitting the United States Department of Commerce to issue antidumping orders is remedial, and was designed to protect domestic industry from sales of imported merchandise at less than fair value which either caused or threatened to cause injury. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673.

**[10] Customs Duties** Injury, material and negative

Where a domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673.

**[11] Customs Duties** Injury, material and negative

The United States Department of Commerce cannot assess antidumping duties on products intentionally omitted from an injury investigation by the International Trade Commission (ITC); allowing the ITC to assess such duties without an injury determination would itself frustrate the purpose of the antidumping laws. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673.

**[12] Customs Duties** Proceedings

Although the Court of International Trade owes significant deference to the United States Department of Commerce's interpretation of its orders, Commerce cannot issue an interpretation that changes the scope of an order nor interpret an order in a manner contrary to its terms.

**[13] Customs Duties** Evidence

Plain language of scope provisions of antidumping order applying to "certain circular welded carbon steel pipes and tubes from Thailand" was ambiguous, and, thus, when reviewing final scope ruling issued by United States Department of Commerce, Court of International Trade would rely on administrative documents produced during agency context that led to antidumping order in interpreting whether order encompassed dual-stenciled pipe from Thailand, where order referred to diameter characteristics that could apply to dual-stenciled pipe, order stated pipes were commonly referred to in industry as "standard pipe," and order listed certain Tariff Schedule of the United States (TSUS) item numbers, not including those for dual-stenciled pipe, but stated such list was non-dispositive of scope. 19 C.F.R. § 351.225(k)(1).

[14] **Customs Duties** Proceedings

Insufficient evidence supported finding by United States Department of Commerce that antidumping order regarding "standard pipe" from Thailand applied to dual-stenciled pipe from Thailand, which met specifications for standard and line pipe, and, thus, Commerce could not rely on finding to impose antidumping duties on dual-stenciled pipe; International Trade Commission (ITC) did not investigate or make injury determination as to dual-stenciled pipe or line pipe from Thailand, as statutory prerequisite for application of antidumping duties, sunset reviews of order treated dual-stenciled pipe as line pipe, rejecting argument that it affected same industry as standard pipe, and Commerce and ITC never referred to dual-stenciled pipe as standard pipe in context of specific order at issue. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673; 19 C.F.R. § 351.225(k)(1).

[15] **Customs Duties** Injury, material and negative

International Trade Commission (ITC) never made injury determination on dual-stenciled pipe or line pipe from Thailand, and, thus, antidumping order statute did not authorize United States Department of Commerce to include dual-stenciled pipe in scope of antidumping order concerning circular welded pipe from Thailand; Thailand did not produce line pipe or dual-stenciled pipe, which met specifications for standard and line pipe, at time of ITC injury investigation, ITC could not have determined that nonexistent product injured domestic industry, petitioners who requested initial investigation withdrew their request as to Thai line pipe and dual-stamped pipe, and ITC distinguished between Thai line pipe and standard pipe in final determination, except in opinions of dissenting Commissioners. Tariff Act of 1930 § 733, 19 U.S.C.A. § 1673; 19 C.F.R. § 351.225(k)(1).

[16] **Customs Duties** Injury, material and negative

An antidumping duty order must be supported by an International Trade Commission (ITC) determination of material injury covering the merchandise in question. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673.

[17] **Customs Duties** Proceedings

Antidumping orders involving countries other than Thailand, and documents related to those orders, that referred to dual-stenciled pipe as standard pipe were not administrative documents produced during process leading to antidumping order concerning standard pipe from Thailand, and, thus, could not be considered in determining whether scope of order concerning Thai pipe also encompassed dual-stenciled pipe, which met standards for both standard and line pipe; regulation indicating administrative documents that could be considered for purpose of scope rulings, including "the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary," used article "the" to indicate relevant documents were those related to order at hand. 19 C.F.R. § 351.225(k)(1).

[18] **Administrative Law and Procedure** 🔑 Rule or regulation as a whole; relation of parts to whole and one another

The interpretive canon "noscitur a sociis" holds that words grouped in a list, such as in a regulation, should be given related meanings.

**Attorneys and Law Firms**

***1281** Daniel L. Porter, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington D.C., for Plaintiff. With him on the brief was James C. Beaty.

In K. Cho, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C. for Defendant United States. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Commercial Litigation Branch, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, and Jonzachary Forbes, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Luke A. Meisner, Schagrin Associates, of Washington D.C., for Defendant-Intervenor. With him on the brief were Roger B. Schagrin and Kelsey M. Rule.

**OPINION**

Vaden, Judge:

Saha Thai Steel Pipe Public Company, Ltd. (Saha), filed this case under Section 516A of the Tariff Act of 1930, as amended. Saha challenges the final scope ruling issued by the U.S. Department of Commerce (Commerce) after Commerce conducted a scope inquiry into its 1986 antidumping duty order ("Thailand Order") on circular welded carbon steel pipes and tubes (CWP) imported from Thailand (Case No. A-549-502). Saha challenges Commerce's decision to assess antidumping duties on the importation of dual-stenciled pipe imported as line pipe from Thailand. *See* Compl. ¶ 1, ECF No. 6. Before the Court is the Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record. Pl.'s Mot. for J. on the Agency R. (Pl.'s Mot.), ECF No. 26. For the reasons set forth below, the Court finds that Commerce's determination that dual-stenciled pipe is covered by the Thailand Order is not supported by substantial evidence, holds that Commerce's Final Scope Ruling constitutes an unlawful expansion of the scope of the underlying order, **GRANTS** the Plaintiff's Motion, and remands the Final Scope Ruling back to Commerce to render a redetermination consistent with this Court's opinion.

**BACKGROUND**

The products at issue in this case are Saha manufactured standard pipes, dual-stenciled pipes imported as line pipe, and line pipe, all produced in Thailand for importation into the United States. The International Trade Commission (ITC) has provided a concise and useful explanation of the differences between line pipe and standard pipe. The ITC's description, from its preliminary injury determination published before Commerce's antidumping order imposing duties on standard pipe imported from Thailand, is as follows:

> We have addressed the like product question regarding standard pipes and tubes (standard pipe) and line pipes and tubes (line pipe) in prior investigations. ***1282** In those investigations, the Commission recognized distinctions between standard pipe and line pipe. Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. Wall thicknesses for standard and line pipes, although similar in the smaller diameters, differ in the larger diameters. Moreover, standard pipe (whether imported or domestic) is generally used for low-pressure conveyance of water, steam, air, or natural gas in plumbing, air-conditioning, automatic sprinkler and similar systems. Line pipe is generally used for the transportation of gas, oil, or water in utility pipeline distribution systems.

*Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela,* Inv. Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary), USITC Pub. 1680 (Apr. 1985), Joint Appendix (J.A.) at 1094-96, ECF No. 42. So-called dual-stenciled pipe has received both an American Society of Testing and Materials (ASTM) stencil and an American Petroleum Institute (API) stencil, indicating that it meets the minimum requirements for both standards. *See* J.A. at 1563 (providing a definition for dual-stenciled pipe).

### I. The Original Antidumping Investigation

Early in 1985, a subcommittee of the self-named Committee on Pipe and Tube Imports, with its constituent domestic manufacturers, asked Commerce to impose antidumping duties on circular welded carbon steel pipe imports from Thailand. *See id.* at 1090. Their original request sought the imposition of antidumping duties on standard, line, and dual-stenciled pipes. *Id.* Commerce responded to the petition with a memo on March 7, 1985, asking the petitioners to provide "[d]ocumentation which demonstrates that line pipe is manufactured in Thailand" and "[d]ocumentation which supports the allegation that line pipe from Thailand [was] being sold at less than fair value." J.A. at 1753.

After receiving Commerce's March 7th letter, the initial petitioners, among which was Defendant-Intervenor Wheatland Tube Company (Wheatland), filed an amended petition on March 12, 1985. *Amended Petition Filed by Petitioner on March 12, 1985*, J.A. at 1755-79. In that amended petition, the initial petitioners rejected a meaningful distinction between standard and line pipe. *Id.* The initial petitioners instead argued that a precedent existed that collapsed line pipe and standard pipe into a single reviewable industry and that the better distinction was between small diameter and large diameter pipes. *Id.* at 1763. Despite these arguments in their amended petition, in a subsequent letter dated March 14, 1985, the initial petitioners expressly withdrew from their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209." *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82. The Tariff Schedule of the United States (TSUS) numbers 610.3208 and 3209 are the numbers under which line pipe, dual-stenciled or otherwise, would have been imported in 1985. *See* TSUS 1985 Version; *see also* Tr. of Oral Arg. 7:8-12, ECF No. 51, July 26, 2021 (Government and Wheatland's admission that line pipe and dual-stenciled pipe would have been imported under these numbers in 1985). At no point before or after submitting the March 14th letter did the initial petitioners provide any "[d]ocumentation" ***1283** supporting "the allegation that line pipe from Thailand [was] being sold at less than fair value" or even "manufactured in Thailand." J.A. at 1753. Indeed, the initial petitioners acknowledged that "no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely." J.A. at 1781.[1]

About a month after the back-and-forth between Commerce and the initial petitioners, the ITC released a preliminary report titled *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela; Determination of the Commission in Investigation No. 701-TA-242: (Preliminary) Under the Tariff Act of 1930, Together with the Information Obtained in the Investigation.* The ITC determined "pursuant to section 733(a) of the Tariff Act of 1930 (19 U.S.C. § 1673b(a)), that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand," *i.e.*, the standard pipe industry. J.A. at 1089. In its analysis, the ITC directly addressed the initial petitioners' argument — that distinguishing between line and standard pipe was wrong and that the better distinction was between large and small diameter pipes — describing it as "somewhat arbitrary." *See id.* at 1096. The ITC further stated that "domestic line pipe is like imported line pipe and not like imported standard pipe," and "domestic standard pipe is like imported standard pipe and is not like imported line pipe." *Id.* The ITC also described at length the differences between standard pipe and line pipe. *See id.* at 1095.

Almost a year later in January 1986, Commerce issued its final determination that standard pipe from Thailand was being, or was likely to be, sold in the United States at less than fair value. *Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 3384 (Jan. 27, 1986), J.A. at 1216. This Final Determination described its scope as encompassing "certain circular welded carbon steel pipes and tubes, also known as '*standard pipe*' or 'structural tubing,' which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the Tariff Schedules of the United States Annotated." *Id.* (emphasis added). The TSUS numbers under which dual-stenciled and single-stenciled line pipes would have been imported in 1986 were not listed in this scope. This determination relied on the preliminary ITC report released in April 1985 that addressed the material injury caused to the U.S. standard pipe industry by the importation of standard pipe from Thailand, not by line or dual-stenciled pipe. *Id.*

After Commerce issued its Final Determination on standard pipe imported from Thailand, the ITC issued its own final report in February 1986. This report addressed the material

injury to domestic industry, actual and threatened, resulting from the importation of standard pipe from Thailand and the importation of line and standard pipe from Turkey. *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986) (ITC Final Determination), J.A. at 1221. The ITC evaluated the effects of both imported line pipe *and* standard pipe from Turkey but only evaluated the ***1284** effects of standard pipe from Thailand. *See id.* As a result of its analysis, the ITC made independent material injury determinations regarding line pipe imported from Turkey, standard pipe imported from Turkey, and standard pipe imported from Thailand. *Id.* At no point did the ITC conflate line and standard pipe of identical sizes. *See id.* at 1233-34. At no point did the ITC make a material injury determination regarding line pipe or dual-stenciled pipe imported from Thailand. *Id.* And the ITC consistently treated standard pipe and line pipe as different products throughout its injury analyses but did not mention dual or multi-stenciled pipe imported as line pipe. *See id.* at 1221-1376.

In March 1986, Commerce published its antidumping duty order (the Thailand Order) and the scope of that order included:

> The products under investigation are certain circular welded carbon steel pipes and tubes (referred to in this notice as "pipes and tubes"), also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, of any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA).

*Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8341, 8341 (Dep't of Commerce Mar. 11, 1986).

Following the 1989 shift from the Tariff Schedule of the United States (TSUS) to the Harmonized Tariff Schedule of the United States (HTSUS), the language governing the scope of the Thailand Order was updated to align with the HTSUS and now states:

> The products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inch or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

*Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe from Thailand*, dated June 30, 2020 ("Final Scope Ruling"), J.A. at 2042; *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 86 Fed. Reg. 7260 (Dep't of Commerce Jan. 27, 2021); *see also Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Results of Antidumping Duty Administrative Review*, 55 Fed. Reg. 42596, 42596 (Dep't Commerce Oct. 22, 1990) (noting transition from TSUS to HTSUS).

**II. Subsequent Reviews of the Thailand Order**

Not quite a decade after Commerce published the Thailand Order, President William Jefferson Clinton signed the Uruguay Round Agreements Act (URAA). Pub. L. No. 103-465, 108 Stat. 4809 (1994). Along ***1285** with resurrecting dead copyrights on largely forgotten movies, the Uruguay Round Agreements Act established a five-year sunset review process for antidumping and countervailing duty orders. Uruguay Round Agreements Act § 220. Under this process, every five years, the administering agency and the ITC conduct a review of all active antidumping and countervailing orders to determine whether they remain necessary. 19 U.S.C. § 1675.

Since the signing of the Uruguay Round Agreements Act, the ITC has initiated, conducted, and concluded four sunset reviews of the Thailand Order. The ITC conducted its first review in 1999 and published the results in 2000; it published the results of the second review in 2006, the third review in 2012, and the fourth in 2018. *See Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410,

532–534, 536, and 537 (*First Sunset Review*), USITC Pub. 3316 at 6 (July 2000); *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 409, 410, 532–534, and 536 (*Second Sunset Review*), USITC Pub. 3867 at 4–5 (July 2006); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (*Third Sunset Review*), USITC Pub. 4333 (June 2012); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532–534, and 536 (*Fourth Sunset Review*), USITC Pub. 4754 (Jan. 2018).

In the ITC's *First Sunset Review*, the express exclusion of line and dual-stenciled pipe from relevant antidumping orders of line pipe was discussed. *See First Sunset Review* at 11-12, n.53. This discussion was within the context of streamlining the ITC's different and like product analyses. *See id.* at 11-12. The ITC noted that "the orders on CWP from Thailand and Turkey (CVD) have no express exclusions for products excluded from the scopes in all later cases, including line pipe, OCTG, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit." *Id.* n.53. Notably, none of these products have ever been treated as within the scope of the Thailand Order, despite the lack of an express exclusion. *Cf.* J.A. *passim.*

Elsewhere in the same sunset review, the ITC discussed line pipe and dual-stenciled line pipe in the context of "safeguard duties" imposed by President Clinton on every country reviewed that produced line pipe and dual-stenciled pipe at the time, except Canada and Mexico. *First Sunset Review* at 28; *see also To Facilitate Positive Adjustment to Competition from Imports of Certain Circular Welded Carbon Quality Line Pipe*, Proclamation No. 7274, 65 Fed. Reg. 9191 (Feb. 23, 2000).[2] In that discussion, the ITC notes that dual-stenciled pipe imported as line pipe, and line pipe *simpliciter*, were excluded from antidumping orders but were nonetheless subject to President Clinton's "safeguard duties" covering line pipe. *First Sunset Review* at 28.

When the ITC conducted its second review of the Thailand Order and other similar ***1286** antidumping orders, the safeguard duties against line pipe had expired or otherwise ended. *See Second Sunset Review* at 11, n.55. Nonetheless, in the *Second Sunset Review* the ITC noted that dual-stenciled pipe imported as line pipe had only been subject to duties under President Clinton's safeguard duties covering line pipes, not standard pipes: "Following an affirmative determination by the Commission, in March 2000, President Clinton issued Proclamation 7274, imposing additional duties of 19 percent on line pipe imports of more than 9,000 short tons annually (including "dual-stenciled" pipe but excluding "arctic grade" line pipe)." *Id.* at Overview-5 n.16. The *Second Sunset Review* also noted that "multiple-stenciled line pipe requires additional steel than CWP [*sic*] to meet American Petroleum Institute (API) specifications applicable to line pipe. At [then] current steel prices, this would require that a multiple-stenciled product be sold at a considerable price premium over a product that satisfies ASTM specifications but not API specifications." *See id.* at 13 n.66.

In its third review of the Thailand Order, the ITC described the scope of all Orders under its review and in that description included this caveat: "[D]ual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders." *Third Sunset Review* at 8. The Thailand Order did not receive a special carve out from the general language of the *Third Sunset Review's* scope.[3] *See id.*

In the *Fourth Sunset Review* of the Thailand Order in January 2018, the ITC reiterated the position that it took in the *Third Sunset Review*, that it implied or stated in the first and second reviews, and that Commerce expressed in 1985, 1986, and 2012. *See Fourth Sunset Review* at 6-7. The *Fourth Sunset Review* stated that line pipe, which includes dual-stenciled pipe, was not within the scope of the antidumping orders concerning standard pipes:

> Producers primarily make CWP to ASTM specifications A53, A135, and A795.26 Since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, i.e., stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders.

*Id.*

### III. The Scope Determination in Question

In January 2019, Wheatland told Commerce "that certain imports of merchandise from Thailand that are entering the United States as 'line pipe' are circumventing" the Thailand Order and requested that Commerce make a circumvention ruling against Saha. *Circumvention Ruling Request*, J.A. at 1807. According to Wheatland and Southland Tube Company, the ***1287** domestic interested parties who filed the request, Saha was circumventing the Thailand Order through minor alterations to Saha's merchandise. *See id.* They alleged that Saha began exporting what Wheatland considered "minorly-altered standard pipe" after Saha's dumping margin jumped from 1.36 percent to about 28 percent. *See id.* at 1811.

On November 22, 2019, Commerce self-initiated a scope inquiry into the Thailand Order. *Memorandum from Leo Ayala, International Trade Compliance Analyst, Office VII, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, regarding Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe* (Nov. 22, 2019), J.A. at 1800. Before the scope inquiry, during the inquiry, and since, Saha has consistently asserted that its dual-stenciled line pipes are not standard pipes with minor alterations and that these dual-stenciled line pipes are outside the antidumping duty order's scope. J.A. at 1171-1203, 1898-1953, and 1975-2022.

Commerce issued a preliminary scope ruling in February 2020, finding for the first time in thirty-four years that dual-stenciled line pipe is within the scope of the Thailand Order while single-stenciled line pipe is not. *See Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe* (Feb. 24, 2020), J.A. at 1954. All the parties submitted comments and arguments on the preliminary ruling. J.A. at 1962-2040. Commerce remained unmoved; and in its Final Scope Ruling, Commerce again found that dual-stenciled pipe is within the scope of the Thailand Order. *See* Final Scope Ruling, J.A. at 2042.

**IV. The Present Case**

On July 17, 2020, Saha sued the Department of Commerce seeking to overturn its scope decision. ECF No. 6. Wheatland intervened in the case on August 12, 2020. ECF No. 15. In December 2020, Saha filed its Motion for Judgment on the Agency Record, for which the Court held an extensive hearing on July 15, 2021. ECF Nos. 26 and 47. Counsel for all parties attended. During the hearing, the Court asked several questions.

The first question was:

> [Y]ou can just tell me with a simple yes or no if the statement as I have presented it is factually correct or not.... [I]n 1985 to 1986, the country of Thailand did not produce line pipe, including dual stenciled-line pipe.

Tr. of Oral Arg. 5:24-25, 6:1-4, ECF No. 51, July 26, 2021. The Government responded "Your Honor, our understanding is that the – the stated reason for the withdrawal – affirmative withdrawal of the original petition was that – was the notion that there was no manufacture of line pipe in Thailand at the time." *Id.* at 6:12-16. Wheatland stated it understood "that there was neither production of regular single stenciled line pipe nor dual stenciled standard inline [*sic*] pipe in Thailand at the time the petitions were filed." *Id.* at 7:1-3.

The second question the Court asked was:

> Was all line pipe, including dual stenciled line pipe, in 1985/86 imported under TSUS Codes 610.3208 and/or 610.3209?

*Id.* at 7:8-10. Both the Government and Wheatland admitted that dual-stenciled pipe would have been imported under the TSUS codes for line pipe in 1985 and 1986. *Id.* at 7:11-22.

***1288** At the end of the hearing, the Court ordered the Government and Wheatland to review this case's record thoroughly. After reviewing the record, the Court required them to write a letter identifying for the Court "in the record of this matter" where "there was an instance or more than one instance of ... the Government" referring "explicitly to dual stenciled pipe as standard pipe." *Id.* at 71:3-7. The Court also gave Saha's counsel the right to respond. *Id.* at 72:1-7.

The Government and Wheatland timely submitted their letters. The Government identified for the Court quotes in the *Fourth Sunset Review* that came from Commerce's antidumping order on standard pipe imported from Taiwan and from its antidumping order on standard pipe from Brazil, Mexico, and Korea. Government's Letter Re: *Saha Thai Steel Pipe Public Company Limited v. United States*, No. 20-133 (Ct. Int'l Trade), at 1, ECF No. 49 (citing to *Fourth Sunset Review* at I-12 to I-13). The language that Commerce identifies is as follows:

> **Brazil, Mexico, and Korea**: Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in the orders.
>
> **Taiwan**: Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind or used for oil and gas pipelines is also not included in the scope of the order.

Wheatland, like the Government, also identifies the same language from other antidumping orders that is quoted in the *Fourth Sunset Review.* Wheatland's Letter Re: *Saha Thai Steel Pipe Public Company Limited v. United States* (Ct. No. 20-00133): Response to Court's July 15, 2021 Order, at 1-2, ECF No. 50. But Wheatland goes even further and cites additional quotes from the preliminary and final investigations into CWP imported from China. *Id.* at 3-4; *Circular Welded Carbon-Quality Steel Pipe from China*, Inv. Nos. 701-TA-447 and 731-TA-1116 (Preliminary), USITC Pub. 3938 (July 2007); *Circular Welded Carbon-Quality Steel Pipe from China*, Inv. Nos. 701-TA-447 and 731-TA-1116 (Final), USITC Pub. 4019 (July 2008).

Interestingly, the language that the Government and Wheatland have referenced in response to the Court's order is all language from antidumping orders that the Government and Wheatland have consistently argued "are not probative of the [Thailand] order's scope." Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. (Def.'s Resp.) at 18, ECF No. 37. The Government in its response brief had argued that antidumping orders for other countries are not "enumerated under 19 CFR 351.225(k)(1)" and that the (k)(1) materials do not "include determinations [from] proceedings on similar products from different countries." *Id.* at 19. Wheatland likewise argued that the antidumping orders and investigations dealing with other countries "are not included within the 'scope determinations' that Commerce must consider under section (k)(1)." *See* Defendant-Intervenor's Resp. to Pl.'s Mot. for J. on the Agency R. (Def.-Int.'s Resp.) at 21, ECF No. 34. As Wheatland put it, "Saha Thai fails to appreciate that agency determinations arising from different orders with different scope language—even if similarly captioned" are not relevant. *Id.* And "[i]ndeed, there is no basis in law for Saha Thai's assertion that scope determinations arising from different proceedings involving different records and different scope language should have any bearing on Commerce's analysis of the (k)(1) sources." *Id*

Saha timely responded to the Government and Wheatland's letters. ECF No. ***1289** 52. In its response letter, Saha pointed out that the Government and Wheatland do not cite to any document or statement in the record underlying the Thailand Order. *Id.* at 1. Saha highlighted how the Government and Wheatland's letters quote language from other antidumping orders that do not involve pipe imports from Thailand. *Id.* at 1-2.

## JURISDICTION AND STANDARD OF REVIEW

**[1]** The Court has jurisdiction over Plaintiff's challenge to the Scope Ruling under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting scope determinations described in an antidumping order. The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). If they are supported by neither substantial evidence nor the law, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New American Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *6 (Ct. Int'l Trade Mar. 23, 2021).

**[2]** Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

## DISCUSSION

**I. Legal Framework**

The Federal Circuit has arguably provided the United States Court of International Trade with two distinct methods that the Court may use to begin its analysis of the lawfulness of Commerce's scope inquiries into antidumping orders. The first method evaluates the content of the plain language of an antidumping order without reference to any other document, except typical references used when analyzing any law or regulation, such as a dictionary. *See OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020). The second method is the *Meridian* method, which requires an analysis of a scope's language within the context of the (k)(1) materials, *i.e.*, the administrative documents produced during the agency process that led to the antidumping order. *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018). Both methods seek to determine whether a scope's language is sufficiently ambiguous that Commerce must resort to additional documents or considerations to interpret an order's scope.

**[3]** Under *OMG*, "the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous." *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012). "If it is not ambiguous, ***1290** the plain meaning of the language governs." *Id.* But "[i]f the language is ambiguous, Commerce must next consider the ... '(k)(1) materials.' " *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (citations omitted).

**[4]** **[5]** Under *Meridian*, "the plain language of an antidumping order is paramount." *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018). But when "reviewing the plain language of a duty order, Commerce must consider" the (k)(1) materials. *Id.* at 1277; *see also Midwest Fastener Corp. v. United States*, 494 F.Supp.3d 1335, 1340 (Ct. Int'l Trade 2021) ("When considering the scope language, Commerce will take into account descriptions of the merchandise contained in ... [the (k)(1) sources]"). If the above method does "not dispositively answer the question, Commerce may consider the ... so-called (k)(2) factors." *Meridian Prod.*, 890 F.3d at 1278.

**[6]** Regardless of the method, the question of whether a scope's language is ambiguous is reviewed by the Court *de novo*. *OMG*, 972 F.3d at 1363; *Meridian Prod.*, 851 F.3d at 1382. After its *de novo* review of Commerce's ambiguity determination in this case, the Court has determined that the distinction between the Federal Circuit's two methods is of no moment given that the plain language of the Thailand Order's scope is ambiguous without the context of the (k)(1) materials. Whether the Court uses the (k)(1) materials from the beginning or uses them only after reading the original scope does not matter. In this case, the (k)(1) materials must be read.

**[7]** The (k)(1) materials consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). So-called "Sunset Reviews" conducted pursuant to the Uruguay Round Agreements Act are (k)(1) materials. *See Quiedan Co. v. United States*, 294 F.Supp.3d 1345 (Ct. Int'l Trade 2018) (including sunset reviews among the (k)(1) materials), *aff'd*, 927 F.3d 1328 (Fed. Cir. 2019). Also included among the (k)(1) materials are "determinations of ... the [ITC]," such as injury determinations. 19 C.F.R. § 351.225(k)(1).

**[8]** **[9]** **[10]** **[11]** "A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question." *Wheatland Tube Co. v. United States*, 973 F.Supp. 149, 158 (Ct. Int'l Trade 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998). The law permitting Commerce to issue antidumping orders, 19 U.S.C. § 1673, "is remedial, [and] ... was designed to protect domestic industry from sales of imported merchandise at less than fair value which either caused or threatened to cause injury." *Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States*, 608 F.Supp. 653, 656 (Ct. Int'l Trade 1985). Therefore, "[w]here the domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute." *Id.* at 657. And Commerce cannot "assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998). Allowing the ITC to assess such duties without an injury determination "would itself frustrate the purpose of the antidumping laws." *Id.*

If these (k)(1) materials are dispositive, whether they are evaluated while initially interpreting a scope or evaluated only after a scope is found ambiguous, Commerce may issue a final ruling based on those ***1291** materials. *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). If the (k)(1) materials are not dispositive, Commerce must

consider "(k)(2) factors," which include "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2); *see also* 19 C.F.R. § 351.225(e); *Meridian Prod.*, 890 F.3d at 1278.

**[12]** Although this Court owes "significant deference" to Commerce's interpretation of its orders, Commerce cannot issue an interpretation that changes the scope of the order nor "interpret an order in a manner contrary to its terms." *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002) (*quoting Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).

## II. Analysis

### A. Summary

Saha's Motion for Judgment on the Agency Record presents three principal issues: First, whether Commerce's decision to include dual-stenciled pipe within the scope of the Thailand Order is supported by substantial evidence; second, whether Commerce's final scope decision unlawfully expands the scope to include merchandise that was not part of the final injury determination of the ITC; and third, whether Commerce's final scope decision is otherwise not in accordance with law because it is contrary to the Federal Circuit's decision in *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998). Pl.'s Mot., ECF No. 26.

Saha's argument is straightforward: Commerce unlawfully expanded the scope of the Thailand Order by ignoring overwhelming evidence that dual-stenciled line pipe was not treated as standard pipe by the ITC or by Commerce and was intentionally excluded from the ITC's injury determination and Commerce's Thailand Order. Therefore, dual-stenciled line pipe is outside the Thailand Order's scope. *See* Pl.'s Mot. at 16-24, ECF No. 26. Saha supports its contention with documents that fall within the (k)(1) materials and with documents, orders, and determinations concerning the same products from other countries. *See* J.A., ECF No. 42; *see also* Pl.'s Mot. at 20, ECF No. 26.

Commerce responds that its determination that dual-stenciled pipe is within the scope of the Thailand Order is supported by substantial evidence because the order's plain language unambiguously encompasses dual-stenciled pipe. *See* Def.'s Resp. at 16-20, ECF No. 37. Commerce rejects Saha's contention that there is probative value in antidumping orders, ITC determinations, and Commerce's determinations that cover the same products but are from different countries. *See id.* at 18-20. Finally, Commerce asserts that its determination is consistent with the (k)(1) materials, but that those materials do not need to be consulted given the unambiguous language of the Thailand Order's scope. *See id.* at 15-18, ECF No. 37.[4]

The Court disagrees with Commerce's interpretation of the plain language of the scope and the short shrift it gives to the (k)(1) materials. Reviewing the Thailand Order's scope language *de novo*, the Court holds that the language is ambiguous without the context provided by the (k)(1) materials. *See OMG*, 972 F.3d at 1363 (scope ambiguity determinations by Commerce receive *de novo* review). Therefore, the ***1292** Court, like Commerce, must rely on the (k)(1) materials to interpret the Thailand Order's scope language. *See Mid Continent Nail Corp.*, 725 F.3d at 1302.

After reviewing the (k)(1) materials in the administrative record with the appropriate deference, the Court finds that Commerce lacks substantial evidence for its position that dual-stenciled pipe imported as line pipe is included within the Scope of the Thailand Order; Commerce has instead unlawfully sought to expand the scope of its original order. First, Thailand did not produce dual-stenciled pipe at the time of the original investigation and order, and the request was effectively withdrawn from consideration by the petitioners themselves. Second, the (k)(1) materials show that the ITC made no injury determination as to dual-stenciled or mono-stenciled line pipe from Thailand; therefore, antidumping duties cannot be imposed on those types of pipes when imported from Thailand. Third, Commerce and the ITC throughout the (k)(1) materials consistently treat dual-stenciled pipe as line pipe when imported into the United States.

The Court first will address Commerce's plain language arguments; then it will turn to an analysis of the (k)(1) materials.[5]

### B. The Plain Language of the Thailand Order's Scope

The original Thailand Order's scope in its entirety reads:

> The products under investigation are certain circular welded carbon steel pipes and tubes (referred to in this notice as "pipes and tubes"), also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, of any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA).

*Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8341, 8341 (Dep't of Commerce Mar. 11, 1986).

Commerce later rearranged the scope language, amended the TSUS numbers to reflect the change to the HTSUS, and added language asserting that the HTSUS numbers are simply examples and are not exhaustive of what might be covered by the Thailand Order:

> The products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inch or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter ***1293** designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

Final Scope Ruling, J.A. at 2042.

Commerce argues that the plain language of the amended Thailand Order's scope is "not ambiguous and supports Commerce's determination that dual stenciled pipe is within the scope of the order," and therefore the inquiry should stop there. Def.'s Resp. at 13, ECF No. 37. Because, according to Commerce, the Thailand Order is unambiguous, "the 'plain language of the order governs.' " *Id.* (quoting *OMG*, 972 F.3d at 1364). It is unclear, however, what language in the order Commerce believes governs given that Commerce fails to direct the Court to specific language in the scope that plainly subjects dual-stenciled pipe imported as line pipe to the Thailand Order. *Id.* at 13-16.

Wheatland attempts to bolster Commerce's textual argument by asserting that "[t]he scope covers all circular welded carbon steel pipes and tubes from Thailand with an outside diameter of 0.375 inch or more, but not exceeding 16 inches." *See* Def.-Int.'s Resp. at 12, ECF No. 34. Wheatland argues that, because dual-stenciled pipe imported as line pipe possesses the same shape characteristics of the merchandise described in the scope language, dual-stenciled pipe falls under the scope's plain language; and no further analysis is necessary. *See id.* at 14-15.

**[13]** The problem with the Defendants' analysis of the text of the scope is that the Defendants look at the language of only one-third of the scope, isolating the language about size and diameter from the rest of the text. The scope includes more. The original scope also lists a set of TSUS item numbers that do not include, as all the parties agreed, the item numbers under which dual-stenciled pipe would have been imported in 1986. *See* Tr. of Oral Arg. 6:12-7:3; 7:11-22, ECF No. 51, July 26, 2021 (all parties agreeing that dual-stenciled pipe would have been imported in 1986 under TSUS item numbers that were expressly excluded from the scope of the original antidumping order). These item numbers, as the amended Thailand Order scope says, are not dispositive. *See also* *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1270 (Fed. Cir. 2002) (reasoning that absence of particular HTSUS classification number does not show exclusion of any merchandise); *Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990) (reasoning that reference to TSUS classification number is not dispositive); *Wirth Ltd. v. United States*, 5 F.Supp.2d 968, 977-78 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999) ("The inclusion of various HTSUS headings in a petition ordinarily should not be interpreted to exclude merchandise determined to be within the scope of the antidumping or countervailing duty orders but classified under an HTSUS heading not listed in the petition"). Though not dispositive, their absence certainly does not provide evidence that dual-stenciled line pipe's inclusion is supported by the scope's plain language.[6]

***1294** Reading further past the language convenient for Wheatland's argument, the scope also states that the pipes subject to the Thailand Order are "commonly referred to in the industry as 'standard pipe.' " J.A. at 2042. Meaning, the scope applies not simply to circular welded pipes with a given size or shape, but rather circular welded pipes that meet the industry standards and specifications required for those pipes to qualify as "standard pipes" *and* are referred to by the

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

industry as "standard pipes" in common usage. *Id.* But what exactly is "standard pipe," and does it include dual-stenciled pipe? The language of the scope itself is silent. Given this, the Court, like Commerce, must turn to the (k)(1) materials to resolve the ambiguity. *Id.* at 2047 (expressly determining that it must examine the (k)(1) materials to resolve the question). The Court, therefore, considers next whether, viewed with the appropriate deference, the record as a whole supports Commerce's decision with substantial evidence.

**C. The (k)(1) Materials**

The (k)(1) materials consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). Saha argues that these materials do not support Commerce's decision to include dual-stenciled pipe imported as line pipe within the scope of the Thailand Order but rather lead to the opposite conclusion. *See* Pl.'s Mot. at 16-26, ECF No. 26. Saha supports its argument by noting that Thailand did not produce dual-stenciled pipe at the time of the order, that the original petitioners withdrew from consideration products imported under TSUS item numbers 610.3208 and 3209, and that the ITC never made a legally required injury determination for imported Thai produced dual-stenciled pipe. *See id.* at 26. Saha also directs the Court's attention to the various sunset reviews and argues that these reviews consistently treat dual-stenciled pipe as line pipe. *See id.* at 32-34.

Commerce and Wheatland respond that the amended petition itself does not exclude dual-stenciled pipe in its language; therefore, dual-stenciled pipe is not excluded from the scope. *See* Def.'s Resp. at 20, ECF No. 37; Def.-Int.'s Resp. at 12, ECF No. 34. They also argue that the original ITC investigation only excluded line pipe and did not expressly exclude dual-stenciled pipe that receives both an ASTM standard pipe stencil and an API line pipe stencil so that any pipe with an ASTM stencil would fall within the ITC's injury determination. *See* Def.'s Resp. at 16, ECF No. 37. Finally, they assert that, when the sunset reviews emphasized that the antidumping orders under review excluded dual-stenciled pipe, "the Commission's statement was not addressing the language of each individual order but rather providing a generalized statement 'applicable ***1295** to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe.' " *See* Def.-Int.'s Resp. at 18, ECF No. 34 (quoting Final Scope Ruling at 15).

Without going deeply into the (k)(1) materials, one finds the following definition: "Standard pipe is [pipe that is] manufactured to American Society of Testing and Materials (ASTM) specifications." *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 7-8 (internal references omitted). With this aid, the meaning of the scope becomes clearer: The products subject to the Thailand Order as described by its scope consist of circular welded pipes with a specific range of diameters, any wall thickness, the production and metal quality of what are commonly called "standard pipes," and that obtain an American Society of Testing and Materials stencil. *See id.*

**[14]** Even this explanation of the Thailand Order's scope raises one final question: Does "standard pipe" refer only to mono-stenciled standard pipe, or does it also include dual-stenciled pipe – pipe that meets both the minimum specifications demanded by the American Society of Testing and Materials for standard pipe and has the higher quality steel and has passed the more stringent tests required to receive an American Petroleum Institute line pipe stencil? That the scope raises this question and does not answer it means that there is an ambiguity that must be resolved, and thus a much deeper evaluation of the (k)(1) materials is necessary to understand the boundaries of the scope. After reviewing the (k)(1) materials, the Court finds that the original petition, the injury determination, and the sunset reviews do not support Commerce's final scope ruling on the Thailand Order with substantial evidence. They instead reflect that Commerce has unlawfully expanded the scope of its original order.

**i. Initial Investigation and Injury Determination**

In their first petition in 1985, the initial petitioners requested an investigation of pipe imported from Thailand under a variety of item numbers found in the Tariff Schedules of the United States at the time, including item numbers 610.3208 and 3209. *See* J.A. at 1706. Dual-stenciled pipe imported as line pipe would have been imported under these numbers at the time of the original Thailand Order. *See* TSUSA 1985 Version; *see also* Tr. of Oral Arg. 7:11-22, ECF No. 51, July 26, 2021. But after Commerce sent an inquiry asking for evidence that Thailand produced such pipes, the initial petitioners decided to expressly withdraw their "petitions

insofar as they concern line pipe, TSUS numbers 610.3208 and 3209." *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82.

**[15]** Once the initial petitioners withdrew all pipes that were importable under 610.3208 and 3209 from consideration by the ITC and Commerce, those pipes were not included in either the resulting injury investigation conducted by the ITC or the antidumping order issued by Commerce. *See Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82 (letter from petitioners withdrawing from their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209"). Consequently, the ITC has never conducted an injury investigation, nor made an injury determination, on pipes imported from Thailand that are dual-stenciled, or obtain an API stencil, regardless of whether those pipes also have an ASTM stencil.

***1296** Commerce cannot impose a duty on a fiction. API stenciled pipes, *i.e.* line and dual-stenciled pipes, were omitted by the decision of the petitioners themselves from the ITC's original injury investigation. The parties have also admitted that Thailand *did not produce* line pipes, dual-stenciled or otherwise, at the time the ITC conducted its injury investigation. Tr. of Oral Arg. 6:12-16, 7:1-3, ECF No. 51, July 26, 2021. It is well settled that Commerce cannot "assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube Co.*, 161 F.3d at 1371. Allowing Commerce to assess such duties without an injury determination "would itself frustrate the purpose of the antidumping laws." *Id.* And finding that the ITC determined a product that did not yet exist somehow injured domestic industry would frustrate common sense.

**[16]** Since their initial omission from the original injury investigation, the ITC has conducted no subsequent injury investigation to determine whether API stenciled pipe from Thailand injures a domestic industry. Given that it is "a fundamental requirement" in our law "that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question," the lack of such an injury determination for API stenciled pipes is fatal to Commerce's case. *See Wheatland Tube Co.*, 973 F. Supp. at 158, *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998).

It is worthwhile to note that, when the ITC conducted its injury investigation of domestic industries affected by pipes imported from Thailand, the ITC's preliminary report on the subject addressed the injury caused to domestic industries by not only standard pipes imported from Thailand but also the injury caused by imported standard and line pipes from Venezuela. *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela,* Inv. Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary), USITC Pub. 1680 (April 1985). In that report, the ITC emphasized that imported standard pipe and line pipe affect separate industries and are different products. At every point, it was careful to not conflate line pipe and standard pipe when discussing imports from Thailand. *See id.* at 7-8.

The same holds true for the ITC Final Determination. J.A. at 1221. The ITC did not include line pipe or dual-stenciled pipe imported as line pipe within the description of the investigation's scope into Thailand circular welded pipes. *See Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986). The only discussion of line pipe appears in the sections of the report addressing Turkish imports, and the Commissioners were cautious even in their section headings to use "line pipe" only in conjunction with Turkey. *See, e.g.*, ITC Final Determination, J.A. at 1244-45 (differentiating among "standard pipe imports from Thailand," "standard pipe imports from Turkey," and "line pipe imports from Turkey").

Most notably, the only conflation of standard pipe and line pipe came from the two Commissioners in *dissent. Id.* at 1263-83 (dissenting views of Vice Chairman Liebeler and Commissioner Brunsdale). Commissioner Brunsdale thought that the Commission should not separate its analysis of standard pipes and line pipes but should instead consider them as one product to be analyzed together.[7] *Id.* at 1281. ***1297** That this view was in dissent further points to the lack of evidence of *any* harm finding from the ITC regarding the importation of line pipe, including dual-stenciled line pipe, from Thailand. With no harm determination from the ITC, Commerce lacks legal authority to impose duties on dual-stenciled pipe. *See Wheatland Tube Co.*, 161 F.3d at 1371.

**ii. Sunset Reviews**

Although a finding that the ITC's injury determination did not cover dual-stenciled pipe is sufficient to overturn Commerce's scope determination, the ITC's sunset reviews reinforce the Court's finding that dual-stenciled, or API stenciled pipe of any kind, was not included in the Thailand Order's scope.

*See* *Quiedan Co.*, 294 F.Supp.3d 1345, 1351-53 (including sunset reviews among the (k)(1) materials), *aff'd*, 927 F.3d 1328 (Fed. Cir. 2019). Every sunset review of the Thailand Order treats dual-stenciled pipe as line pipe. For example, the first two sunset reviews did not find that dual-stenciled pipe imported from any country affected the domestic standard pipe industry. *See First Sunset Review* (makes no findings as to whether dual-stenciled pipe imported as line pipe affects the domestic standard pipe industry); *see also Second Sunset Review* at 13 n.66. Additionally, when the first two sunset reviews discussed duties on dual-stenciled pipe from countries that produced it at the time, it was solely in the context of President Clinton's safeguard duties on line pipe. The ITC consistently understood those duties to apply to dual-stenciled pipe, not just mono-stenciled line pipe, and *not to apply* to standard pipe. *First Sunset Review* at 28 ("In the case of Korea ... until safeguard duties on line pipe went into effect on March 1, 2000, they enjoyed unlimited access to the U.S. CWP market by exporting dual-stenciled line pipe"); *Second Sunset Review* at Overview-5 n.1 ("Following an affirmative determination by the Commission, in March 2000, President Clinton issued Proclamation 7274, imposing additional duties of 19 percent on line pipe imports of more than 9,000 short tons annually (including "dual-stenciled" pipe but excluding "arctic grade" line pipe)."). If dual-stenciled pipe is standard pipe and is only excluded from antidumping orders on standard pipe when it is expressly excluded in the language of those orders' scopes, then dual-stenciled pipe would have fallen under neither the antidumping orders that excluded it nor the safeguard duties imposed by President Clinton that covered line pipe. But dual-stenciled pipe *was* treated as falling under the safeguard duties imposed by President Clinton, even though the proclamation only mentions "line pipe." *Id.*

The *Second Sunset Review* also expressly rejected the argument that dual or multiple-stenciled pipe affected the same industry as standard pipe. The review found that "multiple-stenciled line pipe requires additional steel than CWP to meet American Petroleum Institute (API) specifications applicable to line pipe. At [then] current steel prices, this would require that a multiple-stenciled product be sold at a considerable price premium over a product that satisfies ASTM specifications but not API specifications." *Second Sunset Review* at 13 n.66.

Consistent with the first two sunset reviews, the *Third* and *Fourth Sunset Reviews* also treat dual-stenciled pipe as line pipe. The *Fourth Sunset Review* states in its scope that "[d]ual-stenciled pipe, which enters as line pipe under a different subheading ***1298** of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders." *Fourth Sunset Review* at 6-7. The *Third Sunset Review's* language is largely identical. *See Third Sunset Review* at 8. Both statements are unqualified and give no indication that the scope language does not apply to the Thailand Order. Commerce's argument that the language in these sunset reviews only applied to dual-stenciled pipe imported from every country other than Thailand is not persuasive. The language of the third and fourth reviews is unqualified and consistent with the treatment of dual-stenciled pipe, or API stenciled pipe, at each stage of the administrative process. *Cf., e.g.*, ITC Final Determination at J.A. 1233-34 (differentiating among "standard pipe imports from Thailand," "standard pipe imports from Turkey," and "line pipe imports from Turkey").

No review, original or sunset, has determined that dual-stenciled or API stenciled pipe from Thailand injures a domestic industry. Given that when a "domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute," Commerce's expansion of the Thailand Order's scope is unlawful. *Badger-Powhatan*, 608 F. Supp. at 657.

### iii. The Defendants' Letters to the Court

In response to an invitation extended at oral argument, the Government and Wheatland did provide isolated examples of dual-stenciled pipe being referred to as standard pipe within the record. But these quotes came from documents that the Government and Wheatland themselves argue are irrelevant and not (k)(1) materials. *See* Def.'s Resp. at 18-20, ECF No. 37; and Def.-Int.'s Resp. at 21, ECF No. 34. The Court agrees with the Defendants.

**[17]** **[18]** The (k)(1) materials consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."). 19 C.F.R. § 351.225(k)(1). The interpretive canon *noscitur a sociis* is relevant here. This canon holds that "words grouped in a list should be given related meanings." *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322, 97 S.Ct. 2307, 53 L.Ed.2d 368 (1977). The regulation 19 C.F.R. § 351.225(k)(1) first lists among the (k)(1) materials "*the* petition," and "*the* initial investigation." (emphasis

added). This indicates that the relevant petition and initial investigation are the ones related to the antidumping order at hand, in this case the Thailand Order. The identical use of the definitive article for "*the* determinations by the Secretary ... and the Commission" in 19 C.F.R. § 351.225(k)(1) indicates that the references to the determinations by the Secretary and Commission are references to determinations that resulted from "*the* petition" and "*the* initial investigation." In this case, that is the Thailand Order. Thus, the Government and Wheatland's appeal to language in other countries' orders is unavailing.

Even were one to consider the language proffered by the Government and Wheatland, it remains true that, after an exhaustive search and a further opportunity provided by the Court, neither has found a single instance of dual-stenciled pipe being referenced as "standard pipe" throughout the entire history of the Thailand Order and the sunset reviews of *that* order. That fact damns the strongest. From 1985 until 2020, there is no record evidence of dual-stenciled pipe being considered as standard pipe for purposes of the Thailand Order. Evidence from other proceedings should not overrule the consistent import of the record of the order actually at issue. ***1299** Here, the absence of evidence is indeed evidence of absence. Substantial evidence does not support the Commerce Department's scope determination. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (requiring the Court to "hold unlawful any determination" that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law"); *see also Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. 456 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

## CONCLUSION

The Court finds that Commerce's determination is both unsupported by substantial evidence and not issued in accordance with the law. No Thai manufacturer produced dual-stenciled pipe imported as line pipe at the time of the order; therefore, dual-stenciled pipe could not have been included within the scope. Tr. of Oral Arg. 5:24-25, 6:12-16, 7:1-3, ECF No. 51, July 26, 2021. The initial petitioners expressly withdrew from Commerce and the ITC's consideration the item numbers under which dual-stenciled pipe would have been imported. *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82. There has been no injury determination as required by 19 U.S.C. § 1673 and case law. *See Badger-Powhatan*, 608 F. Supp. at 657 ("Where the domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute"). The ITC has not included dual-stenciled pipe imported as line pipe in any injury determination concerning pipe imported from Thailand. And for nearly four decades, the ITC has treated dual-stenciled pipe as line pipe and has noted in the relevant sunset reviews the exclusion of dual-stenciled pipe imported as line pipe from the scope of the orders imposing duties on standard pipes.

For the foregoing reasons, this matter is remanded for Commerce to conduct an analysis that considers the sources listed in 19 C.F.R. § 351.225(k)(1) in assessing whether dual-stenciled pipe falls within the scope of the Thailand Order, and it shall do so in compliance with the reasoning in this Opinion and Order. Commerce may not assess tariffs on any item absent an injury determination from the ITC. This Opinion and Order in no way disturbs Commerce's finding that mono-stenciled line pipe is outside the scope of the Thailand Order.

Thus, on consideration of the Plaintiff's Motion for Judgment on the Agency Record and all papers and proceedings had in relation to this matter, and on due deliberation, it is hereby:

**ORDERED** that Plaintiff's motion for judgment on the agency record is **GRANTED**;

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a Remand Redetermination in compliance with this Opinion and Order;

**ORDERED** that Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination;

**ORDERED** that Plaintiff shall have 30 days from the filing of the Remand Redetermination to submit comments to the Court; and

**ORDERED** that Defendant and Defendant-Intervenor shall have 15 days from the date of Plaintiff's filing of comments to submit a reply.

### All Citations

547 F.Supp.3d 1278

Footnotes

1 Meaning, Thailand produced neither line pipe, nor dual-stenciled line pipe, at the time of the initial petition, injury determination, and antidumping order.

2 The Proclamation's safeguard duties expired in March 2003. Proclamation No. 7274, 65 Fed. Reg. at 9194.

3 The argument that the lack of an express exclusion in the Thailand Order means the *Third Sunset Review's* scope cannot possibly include the Thailand Order within its general exclusion of line pipe, single or dual-stenciled, is unavailing. That Thailand's order does not expressly exclude line pipe or dual-stenciled pipe is a function of Thailand's production capacity. It is not an expression of intent to include line pipe, single and dual-stenciled, within the scope of the Thailand Order. As mentioned above, Thailand's order does not include an express exclusion because Thailand did not produce line pipe or dual-stenciled line pipe at the time the Thailand Order was issued.

4 Wheatland's arguments are essentially aligned with the Government's.

5 The Court will not discuss *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998) at length. *Wheatland Tube Co.* involved an analysis of the following question: If the language in an antidumping order's scope expressly excludes a given product, but that product is then imported and used for the same purpose as the products otherwise covered by that same order, does the excluded product then fall under the scope of that antidumping order? *See Wheatland Tube Co.*, 161 F.3d at 1368-69. The answer *Wheatland Tube Co.* gave is no, it does not fall under the scope unless the scope is ambiguous and the (k)(1) materials are not dispositive. *Id.* at 1369-70.

The present case deals with an entirely different legal issue – the applicability of an antidumping order's scope to products neither expressly included in nor expressly excluded from that scope, and whether the (k)(1) materials underlying that antidumping order support by substantial evidence the reading of that scope to nevertheless include those otherwise unmentioned products.

6 Wheatland's argument that size and shape are the only relevant characteristics for classifying different kinds of pipes has also been consistently rejected by Commerce and the ITC. For example, the ITC in 1985 called this approach “somewhat arbitrary” and did not apply it in its injury determinations, instead taking great care to distinguish between standard and line pipe. J.A. at 1096. During the scope inquiry that led to this case, Wheatland used this same argument again while attempting to convince Commerce to apply the Thailand Order not only to dual-stenciled line pipe but also to mono-stenciled line pipe. J.A. at 1004-06. Commerce rejected Wheatland's argument in its Final Scope Ruling insofar as mono-stenciled line pipe is concerned, noting as the Court does that “[t]he historical documents establish that the investigations of both Commerce and the ITC were limited to standard pipe.” J.A. at 2053. And that “to impose AD duties, Commerce must determine that the class or kind of merchandise has been found to be sold at less than fair value, and the ITC must conclude that a domestic industry has been materially injured or threatened with material injury.” J.A. at 2053-54.

7 Interestingly, the dissent found that, if viewed as one product instead of two, there would be no harm to domestic producers. Thus, the dissent wished to conflate line pipe and standard pipe to block the imposition of tariffs on either type of pipe. ITC Final Determination, J.A. 1281. Nearly forty years later, Commerce wants to conflate the two types of pipe to achieve the exact opposite result.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Addendum 4

Barcode:4197562-01 A-549-502 REM - Remand - Sco -Dual Stenciled Pipe, Slip Op.21-135

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Remand
Slip Op. 21-135
Scope – Dual-Stenciled Pipe
**Public Document**
E&C/O VII: Team

***Saha Thai Steel Pipe Public Company, Ltd., v. United States***
**Court No. 1:20-cv-133, Slip Op. 21-135 (CIT October 6, 2021)**

## FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (Court or CIT) in *Saha Thai Steel Pipe Public Company, Ltd., v. United States*, Court No. 1-20-cv-133, Slip Op. 21-135 (October 6, 2021) *(Remand Order*). This remand concerns the final scope ruling issued by Commerce after conducting a scope inquiry under the 1986 antidumping duty order on circular welded carbon steel pipes and tubes (CWP) from Thailand.[1] In its *Remand Order*, the Court directed Commerce to file its remand redetermination with the Court within 90 days from the date of issuance of the *Remand Order*. The Court remanded Commerce to conduct an analysis that reconsiders the sources listed in 19 CFR 351.225(k)(1) in light of its holding to determine whether dual-stenciled pipe, which is certified for use in standard pipe or line pipe applications, falls within the scope of the *Thailand Order*.[2]

In accordance with the *Remand Order*, Commerce has reconsidered record sources under 19 CFR 351.225(k) in light of the reasoning, analysis and conclusions of the Court, and under

---

[1] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe," dated June 30, 2020 (Final Scope Ruling).
[2] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Thailand Order*).

Filed By: Leo Ayala, Filed Date: 1/6/22 9:38 AM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

respectful protest,[3] for the reasons explained below, we find on remand that dual-stenciled standard pipe and line pipe are not covered by the scope of *Thailand Order*.

## II. SCOPE OF THE *THAILAND ORDER*

The products covered by the *Thailand Order* are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the *Thailand Order* is dispositive.

## III. BACKGROUND

On November 22, 2019, Commerce self-initiated a scope inquiry to determine whether dual-stenciled standard pipe and line pipe (dual-stenciled pipe) and single-stenciled line pipe are subject to the *Thailand Order*.[4]

*Preliminary Scope Ruling*

On February 24, 2020, Commerce issued a Preliminary Scope Ruling.[5] Both a domestic producer of the domestic like product, Wheatland Tube Company (Wheatland), and an exporter

---

[3] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376-77 (Fed. Cir. 2003).

[4] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019.

[5] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard Line Pipe," dated February 24, 2020 (Preliminary Scope Ruling).

of the subject merchandise, Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), participated in Commerce's scope inquiry.

- Commerce and both parties placed information on the record, and Wheatland and Saha Thai provided comments and rebuttal comments.[6] Commerce considered all of the information on the administrative record, as well as the parties' comments, in issuing its Preliminary Scope Ruling.
- Commerce preliminarily determined that single-stenciled line pipe was not covered by the scope of the *Thailand Order*, but that pipe that is dual-stenciled standard pipe and line pipe to "indicate compliance with two different industry specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L" was covered by the scope of the *Thailand Order*.[7]
- Commerce explained that the *Thailand Order* covers only "standard pipe," and cited to descriptions in the Petition and in the *ITC Final Injury Determination*, for descriptions of what products are covered by the term "standard pipe."[8]
- Commerce explained that line pipe was not covered by the *Thailand Order* and that "during the underlying investigation, the petitioners withdrew line pipe from the scope of the Petition with respect to Thailand" and the U.S. International Trade Commission (ITC) "explicitly" stated that the "underlying investigation of steel pipe from Thailand did not

---

[6] *See* Memorandum, "Placing Document of the Record of the Line Pipe Scope Inquiry," dated December 6, 2019; Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to November 22, 2019 Request for Comments," dated December 12, 2019; Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 20, 2019; and Saha Thai's Letter, "Saha Thai's Rebuttal Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 30, 2019.
[7] *See* Preliminary Scope Ruling at 3.
[8] *Id.* (citing Petitioner's Letter, "Petition for Imposition of Antidumping Duties: Members of Committee on Pipe and Tube Imports," dated February 28, 1984 (Petition); and *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand (Final)*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (February 1986) (*ITC Final Injury Determination*).

include line pipe."[9] However, Commerce also found that unlike other "orders covering similar merchandise (*e.g.*, from Brazil, Mexico, Korea, and Venezuela)," the *Thailand Order* did "not explicitly exclude pipe that has been dual-stenciled as standard pipe and line pipe."[10]

- Based on the information on the administrative record before it, Commerce concluded that there was "no information from the investigation indicating that pipe which has been dual-stenciled as both standard pipe and line pipe was intended to be excluded from the {*Thailand Order*}."[11] Therefore, under the scope language itself, Commerce preliminarily found that the *Thailand Order* covered dual-stenciled standard pipe and line pipe, *i.e.*, certified as standard pipe as well as certified as line pipe.[12]
- Relying on the sources listed in 19 CFR 351.225(k)(1), Commerce continued its analysis by looking to the *ITC Fourth Sunset Final Report* which covered seven different orders on similar standard pipe products and noted that the "individual orders were established based on different petitions with different scope language. Although some of the CWP orders explicitly include exclusions for line pipe and dual-stenciled line pipe, some of the CWP orders do not include such exclusions."[13]
- Commerce explained, therefore, that the ITC's statements about line pipe and dual-stenciled standard pipe and line pipe in general which indicated that CWP orders did not

[9] *Id.* at 5 (citing *ITC Final Injury Determination*)
[10] *Id.* at 6-7 (citing *Notice of Antidumping Duty Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992)).
[11] *Id.* at 7.
[12] *Id.*
[13] *Id.* (citing Saha Thai Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 at Attachment 9: *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub. 4754 (January 2018) (*ITC Fourth Sunset Final Report*)).

cover dual-stenciled pipe "did not apply to all of the CWP orders, as some CWP orders contained express dual-stenciled exclusions and some did not."[14]

- Commerce explained that the CIT's opinion in *Wheatland Tube Co.*,[15] which applied to the CWP from Mexico proceeding, was "inapposite," because that holding was "separate from the order on CWP from Thailand, which has different scope language and its own record that differs from the records covered by the proceedings referenced by Saha Thai. Specifically, the scope of the Mexican CWP order includes the explicit exclusions for line pipe and dual- or triple-stenciled products, which was the crux of the *Wheatland Tube Co.* litigation," while no such language existed in the scope of the *Thailand Order*.[16]

*Final Scope Ruling*

In the Final Scope Ruling issued on June 30, 2020, Commerce once again considered the evidence on the record as well as the additional arguments of the parties made after the preliminary scope ruling in case briefs and rebuttal briefs filed by Wheatland and Saha Thai.[17]

- Commerce again determined that single-stenciled line pipe was not covered by the scope of the *Thailand Order*, but that pipe that is dual-stenciled to "indicate compliance with two different industry specifications, as conforming to industry standards for both

[14] *Id.*
[15] *See Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 158 (CIT 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998) (*Wheatland Tube Co.*).
[16] *Id.*
[17] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Case Brief," dated March 23, 2020; *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Case Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated March 30, 2020 (Saha Thai's Scope Inquiry Case Brief); Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated April 9, 2020; and Saha Thai's Letter, "Saha Thai's Scope Inquiry Rebuttal Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated April 9, 2020.

standard pipe and line pipe, such as ASTM A53 and API 5L" was covered by the scope of the *Thailand Order*.[18]

- Commerce made this determination based on consideration of the language of the scope of the *Thailand Order*, consideration of the sources under 19 CFR 351.225(k)(1) placed on the record, and the substantial evidence on the administrative record before it. Commerce did not look beyond the record in making its determination.[19]
- Commerce first determined in the Final Scope Ruling that dual-stenciled pipe met the description of subject merchandise included in the scope of the *Thailand Order*, both to the physical description as well as the classification as standard pipe.[20] Standard pipe by definition is pipe that is most commonly produced to American Society for Testing and Materials (ASTM) specifications A-120, A-53, and A-135.[21]
- Next, Commerce considered all 19 CFR 351.225(k)(1) evidence placed on the record by parties, as well as other informative evidence from separate proceedings covering standard pipe.[22]
- Commerce found that neither Commerce's *Final Determination,*[23] nor the *ITC Final Injury Determination*, addressed dual-stenciled pipe, and, therefore, did not signify an intentional omission as contemplated in *Wheatland Tube Co*.[24]

[18] *See* Final Scope Ruling at 3.
[19] *Id.* at 12-17.
[20] *Id.* at 12-14: "if a certain product is certified as standard pipe, then it is standard pipe regardless of whether it is also certified as line pipe."
[21] *Id.* at 3; *see also Remand Order* at 30 (citing *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary), USITC Pub. 1680 (April 1985) (ITC Preliminary Injury Determination) at 7-8).
[22] *See* Final Scope Ruling at 12-17.
[23] *See Antidumping: Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 FR 3384 (January 27, 1986).
[24] *See* Final Scope Ruling at 14.

- With respect to the arguments that some CWP orders had language excluding dual-stenciled pipe and some did not, Commerce found that "such differences merely suggest that some products may have been intended differently under the different orders."[25] Commerce also reviewed the *ITC Third Sunset Final Report*[26] and *ITC Fourth Sunset Final Report*, which had been placed on the record by Saha Thai. Saha Thai pointed out that in both of the ITC's sunset reviews, the ITC stated that "dual-stenciled pipe, which enters as line pipe under a different subheading of the {HTSUS} for U.S. customs purposes, is not within the scope of the orders."[27] Commerce, however, found that it was "clear that the ITC was not addressing the language of each individual order, including the scope text which differed between those orders, but instead was providing a generalized statement applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe."[28] As it concluded in analyzing the similar language from the *ITC Fourth Sunset Final Report*, Commerce determined that this reference, as well to "orders" in the plural, was not intended to cover all of the CWP orders.[29] Commerce determined, instead, that the only reasonable conclusion was that the various references to the ITC language were meant to summarize the status of dual-stenciled pipe

[25] *Id.* at 15.
[26] *See Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Publication 4333 (June 2012) (*ITC Third Sunset Final Report*). Saha Thai raised arguments concerning language in the Third Sunset Final Report for Commerce to consider in its scope inquiry case brief. *See* Saha Thai's Scope Inquiry Case Brief at 12-13.
[27] *Id.* (citing *ITC Fourth Sunset Final Report* at 6-7; and *ITC Third Sunset Final Report* at 8).
[28] *See* Final Scope Ruling at 15 (citing *ITC Fourth Sunset Final Report*).
[29] *Id.* at 16 (citing *ITC Third Sunset Final Report*).

under the majority of the orders, but were not applicable to other specific orders, including the *Thailand Order*, without such exclusion.[30]

- Saha Thai also argued that the specific exclusionary language in some CWP orders as well as the CIT's holding in *Wheatland Tube Co.* should preclude Commerce from finding that dual-stenciled pipe is covered by the *Thailand Order*. Commerce determined that the proceedings referenced by Saha Thai and those at issue in *Wheatland Tube Co*, had importantly different scope language and records, with an explicit exclusion for dual-stenciled pipe, which was the main factual issue in *Wheatland Tube Co.*[31]
- Given that dual-stenciled pipe is certified as standard pipe under ASTM specifications and meets the other physical description of the scope language and given that Commerce found that other record information did not show an intention to omit dual-stenciled pipe from the scope of the *Thailand Order*, Commerce determined in the Final Scope Ruling that dual-stenciled pipe was included in the scope of the *Thailand Order*.[32]

*Remand Order*

Saha Thai challenged the Final Scope Ruling before the Court, and on October 6, 2021, the Court issued its holding. In summary, the Court held in the *Remand Order* that Commerce's Final Scope Ruling unlawfully expanded the scope by ruling that dual-stenciled pipe was covered by the scope of the *Thailand Order* on the following bases:

- When the petitioners withdrew the petition covering line pipe, it concerned products classified under the Tariff Schedule of the United States Annotated (TSUSA)

[30] *Id.* at 16. As the ITC noted in the *ITC Third Sunset Final Report*, "Because of differences in wall thicknesses and excluded products among the circular welded pipe scope definitions, the domestic like products defined by the Commission in the various underlying original investigations differed from one another in some respects." *See ITC Third Sunset Final Report* at 9.
[31] *See* Final Scope Ruling at 16.
[32] *Id.* at 17.

610.3208 and 610.3209 and those "are the numbers under which line pipe, dual-stenciled or otherwise, would have been imported in 1985." The Court cited to the TSUSA in 1985 and statements on the oral argument transcript for the "Government and Wheatland's admission that line pipe and dual-stenciled pipe would have been imported under those TSUSA classifications in 1985."[33]

- The Court held that the TSUSA numbers appearing in Commerce's *Final Determination* did not list the TSUSA numbers which would have covered dual-stenciled line pipes in 1986. The Court said that the ITC report released in April 1985 that listed these TSUSA numbers in the first place addressed "material injury caused to the U.S. standard pipe industry by the importation of standard pipe from Thailand, not by line or dual-stenciled pipe."[34]
- The Court pointed out that "at no point did the ITC make a material injury determination regarding the … dual-stenciled pipe imported from Thailand."[35]
- The Court also pointed out that the ITC "did not mention dual or multi-stenciled pipe imported as line pipe" in its injury determination.[36]
- Looking beyond the administrative record, the Court referenced the fact that in the *ITC First Sunset Final Report*, in an analysis covering safeguard duties, the ITC noted that "dual-stenciled pipe imported as line pipe" was "excluded from

---

[33] *See Remand Order* at 5, 15, 32.
[34] *Id.* at 7, 32 ("Once the initial petitioners withdrew all pipes that were importable under 610.3208 and 3209 from consideration by the ITC and Commerce, those pipes were not included in either the resulting injury investigation conducted by the ITC or the antidumping order issued by Commerce").
[35] *Id.*
[36] *Id.*

antidumping orders were nonetheless subject to President Clinton's 'safeguard duties' covering line pipe."[37]

- Looking beyond the administrative record, the Court continued that the *ITC Second Sunset Final Report*, likewise, referenced the fact that the safeguard duties covering line pipe included dual-stenciled pipe, and that dual-stenciled pipe would likely be sold at a price premium over single-stenciled pipe due to additional steel requirements.[38]
- Citing the *ITC Third Sunset Final Report*, the Court found that the ITC did not specifically provide a caveat when it stated that the scope of the seven orders under review did not include dual-stenciled pipe when it stated: "Producers primarily make circular welded pipe to ASTM specifications A53, A135, and A795.40. As these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual-stenciled, *i.e.*, stamped to indicate compliance with two different specifications, such as ASTM53 and API5L. This dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[39]
- Citing the *ITC Fourth Sunset Final Report*, the Court found that the ITC reiterated the treatment of dual-stenciled pipe in the *ITC Third Sunset Final Report* as it contained the same language used.[40]

---

[37] *Id.* at 11 (citing *Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532–534, 536, and 537 (First Sunset Review)*, USITC Pub. 3316 at 6 (July 2000) (*ITC First Sunset Final Report*).
[38] *Id.* at 11-12 (citing *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 409, 410, 532–534, and 536 (Second Sunset Review)*, USITC Pub. 3867 at 4–5 (July 2006) (*ITC Second Sunset Final Report*).
[39] *Id.* at 12.
[40] *Id.* at 12-13.

- The Court explained that at the hearing it required all parties to "write a letter identifying for the Court 'in the record of this matter where there was an instance or more than one instance of … the Government' referring 'explicitly to dual stenciled pipe as standard pipe.'"[41]
- The Court stated that the "Government and Wheatland have consistently argued" that language of CWP orders covering other countries "are not probative of the [Thailand] order's scope,"[42] but in responding to the Court's demand for explicit references to dual-stenciled pipe as standard pipe, both referenced other orders.
- The Court held that the scope language was "ambiguous without the context of the (k)(1) materials."[43]
- The Court stated that Commerce in its arguments rejected "Saha's contention that there is probative value in antidumping orders, ITC determinations and Commerce's determinations that cover the same products are from different countries," and believed that the "order's plain language unambiguously encompasses dual-stenciled pipe."[44] Nonetheless, Commerce argued that the (k)(1) sources still support its decision.
- The CIT held that it was relevant that Thailand "did not produce dual-stenciled pipe at the time of the original investigation and order."[45]

[41] *Id.* at 16.
[42] *Id.* at 17 (citing U.S. 56.2 Motion Response Brief at 18-19).
[43] *Id.* at 21.
[44] *Id.* at 24.
[45] *Id.* at 25.

- The CIT held that the "ITC made no injury determination as to dual-stenciled" standard pipe and line pipe from Thailand, and, "therefore, antidumping duties cannot be imposed on those types of pipes when imported from Thailand."[46]
- The CIT held that unlike the facts in *Wheatland Tube Co*., the scope "neither expressly included" nor "expressly excluded" the merchandise at issue, so therefore that opinion is not applicable.[47]
- Despite meeting the physical characteristics of the scope, which the Court did not disagree was the case, the Court pointed out that the original scope also included TSUSA numbers "that do not include, as all the parties agreed, the item numbers under which dual-stenciled pipe would have been imported in 1986."[48] The Court described the "language about size and diameter" of the scope as only "one-third" of the scope, and equivocated the TSUSA classifications with the physical descriptions in importance.[49] Still, the Court determined that because the scope said it covered pipe "commonly referred to" in the industry as "standard pipe," it was also important to determine if dual-stenciled pipe was "standard pipe," and on that the scope was "silent," thereby making it ambiguous.[50]
- The Court held that Commerce "cannot impose a duty on a fiction. API stenciled pipes, *i.e.*, line and dual-stenciled pipes were omitted by the decision of the petitioners themselves from the ITC's original injury investigation" and that "it is well settled that Commerce cannot 'assess antidumping duties on products

[46] *Id.*
[47] *Id.* at 25, n. 5.
[48] *Id.* at 27.
[49] *Id.*
[50] *Id.* at 28-29.

intentionally omitted from the ITC's injury investigation. *Wheatland Tube Co*., 161 F.3d at 1371. Allowing Commerce to assess such duties without an injury determination 'would itself frustrate the purpose of the antidumping laws.' *Id.*"[51]

- The Court held that the "lack of" an injury determination by the ITC explicitly referencing dual-stenciled pipe was "fatal to Commerce's case."[52]
- Citing the *ITC Third Sunset Final Report* and the *ITC Fourth Sunset Final Report*, the Court notes that in speaking generally about orders from countries that had exclusions for dual-stenciled standard pipe and line pipe and orders that did not include such exclusions, that because the statements by the ITC that "dual-stenciled pipe, which enters as line pipe" was not within the scope of the orders were "unqualified" and gave "no indication that the scope language does not apply to the {*Thailand Order*}," the Court found Commerce's arguments that the language that the language was general to be "not persuasive."[53]
- Finally, the Court held that because Commerce could not find "a single instance of dual-stenciled pipe being referenced as 'standard pipe" through the entire history of the *Thailand Order* and the sunset reviews of that order," that fact was relevant to the issue.[54]

## IV. ANALYSIS

In compliance with the *Remand Order*, Commerce has reconsidered the sources listed in 19 CFR 351.225(k)(1) that were on the administrative record before Commerce, as well as the additional information which was not on the record but which was, nonetheless, considered by

[51] *Id*. at 32-33.
[52] *Id.* at 33.
[53] *See Remand Order* at 37.
[54] *Id.* at 39.

the Court, and in light of the Court's holding, on remand we must determine that dual-stenciled pipe, which is certified as and can be used as either standard pipe or line pipe, is not covered by the *Thailand Order*. Respectfully, we are conducting this analysis under protest, based on concerns with the following issues:

*The Remand Order's Citation to, and Reliance on, Extra-Record Sources Not Raised By Parties Before Commerce*

Commerce was required by statute to make its scope ruling based solely on information on the administrative record. Under 19 U.S.C. § 1516a(b)(1)(B)(i) describing the appropriate standard of review, "{t}he court shall hold unlawful any determination, finding, or conclusion found... to be unsupported by substantial evidence *on the record*." (emphasis added).[55] The CIT has held that judicial review must be based solely upon the administrative record compiled by the agency during the particular review proceeding which resulted in the determination subject to judicial review.[56] The scope of the record for purposes of judicial review must be based upon information which was "before the relevant decision-maker" and was presented and considered "at the time the decision was rendered."[57] This information, which constitutes the formal record is the only information upon which the factual findings and legal conclusions underlying the challenged determination could have been based, consideration of documentary evidence and information not before Commerce could be considered a *de novo* review.[58]

---

[55] As defined under 19 U.S.C. § 1516(b)(2), the record consists of "a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings... and a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the *Federal Register*."

[56] *See Association of American School Paper Suppliers v. United States*, 683 F. Supp. 2d 1317, 1323-34 (CIT 2010) (citing *Beker Industries Corp. v. United States*, 7 CIT 313, 1984 WL 3727 (CIT 1984) (Court denied addition of information and documents from proceedings before or during the review in question that were not before Commerce at the time of its decision)).

[57] *Id.*

[58] *Id.*

In its discussion of factors supporting the Court's conclusion, the *Remand Order* considered, and quoted from, language from the *ITC First Sunset Final Report* and the *ITC Second Sunset Final Report* to support the conclusion that the ITC "intentionally" omitted dual-stenciled pipe from its initial injury determination in the *Thailand Order*.[59] However, neither of these ITC sunset final reports[60] was the basis of arguments raised by parties in the course of the scope inquiry, and, thus, the information contained in these ITC sunset final reports was not considered by Commerce in issuing its Final Scope Ruling.[61] In holding that Commerce did not issue a decision consistent with the evidence before it, the *Remand Order* relied on agency decisions that were not before Commerce on the administrative record, and not argued by parties before Commerce in the underlying administrative proceeding or in their initial case briefs before the Court.

In addition, in the *Remand Order*, the Court cited *Proclamation 7274*[62] concerning Section 201 safeguard duties covering line pipe issued by President Clinton.[63] Neither Saha Thai nor Wheatland raised *Proclamation 7274* before Commerce during the scope inquiry and neither party referenced that proclamation in their Rule 56.2 briefs before the Court. The *Remand Order* looked beyond the administrative record in citing to, and relying on, these materials, thereby holding that Commerce unlawfully did not consider information that was not before it.

[59] *See Remand Order* at 10-12; 35-37.
[60] Saha Thai raised arguments concerning language in the Third Sunset Final Report for Commerce to consider in its scope inquiry case brief. *See Saha Thai's Scope Inquiry Case Brief*, dated March 30, 2020 at 12-13.
[61] The Court also states that Commerce gave "short shrift" to the (k)(1) sources. *See Remand Order* at 24. Commerce respectfully disagrees with this description of Commerce's Preliminary and Final Scope Rulings, as we considered all of the record evidence before us as part of our analysis and addressed each argument raised by parties.
[62] *See To Facilitate Positive Adjustment to Competition from Imports of Certain Circular Welded Carbon Quality Line Pipe, Proclamation No. 7274*, 65 FR 9191 (February 23, 2000) (*Proclamation 7274*).
[63] *See Remand Order* at 11, 36. It is also unclear what weight should be given to *Proclamation 7274*, as presidential proclamations are not sources enumerated under 19 C.F.R. § 351.225(k)(1).

*The Remand Order's Understanding of Commerce's Interpretation of 19 CFR 351.225(k)(1) and Practice With Respect to Other Antidumping and Countervailing Duty Orders*

In determining the extent of sources to be considered under 19 CFR 351.225(k)(1), the Court agreed with Commerce that the sources listed under the regulation refer to the administrative proceeding at issue and do not direct Commerce to consider the scopes or the records of other proceedings.[64] However, the *Remand Order* appears to misunderstand Commerce's position regarding the text of other orders when it stated that the Government argued these sources are "irrelevant."[65] As Commerce stated in its Final Scope Ruling, and as the Government stated in its brief before the Court, depending on the circumstances in other proceedings, 19 CFR 351.225(k)(1) does not require review or consideration of petitions or orders involving other countries, but Commerce, nonetheless, may (and frequently does) find various materials from other proceedings informative, if information from those other proceedings is placed on the administrative record.[66] As part of its practice, Commerce frequently relies on the treatment of certain products under other orders as part of its scope analysis, including scope rulings pertaining to those other orders, as long as those scope rulings are placed on the record before it.[67]

*Commerce Believes that the Remand Order Misunderstands the ITC's Finding in the Investigation*

As part of its holding, the *Remand Order* concluded that there was no requisite specific injury determination for dual stenciled pipe for Commerce to find such pipe in scope, reasoning

[64] *Id.* at 38.
[65] *Id.* at 38.
[66] *See* Final Scope Ruling at 15; *see also* Government's Response to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record, dated March 26,2021 at 20.
[67] Commerce recently codified this practice in its new scope regulations. New 19 CFR 351.225(k)(1)(i)(C), which became effective on November 4, 2021, was revised "to clarify that both previous or concurrent Commerce scope determinations may be considered by Commerce as part of its analysis, including prior scope rulings, memoranda, or clarifications which pertain to both the order at issue, as well as other orders with the same or similar language as

that "{s}ince their initial omission from the original injury investigation, the ITC has conducted no subsequent injury investigation to determine whether API stenciled pipe from Thailand injures a domestic industry. Given that it is 'a fundamental requirement' in our law 'that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question, ' the lack of such an injury determination for API stenciled pipes is fatal to Commerce's case."[68] This conclusion, however, does not appear to consider that the ITC expressly found ASTM stenciled pipe (standard pipe) from Thailand injures the domestic industry.[69] Dual-stenciled pipe is certified as showing compliance with two different industry specifications, such as ASTM A53 and API 5L, which are applicable for standard pipe and line pipe, respectively.[70] Thus, because dual-stenciled pipe is certified as meeting ASTM compliance for standard pipe, Commerce determined that there was the requisite underlying affirmative ITC injury determination.[71]

Furthermore, because the issue of scope coverage absent ITC explicit analysis in the investigation was not an issue which was specifically raised by the parties before Commerce,

---

that of the order at issue. This change reflects Commerce's practice and interpretation of that provision over the years, and shows that unlike the other three primary sources, this primary source includes scope determinations, such as scope rulings and scope clarifications, from other proceedings addressing similar language used in the scopes of different orders and sometimes cover the same or similar physical merchandise from other countries. We have found it valuable over the years to consider such determination as part of our scope inquiry analysis." *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, Final Rule*, Preamble, 86 FR 52300, 52323 (September 20, 2021).

[68] *See Remand Order* at 33 (citing *Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 158 (CIT 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998).

[69] *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand: Determinations of the Commission In Investigation No. 701-TA-253 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation; and Determination of the Commission In Investigation No. 731-TA-252 (Final) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation*, USITC Publication 1810 (February 1986) at 2. ("{T}he Commission determines... that an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes, which have been found by the Department of Commerce to be sold in the United States at less than fair value (LTFV).")

[70] *See* Final Scope Ruling at 1 n. 2.

[71] *Id.* at 13-14 (Commerce stated, "{i}n the ITC Final Injury Determination, the ITC found that, as a result of imports of standard pipe from Thailand... an industry in the United States is materially injured" and further found "if a certain product is certified as standard pipe {such as dual-stenciled pipe}, then it is standard pipe regardless of

Commerce never had an opportunity to address the fact the Court of Appeals for the Federal Circuit (and the CIT in the decision below) in *Shenyang Yuanda* explicitly held that there is no requirement that a particular product be analyzed by the ITC in its industry analysis in the underlying investigation to be covered by the scope of an order and for a domestic producer of that product to have standing to challenge a scope ruling on that product.[72] Accordingly, it is our understanding that the Federal Circuit held that there is no contingent requirement that the ITC reference a specific product in its injury analysis to have it covered by the scope of an order if that product is ultimately determined to be covered by the physical description of the general merchandise covered by the scope of an order.[73] Accordingly, the Federal Circuit's holding in *Shenyang Yuanda* supports the argument that the absence of an injury determination specific to dual-stenciled pipe (and lack of a specific reference to dual-stenciled pipe) by the ITC and Commerce in the original investigation does not mean that Commerce was precluded from finding dual-stenciled pipe to be subject merchandise.

*The Remand Order's Understanding of the ITC's Statements in the Third and Fourth ITC Sunset Final Reports and May Not Have Considered Other Relevant Statements in those Reviews*

Finally, in the *ITC Third Sunset Final Report* and *ITC Fourth Sunset Final Report*, multiple CWP orders from other countries were reviewed along with the *Thailand Order* and a majority of these have an express exclusion for dual-stenciled standard pipe and line pipe. Specifically of the seven countries with orders under review, the antidumping duty orders on

---

whether it is also certified as line pipe."). In addition, the *Remand Order* held that the ITC "intentionally omitted" dual-stenciled line pipe from its injury investigation, but there was no evidence from the original Commerce and ITC investigations for the *Thailand Order* on the administrative record that ITC intentionally omitted dual-stenciled pipe. *See Remand Order* at 22, 33.

[72] *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 961 F. Supp. 2d 1291, 1299 (CIT 2014), *aff'd by Shenyang Yuanda v. United States*, 776 F.3d 1351, 1355-56 (Fed. Cir. 2015) (*Shenyang Yuanda*) ("{Plaintiffs}' suggestion that the ITC must find injury as to all domestic producers is akin to requiring every producer of {subject merchandise} expressly listed in the scope, and those covered by an order but not expressly listed, to participate in an investigation.").

[73] *Id.*

Brazil, Mexico, Korea, and Taiwan contain express exclusions for dual-stenciled pipe, whereas the orders on Thailand, Turkey, and India do not.[74] In its Final Scope Ruling, Commerce determined that the language from these reports stating that dual-stenciled pipe was excluded from the scope of the orders was a general statement, not meant to expressly include the orders that did not have such exclusionary language, such as the *Thailand Order*.[75] The Court held that this description was incorrect -- that lacking any qualification in the specific ITC sentences cited, the ITC meant to include the *Thailand Order*'s scope as well in the generalized statement.[76]

However, there was additional language in those ITC reports that seems to contradict that description of the ITC's understanding of the scopes of the various orders. In the *ITC Fourth Sunset Final Report*, the ITC highlighted that there were differences in the scope of the orders based on specific product exclusions, stating, "{t}he... CWP orders generally cover circular welded non-alloy steel pipes not more than 16 inches in outside diameter, but vary in terms of outside wall thickness specifications and *product exclusions*."[77] Likewise, with respect to the *ITC Third Sunset Final Report* included language acknowledging the difference in each orders' scope: "Because of differences in wall thicknesses and excluded products among the circular welded pipe scope definitions, the domestic like products defined by the Commission in the various underlying original investigations differed from one another in some respects."[78] Furthermore, the *Federal Register* notice issued as part of both reviews made no reference to dual-stenciled pipe being excluded for the purposes of the *Thailand Order*: "The products covered by the order include certain welded carbon steel standard pipes and tubes with an

[74] *See ITC Third Sunset Final Report* at I-22 – I-23 Table I-12.
[75] *See* Final Scope Ruling at 15-16.
[76] *See Remand Order* at 37. Presumably, under that interpretation, the ITC also intended to suggest that dual-stenciled pipe was excluded from the Turkey and India orders as well.
[77] *See ITC Fourth Sunset Final Report* at 6 (emphasis added)
[78] *See ITC Third Sunset Final Report* at 9.

outside diameter of 0.375 inch or more but not over 16 inches. These products are commonly referred to in the industry as standard pipes and tubes produced to various American Society for Testing Materials (ASTM) specifications, most notably A–53, A– 120, or A–135."[79] Accordingly, we find no evidence on the record with respect to the intentions of the ITC to specifically interpret the scope of the Thailand, Turkey and Indian orders (with no express exclusions) and the Brazil, Mexico, Korea, and Taiwan orders (with express exclusions) as covering the exact same universe of merchandise in either the *ITC Third Sunset Final Report* or the *ITC Fourth Sunset Final Report*, especially in light of the fact that the ITC acknowledged in both that the scopes of the orders under review varied in terms of product exclusions.[80]

*Conclusion*

The Court held that Commerce's Final Scope Ruling was unlawful and unsupported by substantial evidence on the record.[81] Therefore the *Remand Order* held that Commerce should reconsider the sources under 19 CFR 351.225(k)(1) in compliance with the Court's reasoning and analysis, and we have done so. We have determined that dual-stenciled standard pipe and line pipe could not be covered by the scope of the *Thailand Order*, under the analysis, reasoning, and conclusions reached by the Court in the *Remand Order*, even if two inconsistent conclusions could be drawn from the record evidence.[82] As we have explained, we have concerns with the *Remand Order* and, therefore, have issued these remand results of redetermination under respectful protest. Should the Court affirm our final results of redetermination, we intend to issue instructions to U.S. Customs and Border Protection accordingly.

[79] *See Certain Circular Welded Carbon Steel Pipes and Tubes from India, Thailand, and Turkey; Final Results of Expedited Five-Year ("Sunset") Reviews of Antidumping Duty Orders*, 76 FR 66,893, 66,894 (October 28, 2011).
[80] *See ITC Fourth Sunset Final Report* at 6.
[81] *Remand Order* at 40.
[82] *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308-09 (Fed. Cir. 2020); *accord United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 798 (Fed. Cir. 2020).

## V. COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On December 10, 2021, we released our Draft Results of Redetermination to interested parties.[83] On December 17, 2021 we received comments from Saha Thai[84] and Wheatland.[85] We respond to these comments below.

*Saha Thai's Comments*

- The Draft Results of Redetermination fully complies with the Court's *Remand Order* and is in line with applicable law and the evidentiary record.[86]
- Commerce has followed the Court's instructions and concluded that dual-stenciled standard pipe and line pipe is not covered by the *Thailand Order*. Saha Thai supports a final results of redetermination that, if affirmed by the Court, will set aside Commerce's Final Scope Ruling.[87]
- Saha Thai strongly supports the adoption of a final results of redetermination in the same terms as Commerce's Draft Results of Redetermination.[88]

*Commerce's Position*

We agree with Saha Thai's argument that these Results of Redetermination are in full compliance with the Court's *Remand Order*.

[83] *See* Draft Results of Redetermination Pursuant to Court Remand, *Saha Thai Steel Pipe Public Company, Ltd., v. United States*, dated December 10, 2021 (Draft Results of Redetermination).
[84] *See* Saha Thai's Letter, "Saha Thai's Comments Concerning the Department's Draft Remand Redetermination Pursuant to the Court Remand in Slip Op. 21-135. Court No. 1:20-cv-133 Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 17, 2021 (Saha Thai's Draft Redetermination Comments).
[85] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes: Comments on Draft Remand Redetermination," dated December 17, 2021 (Wheatland's Draft Redetermination Comments).
[86] *See* Saha Thai's Draft Redetermination Comments at 2.
[87] *Id*.
[88] *Id*.

*Wheatland's Comments*

*Wheatland Comment 1: The CIT's Opinion and Remand Order and Commerce's Draft Results of Redetermination are Not Supported by Evidence on the Record But Instead Impermissibly Rely on Evidence Outside the Record*

- In its opinion, the CIT substituted its own judgment before that of Commerce and conducted a *de novo* review of its own, expanding the record of the review by relying on sources outside of the record before Commerce in the underlying scope inquiry and improperly excising relevant evidence from the record when it directly contradicted the CIT's own findings of facts.[89]
- The CIT's judicial review is limited to whether Commerce's determination is supported by substantial evidence on the record and otherwise in accordance with law. Nonetheless, the CIT repeatedly looked outside the administrative record, citing to the *ITC First Sunset Final Report*, the *ITC Second Sunset Final Report*, and *Proclamation 7274*. None of these documents were placed on the administrative record before Commerce. Therefore, it is impossible that these sources could have been considered "record evidence" to either support or detract from Commerce's scope determination. The CIT acted *sua sponte* to develop its own factual record and conducted its own *de novo* scope inquiry. Such action far exceeds the limits of judicial review of Commerce's determinations provided by the statute, and the CIT's reliance on sources outside the record is misguided.[90]
- The U.S. Supreme Court has recognized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," and the CIT has applied this principle in its judicial review of

[89] *See* Wheatland's Draft Redetermination Comments at 2.
[90] *Id*. at 3.

antidumping determinations conducted by Commerce.[91] Similarly, the Federal Circuit has also cautioned against expansion of the record by the reviewing court to include information that was not before the administrative agency.[92]

- Because Commerce's Draft Results of Redetermination impermissibly relied on evidence that was not part of the record of the underlying scope inquiry, the Draft Results of Redetermination is not supported by substantial evidence on the record.[93]

*Commerce's Position*

We agree with Wheatland's argument that the conclusion of these Results of Redetermination is problematic because it is based, in part, on sources relied upon by the Court which were outside of the record before Commerce in the underlying scope inquiry and arguments pertaining to that non-record evidence that were not raised before the agency during the underlying scope inquiry. We also agree that the agency cannot be expected to make determinations based on facts and arguments in the first instance that neither it, nor interested parties, placed on the record. However, as we have explained, despite this concern, we do not believe that the Court's *Remand Order* permits Commerce to find that duel-stenciled standard pipe and line pipe is included in the scope of the *Thailand Order*.

*Wheatland Comment 2: Commerce's Draft Results of Redetermination Ignores Relevant Evidence on the Record*

- The Draft Remand Redetermination ignores evidence on the record that shows examples from other country proceedings where the scopes contain language demonstrating dual-stenciled pipe is referred to as standard pipe,[94] *i.e.*, evidence that is directly relevant to the

---

[91] *Id.* at 4 (citing *Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d 1283, 1287 (CIT 2020)).
[92] *Id.*
[93] *Id.*
[94] *See* ITC Fourth Final Sunset Report at I-12-I-13.

key question of whether dual-stenciled pipe is covered by the scope of the *Thailand Order*.[95]

- The CIT has failed to recognize Commerce's established practice with respect to the interpretation of 19 CFR 351.225(k)(1), stating that Commerce could not rely on this evidence because it did not pertain specifically to the *Thailand Order*. However, as Commerce correctly has recognized, while its regulation does not require it to review or consider petitions or orders involving other countries, Commerce nonetheless may do so when such information is placed on the administrative record – as it was in this scope inquiry. This longstanding practice has now been codified in Commerce's updated scope regulations.[96]

*Commerce's Position*

We agree with Wheatland's argument that the conclusion of these Results of Redetermination is problematic because it is inconsistent with the provided examples of dual-stenciled pipe being referred to as standard pipe in the scope languages of the other country proceedings covering similar subject merchandise from other countries.[97] We also agree that Commerce may, though is not required to, consider such relevant evidence from other country proceedings when it is before the agency. However, as we have explained, despite this concern, we do not believe that the Court's *Remand Order* permits Commerce to reach another conclusion other than that duel-stenciled standard pipe and line pipe is not included in the scope of the *Thailand Order*.

---

[95] *Id*. at 4-5 (citing *Remand Order* at 38).
[96] *Id*. at 5.
[97] *See* ITC Fourth Final Sunset Report at I-12-I-13.

*Wheatland Comment 3: Commerce's Draft Results of Redetermination is Based on a Fundamental Misunderstanding of the ITC's Final Determination in the Original Investigation*

- The CIT misapprehended the ITC's final injury determination in the original investigation,[98] finding that it could not have made an injury finding with respect to dual-stenciled pipe because Thai producers were not manufacturing dual-stenciled pipe at the time of the original investigation. The CIT failed to appreciate that dual-stenciled pipe has the same physical characteristics as standard pipe that the ITC found to be injurious to the domestic industry in the original investigation.[99]
- Moreover, the Federal Circuit has held that there is no requirement that the ITC reference a specific product in its injury analysis to have it covered by the scope of an order if that product is ultimately determined to be covered by the physical description of the general merchandise covered by the scope of an order. Not mentioning specific product specifications does not mean that those particular types of product are not covered by the scope of an order. In fact, there are many types of pipe produced to specifications not specifically discussed by the ITC that, nonetheless, would be covered by the scope.[100]
- Furthermore, it would make no difference if Thailand did not produce or export these particular types of product during the ITC's original investigation; they would still be covered by the scope of the final order if Thailand began producing and exporting them to the United States today.[101]
- It is the purview of Commerce – not the ITC – to determine whether merchandise that shares the physical characteristics of subject merchandise is included with the scope of

[98] *See* ITC Final Injury Determination.
[99] *Id.* at 6.
[100] *Id.*
[101] *Id.* at 6-7 (citing *Shenyang Yuanda*, 961 F. Supp. 2d at 1299).

the order. Indeed, the CIT's requirement that the ITC specifically mention every product that may be within the scope of an order in its injury determination directly conflicts with the provision of the statute that allows Commerce to make factual determinations about later-developed merchandise to prevent circumvention.[102]

- The Draft Results of Redetermination relies on the CIT's flawed understanding of the ITC's final determination and is not in accordance with law.[103]

*Commerce's Response*

We agree with Wheatland's argument that there is no requirement that the ITC reference a specific product in its injury analysis to have it covered by the scope of an order if that product is determined to be covered by the physical description of the general merchandise covered by the scope of an order.[104] Furthermore, we agree that it is the purview of Commerce to determine whether merchandise that shares the physical characteristics of subject merchandise is included with the scope of the order. However, as we have explained, despite this concern, we do not believe that the Court's *Remand Order* permits Commerce to find that duel-stenciled standard pipe and line pipe is included in the scope of the *Thailand Order*.

*Wheatland Comment 4: Commerce's Draft Results of Redetermination Fails to Properly Account for All of the ITC's Statements in the Third and Fourth ITC Sunset Final Reports*

- As Commerce notes, there is no evidence on the record with respect to the intentions of the ITC to specifically interpret the scope of all of the different orders at issue in the *ITC Third Sunset Final Report* and the *ITC Fourth Sunset Final Report* as covering the exact same universe of merchandise, and in fact, any finding of such an intention would seem

[102] *Id.* at 7.
[103] *Id.*
[104] *See Shenyang Yuanda*, 961 F. Supp. 2d. at 1299, *aff'd* 776 F.3d at 1355-56.

contradicted by the fact that the scopes of the orders under review varied in terms of product exclusions [105] Nonetheless, Commerce, in the Draft Results of Redetermination, relies on these *Reports* to support its finding that dual-stenciled pipe is not covered by the scope of the *Thailand Order*. This conclusion is contradicted by Commerce's own well-reasoned analysis in the Draft Results of Redetermination.[106]

*Commerce's Response*

We agree with Wheatland's argument that the conclusion of these Results of Redetermination does not rely on certain statements by the ITC in the *ITC Third Sunset Final Report* or the *ITC Fourth Sunset Final Report* which acknowledge that the scopes of orders covering merchandise from different countries did not cover the same universe of merchandise.[107] We also agree that those statements seem to contradict the CIT's finding that the ITC intended to cover the same merchandise (or at least dual-stenciled pipe) equally in all of those orders. However, as we have explained, despite this concern, we do not believe that the Court's *Remand Order* permits Commerce to find that duel-stenciled standard pipe and line pipe is included in the scope of the *Thailand Order*.

## VI. FINAL RESULTS OF REDETERMINATION

As a result of this redetermination, we have determined, under protest, that dual-stenciled standard pipe and line pipe is outside the scope of the *Thailand Order*. Should the Court sustain

[105] *Id.* at 7-8.
[106] *Id.*
[107] *See, e.g.*, ITC Third Sunset Final Report at 9; ITC Fourth Sunset Final Report at 6.

these final results of redetermination, we will issue appropriate instructions to U.S. Customs and Border Protection accordingly.

1/4/2022

X 

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

# Addendum 5

Barcode:3993265-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry
**Public Document**
E&C/OVII: LA

June 30, 2020

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Melissa G. Skinner
Senior Director, Office VII
Antidumping and Countervailing Duty Operations

**FROM:** Leo Ayala
International Trade Compliance Analyst, Office VII
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe

---

## SUMMARY

Based on the analysis below, we recommend that the Department of Commerce (Commerce) find that line pipe is not within the scope of the antidumping (AD) duty order (*Order*) on circular welded pipes and tubes (CWP) from Thailand.[1] We also recommend that products which are dual-stenciled[2] as standard pipe and line pipe are within the scope of the *Order*. We recommend that you approve the positions described in the "Final Scope Ruling" section of this memorandum. Below is a list of the issues in this scope ruling for which we received comments from interested parties:

Comment 1: Consideration of the (k)(1) sources
Comment 2: Line pipe and dual-stenciled standard and line pipe
Comment 3: Date of initiation

[1] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Order*).
[2] Standard pipe and line pipe often require physical and mechanical characteristics that overlap. Specifically, a pipe may be dual-stenciled, *i.e.*, certified that the product complies with two different industry specifications, such as ASTM A53 and API 5L, which are applicable for standard pipe and line pipe, respectively.

Filed By: Leo Ayala, Filed Date: 6/30/20 11:46 AM, Submission Status: Approved



INTERNATIONAL TRADE ADMINISTRATION

## BACKGROUND

On February 24, 2020, Commerce issued a Preliminary Scope Ruling.[3] In the Preliminary Scope Ruling, Commerce found, pursuant to 19 CFR 351.225(k)(1), that line pipe is not covered by the scope of the *Order*, but that products which are dual-stenciled as standard pipe and line pipe are within the scope of the *Order*.[4] On March 23, 2020 and March 30, 2020, Commerce received case briefs from Wheatland Tube Company (Wheatland) and Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), respectively.[5] On April 9, 2020, Commerce received scope rebuttal briefs from Wheatland and Saha Thai.[6]

## SCOPE OF THE *ORDER*

The products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## DESCRIPTION OF MERCHANDISE SUBJECT TO THIS SCOPE INQUIRY

The scope of this *Order* covers "pipes and tubes," commonly referred to as "standard pipe" and "structural tubing," limited by the dimensional requirements stated in the scope of the *Order*. The Petition describes "standard pipe" as:[7]

> {A} general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in

---

[3] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe," dated February 24, 2020 (Preliminary Scope Ruling).

[4] *Id.*

[5] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Case Brief," dated March 23, 2020 (Wheatland's Case Brief); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Case Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated March, 30, 2020 (Saha Thai's Case Brief).

[6] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated April 9, 2020 (Wheatland's Rebuttal); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Rebuttal Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated April 9, 2020 (Saha Thai's Rebuttal).

[7] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments," dated August 26, 2019 (Wheatland's August 26 Comments) at Exhibit 3: Petitioners' Letter, "Petition for the Imposition of Antidumping Duties: Certain Welded Carbon Steel Pipe and Tube Products from Thailand," dated February 28, 1984 (Petition), at 6-7, filed on behalf of the Committee on Pipe and Tube Imports, its sub-committees and constituent members (petitioners).

> plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.)[8]

Further, the International Trade Commission (ITC), in its final injury determination,[9] defined the merchandise subject to its injury investigation for pipes and tubes from Thailand:

> The imported pipe and tube products that are the subject of these investigations are circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard pipes and tubes. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.[10]

This scope inquiry covers "line pipe" with outside diameters of 0.375 inch or more, but not exceeding 16 inches, produced in Thailand.[11] "Line pipe," as described in the Petition, "is produced to API specifications for line pipe, API-5L or API{-}5X."[12] The ITC stated that "{l}ine pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L."[13]

Further, pipe may be dual-stenciled as both "standard pipe" and "line pipe," *i.e.*, identified to indicate compliance with two different industry specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L.

---

[8] *See* Wheatland's August 26 Comments at Exhibit 3: Petition at 12.

[9] *See* Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 (Saha Thai's August 26 Comments) at Attachment 5: "*Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand: Determinations of the Commission In Investigation No. 701-TA-253 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation; and Determination of the Commission In Investigation No. 731-TA-252 (Final) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation*, USITC Publication 1810 (February 1986) (*ITC Final Injury Determination*).

[10] *See ITC Final Injury Determination* at I-1 to I-2.

[11] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 at 4 (Scope Inquiry Initiation).

[12] *See* Petition at 12. Line pipe was included in the Petition, however, because record information demonstrated that no line pipe was produced in Thailand at that time, the petitioners withdrew their request for the imposition of antidumping duties on line pipe from Thailand. *See* Saha Thai's August 26 Comments at Attachment 14: Petitioners' Letter, "Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition," dated March 14, 1985.

[13] *See ITC Final Injury Determination* at II-1.

The following diagram from Saha Thai is helpful to conceptually illustrate the overlap between the industrial standards which result in a dual-stenciled product.[14]




**FINAL SCOPE RULING**

Legal Framework

In determining if merchandise is covered by the scope of an AD and/or countervailing duty order, Commerce will first examine the plain language of the underlying order to determine if it is dispositive of the matter.[15] Pursuant to its regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the descriptions of the merchandise in the initial investigation, and prior scope determinations made for the same product.[16] If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by the *Order*.[17]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).[18] These factors are: (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19] The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

[14] *See* Saha Thai's Case Brief at 5.
[15] *See Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("a predicate for the interpretive process is language in the order that is subject to interpretation,") (quoting *Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002)).
[16] *See* 19 CFR 351.225(k)(1).
[17] *See* 19 CFR 351.225(d).
[18] Four of the regulatory factors originate from a Court of International Trade holding - *Diversified Products Corp. v. United States*, 572 F. Supp. 883 (CIT 1983) (*Diversified Products*).
[19] *See* 19 CFR 351.225(k)(2).

Analysis of Comments

**Comment 1: Consideration of the 19 CFR 351.225 (k)(1) sources.**

*Wheatland's Case Brief:*

- Commerce's preliminary determination erroneously found that regular line pipe is outside the scope of the *Order*. Commerce should find that the plain language of the *Order* covers both regular line pipe and dual-stenciled pipe.[20]
- There is no requirement that Commerce look beyond the plain language of the scope, to the sources listed under 19 CFR 351.225(k)(1), such as the description of merchandise contained in the Petition, the investigation, and other proceedings conducted by Commerce and the ITC because there is no ambiguity in the scope language that needs clarification.[21]
- Additionally, the Court of Appeals for the Federal Circuit (CAFC) found that, where there is no ambiguity in the language of the scope, there is no need to examine the other factors set forth in 19 CFR 351.225(k)(1).[22]

*Saha Thai's Rebuttal:*

- Commerce is required to consider the sources under 19 CFR 351.225(k)(1) to determine whether the plain language of the scope of the *Order* is ambiguous.
- The scope language does not unambiguously establish that line pipe and dual-stenciled standard and line pipe is covered by the scope of the *Order*. Therefore, the (k)(1) sources are relevant to Commerce's analysis.[23]
- In accordance with 19 CFR 351.225(k), Commerce "will take into account" the (k)(1) sources in conducting a scope determination.[24]
- Even if Wheatland were correct that Commerce "must first determine that the plain language of the scope does not ambiguously cover the product at issue before analyzing the (k)(1) {sources}, such a requirement is met in this case."[25]
- Further, Wheatland's request that Commerce conduct a "minor alteration" circumvention inquiry clearly indicates that the scope of the *Order* is ambiguous.

---

[20] *See* Wheatland's Case Brief at 1.
[21] *Id*.
[22] *Id*. at 4 (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *see also Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous").
[23] *See* Saha Thai's Rebuttal at 2-6.
[24] *Id*. at 2-3 (citing *TMB 440AE, Inc. v. United States*, Ct. No. 18-00095, Slip Op. 19-109, 399 F. Supp. 3d 1314 (CIT 2019) (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1383 (Fed. Cir. 2017) noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed {(k)(1) sources}, is unambiguous").
[25] *Id*. at 3.

**Commerce Position:** We continue to reject Wheatland's argument that Commerce need not consider the (k)(1) sources in making our scope determination because the plain language of the scope is definitive in finding that line pipe and dual-stenciled pipe are covered by the scope of the *Order*. Importantly, the Court of International Trade (CIT) has stated that "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[26] The CIT has also stated that regardless of "{w}hether the order is ambiguous or not, Commerce's regulations are unambiguous– it 'will take into account' the (k)(1) criteria in conducting a scope determination. No case has invalidated this regulatory requirement."[27]

In this scope inquiry, Saha Thai has challenged the inclusion of line pipe and dual-stenciled standard and line pipe in the scope of the *Order*, based on the information in the (k)(1) sources, which Saha Thai has placed on the record of this inquiry, such that it would be inconsistent with Commerce's statutory obligations to ignore these sources. In particular, Saha Thai placed information on the record showing that, in the original investigation, the petitioners filed an amended petition removing line pipe from the scope of the Petition.[28] The omission of "line pipe" from the scope of the investigation was memorialized in Commerce's initiation of the less-than-fair-value investigation for Thailand.[29] Additionally, Saha Thai submitted information documenting the ITC's preliminary and final injury determinations, which explicitly state that its injury investigation of steel pipe from Thailand did not include line pipe.[30] Significantly, in accordance with section 731 of the Act (Supp. V 1981), the ITC must find that an industry in the United States is "materially injured, or threatened with material injury" prior to the imposition of antidumping duties. This requirement has been affirmed by the CAFC in *Wheatland Tube*, where it stated that "{a}llowing Commerce to include downstream products {in the scope} would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation."[31] Based on this statutory requirement, among others,[32] Commerce would be acting inconsistently with our statutory and regulatory obligations[33] if we ignored the (k)(1) sources placed on the record by Saha Thai in rendering our scope determination.

We also disagree with Wheatland that Commerce has been directed by the CAFC to ignore record evidence that speaks directly to an issue in a scope inquiry. In *Fedmet*, the CAFC held that because the plain language of the scope is "paramount," in "reviewing the plain language of a duty order, "Commerce *must* consider the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior

---

[26] *See TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314, 1320 (CIT 2019).
[27] *Id.* (emphasis in original).
[28] *See* Saha Thai's August 26 Comments at 10-12; *see also* Attachment 14 (citing the Petition).
[29] *See* Saha Thai's December 20 Comments at 5; *see also* Saha Thai's August 26 Comments at 11 and Attachment 11.
[30] *See* Saha Thai's December 12 Comments at 10-11; *see also* Saha Thai's August 26 Comments at 16-17 and Attachment 8.
[31] *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).
[32] *See, e.g.*, section 516A(b)(1)(B)(i) of the Act ("The court shall hold unlawful any determination, finding, or conclusion . . . unsupported by substantial evidence on the record.")
[33] *Id.*

determinations) and the Commission."[34] In other words, under the CAFC's holding in *Fedmet*, Commerce cannot elect not to review the (k)(1) sources of information, but must always consider those sources in analyzing the plain language of the scope of an order to determine if the language is unambiguous. Likewise, in its 2015 *Shenyang Yuanda* holding, after affirming Commerce's determination that Yuanda's merchandise was "within the plain language of the Orders," the CAFC stated:

> The regulations require Commerce, when determining the scope of an order, to engage in a two-step process. First, Commerce must consider the scope language contained in the order itself {and then} the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC.[35] The petition and preliminary determinations of Commerce and the ITC involved in the underlying duty investigations "may provide valuable guidance as to the interpretation of the final order."[36]

We recognize that the CAFC has, at times, suggested that the (k)(1) sources might be of less importance if the scope language does not appear to be ambiguous, and we agree with that interpretation of the statute and regulations when there is little to no (k)(1) sources on the record of a proceeding or the sources on the record do not actually address the language at issue. But, when (k)(1) sources have been placed on the record, such as in this inquiry, which directly address the language at issue, the CAFC has never directed Commerce to ignore such evidence in making its determination. In fact, such direction would contradict the statutory requirement that we consider the substantial evidence on the record. Instead, in *Shenyang Yuanda*, the CAFC has affirmed Commerce's two-step process of considering such arguments – first to review the plain language of the scope, and then to examine the (k)(1) sources that were placed on the record and address the language, as a matter of course, to see if those sources add any additional context.[37] The key, for purposes of our analysis in this scope inquiry, is that Commerce's interpretation of the scope was considered *in conjunction with* the additional regulatory sources, such as the initial investigation record, and not *instead* of those sources.[38]

Therefore, in accordance with our regulations and judicial precedent, we have considered the (k)(1) sources in making our final scope determination.

**Comment 2: Line pipe and dual-stenciled standard and line pipe.**

*Wheatland's Case Brief:*

- There is neither an exclusion referencing "line pipe specifications" in the *Order* nor an ambiguity in the other terms used to describe the subject merchandise, such as "circular," "welded," or "diameter."[39]

---

[34] *See Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed Cir 2014).
[35] *See Duferco Steel*, 296 F.3d at 1097; *see also* 19 CFR 351.225(k)(1).
[36] *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015).
[37] *Id.*
[38] *Id.*
[39] *See* Wheatland's Case Brief at 5

- Commerce's preliminary scope ruling ignores the fact that the original language of the scope was never amended through the petition withdrawal process. The petitioners withdrew the Petition with respect to line pipe from Thailand because it would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of circular welded carbon steel pipes and tubes.[40] "Because there was no production of line pipe in Thailand during the course of the ITC's original investigation, there are no concerns as to whether the ITC included line pipe or dual-stenciled standard and line pipe in its injury analysis."[41]

*Saha Thai's Case Brief:*

- The investigation documents demonstrate that all line pipe products are excluded from the scope of the *Order*. Since the investigation, Saha Thai asserts that Commerce has consistently considered dual-stenciled pipe to be the same as line pipe. Therefore, if all line pipe was excluded from the scope, then dual-stenciled standard and line pipe is also excluded from the *Order*.[42]
- On March 14, 1985, the petitioners modified the Petition and withdrew their request for AD duties on line pipe from Thailand.[43] In its withdrawal of line pipe from the Petition, the petitioners place no qualifications on the line pipe to be excluded from its request for AD duties, such that all line pipe is was excluded from the Petition.[44]
- Further, the petitioners identified the excluded line pipe products with numbers 610.3208 and 610.3209 of the Tariff Schedules of the United States, Annotated (TSUSA).[45] Saha Thai asserts that both dual-stenciled standard and line pipe as well as "mono-stenciled" line pipe "could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209."[46] Thus, as a result of the petitioners' exclusion of products classified under TSUSA 610.3208 and 610.3209 from the scope of the Petition, all line pipe products, including dual-stenciled standard and line products are excluded from the scope of the *Order*.
- Saha Thai asserts that the ITC has consistently considered dual-stenciled standard and line pipe as line pipe for injury purposes, especially at the time of the investigation.[47]
- The ITC noted in its preliminary ruling that the Petition regarding imports of line pipe from Thailand had been withdrawn.[48]
- Saha Thai further asserts that "the ITC determined that subject standard pipe were imported entirely under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243,

---

[40] *Id.* at 6.
[41] *See* Wheatland's Case Brief at 7.
[42] *See* Saha Thai's Case Brief at 1.
[43] *See* Saha Thai's Case Brief at 6-7.
[44] *Id.* at 7.
[45] *Id.*
[46] *Id.* at 8.
[47] *Id.* at 5.
[48] *Id.* at 10 (citing *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela: Determination of the Commission In Investigation No. 701-TA-242 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation; and Determinations of the Commission In Investigation Nos. 731-TA-252 and 253 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigations*, USITC Publication 1680 (April 1985) (*ITC Preliminary Injury Determination*) at 3; and the *ITC Final Injury Determination*).

610.3252, 610.3254, 610.3256, 610.3258 and 610.4925; while imports under TSUSA 610.3208 and 610.3209 were of entirely of line pipe, which was not subject to the Thailand investigation."[49]

- In its fourth sunset review of the *Order*,[50] the ITC stated that "since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, *i.e.*, stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[51]
- Furthermore, in the fourth sunset review of the *Order*, the ITC says that "standard pipe of non-alloy steel is the primary product within the scope of these reviews. Standard pipe is intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard (BS) 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; however, such dual-stenciled pipe is not within the scope of the subject orders."[52]
- Further, in its third sunset review of the *Order*,[53] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[54]
- Saha Thai rejects Commerce's determination in the Preliminary Scope Ruling that these statements in the *ITC Fourth Sunset Final* and the *ITC Third Sunset Final* "{are} not definitive, given the variations in the scope language of the CWP orders covered by the {*ITC Fourth Sunset Final*}." Saha Thai asserts that the ITC's explicit exclusion of dual-stenciled products is "without limitation to any particular country."[55] Saha Thai rationalizes that whether the scope of a given order explicitly excludes a product is immaterial, that an order "can specifically exclude a product without containing an enumerated exclusion language in the scope."[56] "Indeed, {Commerce} itself correctly finds in the preliminary determination that the {*Order*} excludes line pipe

---

[49] *Id.* at 10 (citations omitted, emphasis in the original).
[50] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)*, USITC Publication 4754 (January 2018) (*ITC Fourth Sunset Final*).
[51] Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).
[52] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).
[53] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*).
[54] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).
[55] *Id.* at 13 (emphasis in the original).
[56] *Id.* at 14 (referencing *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919 (Fed. Cir. 2014) (*Fedmet*)).

notwithstanding that there is no enumerated exclusion language of line pipe in the scope language."[57]

- Saha Thai asserts that the "{petitioners} testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order."[58] In citing 19 CFR 351.225(k)(1), Saha Thai asserts that "there is a well-developed history of {Commerce} investigations of CWP standard pipes from different countries."
- Commerce's past scope definitions in other standard pipe AD proceedings confirm that dual-stenciled pipe is excluded from the *Order*. Moreover, the petitioners' intentions with respect to multi-stenciled pipe have changed over time.[59]
- In the earliest Petitions concerning CWP, including India, Taiwan, Thailand and Turkey, there was no explicit mention of line pipe or dual-stenciled standard and line pipe in the Petition or the resulting AD duty orders.[60]
- The scopes of the petitions for the 1991 Brazil, Korea, Mexico and Venezuela CWP investigations did not contain enumerated line pipe or dual-stenciled pipe language. In the case of the Brazil, Korea, Mexico and Venezuela CWP investigations, the petitioners stated that "{t}he scope, as defined by the petition, {Commerce} and the Commission, clearly excludes both imports of line pipe entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10 and oil country tubular goods entering the United States in HS category 7306.20." Thus, at the time of the 1985 and 1991 pipe investigations, the petitioners did not seek to include multi-stenciled pipe as subject merchandise. [61]
- The petitioners did not file a petition with scope language that enumerated multi-stenciled pipe was included until the 2007 China pipe investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations.[62]
- Commerce may not expand the scope to include dual-stencil standard and line pipe because the ITC did not include dual-stenciled standard and line pipe in its injury analysis. This legal prohibition has been affirmed by both the CIT and the CAFC in litigation addressing CWP AD orders.[63]

*Wheatland's Rebuttal:*

- Commerce correctly found in its Preliminary Scope Ruling that dual-stenciled is covered by the scope of the *Order*. The plain language of the *Order* covers dual-stenciled standard and line pipe.[64]
- The CAFC's decision in *Wheatland Tube* does not preclude Commerce from finding that dual-stenciled pipe is covered by the scope of the *Order*. Unlike the scope at issue in

---

[57] *Id.*
[58] *Id.* at 13 (emphasis in the original) (citing Saha Thai's August 26, 2019 Comments at Attachment 7: Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 at 58-59).
[59] *See* Saha Thai's Case Brief at 14.
[60] *Id.* at 16.
[61] *See* Saha Thai's Case Brief at 16-20.
[62] *Id.*
[63] *Id.* at 19, 20, 22, 24 (citing *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998); *Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (CIT 1997)).
[64] *See* Wheatland's Rebuttal at 2.

*Wheatland Tube*, the scope of the *Order* on CWP from Thailand does not contain an explicit exclusion for dual-stenciled pipe.[65]

- More importantly, the ITC's pronouncements regarding dual-stenciled line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the order on CWP from Thailand.
- These statements are generally true because the orders on CWP for countries other than Thailand have specific scope exclusions for line pipe.[66]
- Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate. The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. That section of the brief focused exclusively on Korean producers of line pipe. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[67]
- The scope language of the *Order* does not expressly and unambiguously exclude line pipe. Unlike the orders governing CWP from Brazil, Korea, and Mexico, the scope of the *Order* at issue does not mention "line pipe," "dual-stenciled pipe," "triple-stenciled pipe," or pipe of "a kind used for oil or gas pipelines."[68]
- The record of the investigation of CWP from Thailand shows that dual-stenciled pipe is covered by the scope of the *Order*. The petition with respect to line pipe was later withdrawn only because there was no known production in Thailand of line pipe at that time.[69]
- In the investigation, Wheatland did not amend the scope language in the petition in any way to exclude any line pipe that might later be produced in Thailand.[70]
- The only language in the scope that appears to have changed through Wheatland's withdrawal process is the removal of the Tariff Schedules of the United States (TSUS) codes for line pipe – *i.e.*, 640.3208 and 610.3209, which appears to have been done by Commerce.[71]
- Commerce should reject Saha Thai's contention that the scope of the *Order* cannot be interpreted to cover dual-stenciled pipe because the ITC never included imports of line pipe from Thailand in its original injury investigation.[72]
- Because at the time of the investigation there was no production of line pipe in Thailand, there would be no point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand.[73]

---

[65] *Id*. at 10-11.
[66] *Id*. at 7 (citing Saha Thai's August 26 Comments at 20-22).
[67] *See* Wheatland's Rebuttal at 7.
[68] *Id*. at 10.
[69] *Id*. at 2.
[70] *Id*. at 3.
[71] *Id*. at 4.
[72] *Id*. at 10.
[73] *Id*.

*Saha Thai's Rebuttal*

- Wheatland itself does not deny that generally speaking "line pipe" and "standard pipe" are two different types of product. In fact, this is exactly why on January 31, 2019, Wheatland requested that Commerce conduct a "minor alteration" circumvention of Saha Thai's "line pipe" imports under section 781(c) of the Tariff Act of 1930, as amended (the Act), which is the type of proceeding to determine whether an "out-of-scope" product should otherwise be covered to prevent circumvention.[74]
- The original petition included both TSUSA 610.3208 and 610.3209 as two of the relevant HTS of subject merchandise (line pipe), but they were omitted from the final scope language. This intentional omission confirms that the scope of the *Order* does not unambiguously cover line pipe, contrary to Wheatland's contention, and instead the scope was specifically drafted to exclude line pipe.[75]
- As explained in Saha Thai's case brief, all of the other CWP AD cases confirm that Commerce has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering "standard pipe."[76]

**Commerce's Position:** Commerce continues to find that the scope of the *Order* does not include line pipe but does include dual-stenciled standard and line pipe.

As partially documented in the *ITC Fourth Sunset Final*, there has been a decades-long history of trade remedy proceedings involving steel "pipes and tubes."[77] Moreover, as discussed in the *ITC Final Injury Determination*, "pipes and tubes" consists of a number of distinct product groups which are broadly defined by the American Iron and Steel Institute (AISI) based on end-use.[78] In addition to "standard pipe," "structural pipe and tubing" and "line pipe," these product groups include "mechanical tubing," "pressure tubing" and "oil country tubular goods" (OCTG).[79] Although there "may be few or no inherent differences among a number of steel tubular products," "{s}teel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM); the American Society of Mechanical Engineers; and the American Petroleum Institute (API)."[80] These distinct product groups are distinguishable based on these industry standards, which are also reflected in the TSUSA which is contemporaneous with the filing of the Petition, spanning numbers 610.3205 through 610.3299.[81] Although the ITC found that these distinct product groups share many common features, the ITC injury investigation was

---

[74] *See* Saha Thai's Rebuttal at 4.
[75] *Id*. 5-6.
[76] *Id*. at 7.
[77] *See ITC Fourth Sunset Final* at I-4 to I-9.
[78] *See ITC Final Injury Determination* at I-1.
[79] *Id.* (citing *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation*, USITC Publication 1345 (February 1983) (*ITC CWP Korea Final Injury Determination*) at A-3 to A-4);*see also ITC Fourth Sunset Final* at I-14 to I-15.
[80] *See ITC CWP Korea Final Injury Determination* at A-4.
[81] *See Tariff Schedules of the United States Annotated (1985)*, USITC Publication 1610 (1984, 3rd supp. September 1, 1985).

limited to "standard pipes and tubes."[82] Similarly, Commerce's less-than-fair-value investigation was limited to standard pipe.[83]

As discussed above, the original Petition requested the imposition of AD duties on both standard pipe and line pipe from Thailand; however, after inquiry by Commerce, the petitioners withdrew their requests for AD duties on line pipe from Thailand. If not for the qualification that both the ITC's investigation and Commerce's investigation were limited to standard pipe, the scope's description of the physical characteristics of the merchandise (*i.e.*, the product is "welded," made from "carbon steel," with an outside diameter of 0.375 inches through 16 inches, and with any wall thickness) could apply to all of the product groups defined by AISI.

In its investigations, the majority of the commissioners found that the ITC investigations covered two separate-like products:

> We conclude, therefore, that there are two like products in these investigations--standard pipe up to and including 16 inches outside diameter and line pipe up to and including 16 inches outside diameter. We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of standard pipe and line pipe.[84]

In the *ITC Final Injury Determination*, the ITC found that, as a result of imports of standard pipe from Thailand (and only standard pipe), "an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes."[85]

Commerce rejects Wheatland's argument that line pipe must be included within the scope of *Order* because the description of the merchandise was not modified as a result of the petitioners withdraw of their inclusion of line pipe in the Petition. The historical documents establish that the investigations of both Commerce and the ITC were limited to standard pipe.[86] The relevant

---

[82] *See ITC Final Injury Determination* at I-1.
[83] *See Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand: Initiation of Antidumping Duty Investigation*, 50 FR 12068 (March 27, 1985) ("These products {under investigation}, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A-53 or A-135"); *see also Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 FR 3384 (January 27, 1986) (*Final LTFV Determination*) ("The products under investigation are certain circular welded carbon steel pipes and tubes, also known as 'standard pipe' or 'structural tubing'…").
[84] Commerce and the ITC have also found other product groups which satisfy these general physical descriptions to constitute other like products, such as OCTG. *See ITC Final Injury Determination* at 7.
[85] *See ITC Final Injury Determination*.
[86] *See, e.g., Final LTFV Determination*, *see also ITC Final Injury Determination*.

statutory provision[87] states that to impose AD duties, Commerce must determine that the class or kind of merchandise has been found to be sold at less than fair value, and the ITC must conclude that a domestic industry has been materially injured or threatened with material injury. Consequently, the scope of an AD order imposed as a result of the *Final LTFV Determination* and the *ITC Final Injury Determination* does not include line pipe.

Commerce further rejects Saha Thai's assertion that "all" line pipe, including dual-stenciled standard and line pipe, is not covered by the scope of the *Order*. Unlike the AD orders covering similar merchandise (*e.g.*, from Mexico or Venezuela),[88] the CWP from Thailand *Order* does not explicitly exclude dual-stenciled standard and line pipe.[89] Moreover, in contrast to the investigations which resulted in the *1992 Standard Pipe Orders*, and contrary to Saha Thai's claims, neither the *Final LTFV Determination* nor the *ITC Final Injury Determination* address dual-stenciled standard and line pipe.

Commerce finds that Saha Thai's construct that dual-stenciled standard and line pipe are not covered by the scope of the *Order* because line pipe is not covered by the scope of *Order* lacks merit. Simply because a certain product *is* certified as line pipe does not result in it being *not* certified as standard pipe.[90] Stated differently, if a certain product is certified as standard pipe, then it is standard pipe regardless of whether it is also certified as line pipe.

Commerce disagrees with Saha Thai assertion that the sources enumerated under 19 CFR 351.225(k)(1) include determinations in proceedings on similar CWP products "from different countries." The "petition, the initial investigation, and the determinations of the Secretary … and the Commission"[91] reference the instant proceeding and not other proceedings, no matter how similar. The "petition" and "initial investigation," of "the Secretary" and "the

---

[87] *See* section 731 of the Act (Supp. V 1981):

> Imposition of antidumping duties
> If—
> (1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
> (2) the Commission determines that—
> (A) an industry in the United States—
> (i) is materially injured, or
> (ii) is threatened with material injury, or
> (B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise,
> then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

[88] *See Notice of Antidumping Duty Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Welded Non-Alloy Steel Pipe from Korea,* 57 FR 49453 (November 2, 1992) (*1992 Standard Pipe Orders*).

[89] *See 1992 Standard Pipe Orders*, 57 FR at 4945 ("Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in these orders.")

[90] In reference to Saha Thai's diagram copied above, the standard pipe encompasses both the blue area as well as green area representing the dual-stenciled products.

[91] *See* 19 CFR 351.225(k)(1).

Commission," are singular, and do not reference multiple petitions or investigations of multiple proceedings. Depending upon the similarity of the circumstances in other proceedings, the petitions, investigations or determinations in such other proceedings may be informative, but are not dispositive in a separate, distinct proceeding.[92]

In any case, Saha Thai has failed to demonstrate how this assertion is directly applicable to the Thailand *Order*. The fact that some CWP orders include specific exclusion language and other CWP orders do not include similar exclusion language is a relevant fact, but the reason behind that differing language may depend on the circumstances during the investigation stage of the proceeding. Put simply, just because certain language is included in one order does not dispositively provide meaning to an order which does not include the same language. At most, such differences merely suggest that some products may have been intended to be treated differently under the different orders.

As Saha Thai has pointed out, in the *ITC Fourth Sunset Final*[93] covering seven CWP orders, including the instant *Order* on standard pipe products from Thailand, the ITC stated that "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders"[94] and that "such dual-stenciled pipe is not within the scope of the subject orders."[95] However, in reviewing those sentences in context, it is clear that the ITC was not addressing the language of each individual order, including the scope text which differed between those orders, but instead was providing a generalized statement applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe. Notably, the ITC in making such statements cited to a table in the confidential and public reports from the original investigations, neither which is on this record, but were summarized in the footnote as pertaining to all of the underlying investigations.[96]

---

[92] *See* Memorandum "Antidumping Duty Order on Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Scope Ruling on Finished Electrical Conduit Imported by LOA Incorporado," dated November 15, 2012 at 7-8; *see also* Memorandum, "Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Scope Ruling on Precision Components Inc.'s Green Machined but not Heat-Treated Components," dated June 12, 2020 at 7 ("Regarding the Green Rings Memorandum and the Rough Forgings Memorandum {two scope rulings from *TRBs Over Four Inches from Japan*}, we note that although "scope rulings" are a source under 19 CFR 351.225(k)(1), these particular scope rulings are not part of the record of the TRBs from China proceeding, and instead are part of the record of *TRBs Over Four Inches from Japan*, on which these two rulings are based. Nonetheless, because *TRBs Over Four Inches from Japan* and the {Chinese} *Order* are based on the same antidumping duty petition, the scope for *TRBs Over Four Inches from Japan* is unquestionably similar and, in the portions relevant to the scope issue at hand, virtually identical, to the scope of the {Chinese} *Order*. Accordingly, we find that the Green Rings Memorandum and the Rough Forgings Memorandum are informative to the issue at hand, but we have not treated these scope rulings from a separate proceeding as dispositive on their own as to whether Precision Components' merchandise is subject to the scope of the {Chinese} *Order* under 19 CFR 351.225(k)(1)." (citations omitted)).

[93] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub. 4754 (Jan. 2018) (*ITC Fourth Sunset Final* at 6).

[94] *See* Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).

[95] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).

[96] *See ITC Fourth Sunset Final* at I-6 (citing CR at I-20, PR at I-16 which are described in footnote 1 on page 3 as Confidential Report (CR)/Public Report (PR) (tabulating original investigations)). This language appears to be

Further, as Saha Thai also notes, the ITC in its third sunset review of the *Order* and the six other CWP orders,[97] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[98] Again, that reference was to the "orders" in the plural, yet the scope language of those seven orders was not the same with respect to the inclusion or exclusion of dual-stenciled pipe.

Saha Thai provided a chart on this record which shows that only some of the orders contained an enumerated exclusion of dual stenciled pipe in the scope.[99] Specifically, the orders on CWP from Brazil, Mexico, Korea, and Venezuela have exclusionary language for dual-stenciled pipe and line pipe, while the others do not.[100]

It would be illogical for the ITC to "find" that dual-stenciled pipe is not within the scope of all the orders at issue, when the scopes of some orders explicitly excluded dual-stenciled pipe and others did not. As noted above, the *1992 Standard Pipe Orders* include the dual-stenciled exclusions because of issues raised in the specific LTFV investigations which culminated in those orders. Despite Saha Thai's argument, therefore, the only reasonable conclusion we can derive from the various references to the ITC language is that that language was meant to summarize the status of dual-stenciled pipe under the majority of orders, but not all of the orders.

Furthermore, Saha Thai's reliance on the exclusions in other proceedings involving standard pipe, as well as the CIT's opinion in *Wheatland Tube Co.*, which is specific to the AD order on CWP from Mexico, is misplaced.[101] These proceedings are separate from the order on CWP from Thailand, which has different scope language and its own record that differs from the records covered by the proceedings referenced by Saha Thai. Specifically, the scope of the Mexican CWP order includes the explicit exclusions for line pipe and dual- or triple-stenciled products, which was the crux of the *Wheatland Tube Co.* litigation.[102] However, unlike the Mexican CWP order, there is no basis to find that pipe which has been dual-stenciled as standard pipe and line pipe is outside the scope of the *Order*.

Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate. The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. That section of the brief focused on how Korean producers of line pipe would shift from production of line

---

taken from *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*) without further analysis or consideration. Furthermore, the cited clause references only the status of the majority of orders and was not intended to apply to all the orders, regardless of exclusion language.

[97] *See ITC Third Sunset Final*.

[98] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).

[99] *See* Saha Thai's Case Brief at 23.

[100] *See 1992 Standard Pipe Orders*.

[101] *See 1992 Standard Pipe Orders*, 57 FR at 49453.

[102] *Id.*

pipe to standard pipe if the order on standard pipe from Korea were revoked. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[103]

Saha Thai is correct that the petitioners' interest in the imposition of antidumping duties with respect to dual-stenciled pipe changed between the 1991 investigations on Brazil, Korea, Mexico and Venezuela where the petitioners clarified that the scope excluded dual-stenciled pipe and the 2007 China investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations where the four petitions specifically enumerated that multi-stenciled standard pipe was included in the petitioners' request for antidumping duties.

However, Commerce rejects Saha Thai's claim to extrapolate the petitioners' interest in the imposition of antidumping duties for dual-stenciled pipe to the earlier, pre-1991 investigations.[104] Any such conclusions by Saha Thai are mere speculation. There is no information on the record to substantiate Saha Thai's claim that the petitioners' intentions with respect to dual-stenciled pipe in the CWP from Thailand *Order* were the same as in the 1991 investigations on Brazil, Korea, Mexico and Venezuela. Indeed, the petitioners' original interest was to include all line pipe in its request for antidumping duties.[105] The exclusion language in the *1992 Standard Pipe Orders* was based, in part, on the petitioners' clarification in the four 1991 investigations, that Commerce specifically concluded that, notwithstanding an omission of any mention of dual-stenciled standard and line pipe in the scope of the petitions, the petitioners did not intend for the AD orders to cover dual-stenciled standard and line pipe *in those four orders.*

While the scope in the Petition similarly did not include language specific regarding dual-stenciled standard and line pipe, the petitioners made no similar statement or clarification with respect to dual-stenciled pipe in the investigation underlying the instant *Order*. As such, we find that Saha Thai's claim that that the petitioners did not intend to include dual-stenciled pipe in the scope of the instant *Order* is not supported by the record of this proceeding.

**Comment 3: Date of Initiation**

*Saha Thai's Case Briefs*

- If Commerce concludes that the *Order* covers line pipe, the earliest date that Commerce can suspend liquidation of imports is November 22, 2019, the date of the self-initiation, because it did not properly initiate the scope inquiry by way of its July 29, 2019 letter.[106]

---

[103] Elsewhere in Wheatland's Prehearing Brief, multiple parties acknowledge that 70 to 80 percent of dual stenciled pipe imported from Korea is sold for "standard pipe applications." *See* Saha Thai's August 26 Comments at Attachment 7 (pages 58-59).

[104] *See* Saha Thai's Case Brief at 15 ("When they intended to include dual-stenciled pipe to be included they explicitly stated so. The lack of explicit inclusion language in earlier petitions means that there was no intention at all.").

[105] *See* Petition.

[106] *See* Saha Thai's Case Brief at 15 22.

*Wheatland's Case Brief*

- There is no merit to Saha Thai's argument that Commerce did not properly initiate this scope inquiry in its July 29, 2019 notice.[107]
- On July 29, 2019, Commerce issued a notification to all interested parties on its scope service list that it was initiating an inquiry and requesting comments on whether the *Order* covers line pipe and products that are dual-stenciled as both standard pipe and line pipe. This notification complied with all of the relevant requirements set form in the agency's regulations.[108]
- Saha Thai's contention that "the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry" simply ignores the reasons that were provided in the letter.[109]

**Commerce's Position:** On November 22, 2019, Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.[110] The Initiation Memorandum was the first document on this record which provided the following: (1) a description of the products covered by this scope inquiry;[111] (2) an explanation of our decision to initiate the scope inquiry;[112] and (3) 20 days for interested parties to submit additional comments and supporting factual information concerning this issue and 10 days for interested parties to submit rebuttal comments and supporting factual information.[113] Commerce did not initiate a formal scope inquiry in its July 29, 2019 Memorandum.[114] Instead, Commerce intended to provide parties with an opportunity to comment[115] on whether line pipe was covered by the scope of the *Order*, and "to issue a final scope ruling within 45 days of the {July 29th letter}."[116] Normally, when initiating a formally scope inquiry, Commerce issues a final scope ruling within 120 days after initiation, rather than 45 days.[117] In this case, we set a deadline of issuing a final scope ruling within 45 days, and found that the phrase "pipe and tube with an outside diameter of 0.375 inches or more but not over 16 inches" is covered by the *Orde*r was critical to our analysis.[118] However, after receiving scope comments from interested parties, containing (k)(1) sources, we determined that initiation of a formal scope inquiry was warranted.[119] We disagree with Wheatland that the phrase "line pipe" in the July 29th Memorandum satisfies the requirement to provide a "*description* of the product that is the subject of the scope inquiry" under 19 CFR 351.225(f)(1)(i). Accordingly, Commerce's November 22,

[107] *See* Wheatland's Rebuttal at 11-13.
[108] *Id.* at 11.
[109] *Id.* at 13.
[110] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 (Initiation Memorandum).
[111] *See* 19 CFR 351.225(f)(1)(i).
[112] *See* 19 CFR 351.225(f)(1)(ii).
[113] *See* 19 CFR 351.225(f)(1)(iii).
[114] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe," dated July 29, 2019 (July 29th Memorandum).
[115] We set a deadline of 10 days for initial comments and factual information and 7 days for rebuttal comments and factual information. *Id.* Typically, when initiating a formal scope inquiry, Commerce provides interested parties with 20 days to provide comments and factual information and 10 days to provide rebuttal to such comments. *See* 19 CFR 351.225(f)(1(iii).
[116] *See* July 29th Memorandum at 2.
[117] *See* 19 CFR 351.225(f)(5).
[118] *See* July 29th Memorandum at 2.
[119] *See* Initiation Memorandum at 3-4.

2019 Initiation Memorandum complied with all of the regulatory requirements and is the date on which Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.

**Recommendation**

For the reasons discussed above, we recommend continuing to find that line pipe is not covered by the scope of the *Order*. We further recommend continuing to find that products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order*. If the recommendations in this memorandum are accepted, we will serve a copy of this memorandum on all interested parties on the scope service list via FEDEX in lieu of first-class mail as directed by 19 CFR 351.225(f)(3). In addition, we will issue the appropriate instructions to U.S. Customs and Border Protection (CBP) stating that we found line pipe not within the scope of the *Order*. We will also issue instructions to CBP that we found products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order* and to suspend liquidation and to require a cash deposit of estimated antidumping duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry.

This scope ruling does not preclude an interested party to the proceeding from requesting a circumvention inquiry in the future concerning line pipe. If interested parties become aware of circumvention involving merchandise not considered part of the scope as a result of this scope ruling through one of the four scenarios set forth in Section 781 of the Act, please bring the alleged circumvention to our attention, and we will consider such a request for a circumvention ruling at that time.

☒ Agree ☐ Disagree

6/30/2020

X James Maeder

Signed by: JAMES MAEDER