**2022-2181**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED
*Plaintiff-Appellee*

v.

### UNITED STATES
*Defendant*

### WHEATLAND TUBE COMPANY,
*Defendant-Appellant.*

---

Appeal from United States Court of International Trade in
Case No. 1:20-cv-00133-SAV, Judge Stephen A. Vaden

---

### RESPONSE BRIEF OF PLAINTIFF-APPELLEE SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED

---

Daniel L. Porter
James P. Durling
James C. Beaty

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

*Counsel for Saha Thai Steel Pipe
Public Company Limited*

January 13, 2023

**FORM 9. Certificate of Interest**                                    Form 9 (p. 1)
                                                                        July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-2181 |
| **Short Case Caption** | Saha Thai Steel Pipe Public Company Limited v. US |
| **Filing Party/Entity** | Saha Thai Steel Pipe Public Company Limited |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 1/13/2023

Signature: /s/ Daniel L. Porter

Name: Daniel L. Porter

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Saha Thai Steel Pipe Public Company Limited | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Daniel L. Porter | | |
| James P. Durling | | |
| James C. Beaty | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .......................................................1

STATEMENT OF THE ISSUE ..............................................................1

STATEMENT OF THE CASE ................................................................2

SUMMARY OF ARGUMENT ..............................................................10

ARGUMENT ......................................................................................14

I. CONTRARY TO WHEATLAND TUBE'S ARGUMENT, BOTH COMMERCE AND THE TRADE COURT CORRECTLY RELIED ON THE (K)(1) FACTORS WHEN ADDRESSING THE PROPER SCOPE OF THE ORDER .....................................................................................15

    A. The Ambiguous Scope Language Does Not Expressly Include All Pipe Of A Certain Size Even If That Pipe Meets The Higher Standards For Line Pipe ..................................................................16

    B. The Applicable Commerce Regulation In Effect At The Time of Commerce's Determination Required Consideration Of The (k)(1) Factors ........................................................................................21

II. CONTRARY TO WHEATLAND TUBE'S ARGUMENTS, THE (K)(1) FACTORS CONFIRM THAT DUAL-STENCILED PIPE IS OUTSIDE THE SCOPE OF THE ORDER ...................................................................24

    A. The Original Investigation Documents, Including The Petition and Amended Petition, Confirm That All Line Pipe – Including Dual Stenciled Pipe –Was Outside the Scope ...................................25

    B. The ITC's Original Injury Determination, As Reinforced By The ITC's Sunset Review Determinations, Confirm That All Line Pipe—Including Dual Stenciled Pipe—Was Excluded from The ITC's Original Injury Analysis ...............................................................33

        1. The ITC's original injury determination .................................34

        2. The ITC's subsequent sunset determinations ..........................37

3.    The Trade Court properly concluded that the ITC's original injury determination did not include dual-stenciled pipe .........40

4.    Wheatland Tube's arguments about the ITC's original injury determination miss the mark and are unavailing .....................41

5.    Contrary to Wheatland Tube's argument, the inclusion of dual-stenciled pipe in the safeguard remedy on line pipe provides important context ....................................................................43

C.    Contrary to Wheatland Tube's Approach, The (k)(1) Factors Should Not Be Analyzed In Isolation..............................................................45

III.    COMMERCE'S ORIGINAL SCOPE DETERMINATION WAS CONTRARY TO THIS COURT'S *WHEATLAND TUBE* PRECEDENT ...47

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ...................51

# <u>TABLE OF AUTHORITIES</u>

## Cases

*ABB, Inc. v. United States*,
   920 F.3d 811 (Fed. Cir. 2019) ...............................................................14

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002) ............................................................33

*Eckstrom Indus. v. United States*,
   254 F.3d 1068 (Fed. Cir. 2001) ............................................................33

*JTEKT Corp. v. United States*,
   642 F.3d 1378 (Fed. Cir. 2011) ............................................................14

*Juancheng Kangtai Chem. Co. v. United States*,
   932 F.3d 1321 (Fed. Cir. 2019) ............................................................14

*Meridian Prod. v. United States*,
   890 F.3d 1272 (Fed. Cir. 2018) ............................................................23

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016) ............................................................14

*OMG, Inc. v. United States*,
   972 F.3d 1358 (Fed. Cir. 2020) ............................................................23

*Saha Thai Steel Pipe Pub. Co. v. United States*,
   547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021)............................... passim

*Saha Thai Steel Pipe Pub. Co. v. United States*,
   592 F. Supp. 3d 1299 (Ct. Int'l Trade 2022)............................... passim

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
   776 F.3d 1351 (Fed. Cir. 2015) ............................................ 23, 49, 50

*Sunpreme Inc. v. United States*,
   946 F.3d 1300 (Fed. Cir. 2020) ............................................................23

*Wheatland Tube Co. v. United States*,
   973 F. Supp. 149 (Ct. Int'l Trade 1997),
   *aff'd* 161 F.3d 1365 (Fed. Cir. 1998) ........................................................ passim

## Statutes

19 U.S.C. § 1516a(b)(1) ........................................................................................14

19 U.S.C. § 1673d(b)(1) ........................................................................................35

19 U.S.C. § 1677j(c) ................................................................................................4

## Regulations

19 C.F.R. § 351.225(k)(1) .................................................................... passim

## Administrative Decisions

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico,*
   *Taiwan, Thailand, and Turkey*,
   Inv. Nos. 701-TA-253 and 731-TA- 132, 252, 271, 273, 532–534, and 536,
   USITC Pub. 4754 (Jan. 2018) ...............................................................38

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico,*
   *Taiwan, Thailand, and Turkey,*
   Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536,
   USITC Pub. 4333 (June 2012) .................................................... 37, 39

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Plaintiff–Appellee Saha Thai states that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

## STATEMENT OF THE ISSUE

Does the language of the scope determination, read in its entirely and in the context of the relevant historical record, including the ITC's original injury determination, constitute substantial evidence supporting the Department of Commerce's remand determination that dual-stenciled pipe is outside the scope of the order.

## STATEMENT OF THE CASE

This appeal does not present any question of statutory interpretation. Rather, this appeal represents Wheatland Tube Company's ("Wheatland Tube") attempts to rewrite the relevant scope language of a particular antidumping order and to have this Court overturn the careful examination of the scope language and historical record performed by the United States Court of International Trade ("Trade Court") below. That scope language and historical record was the factual basis for the Trade Court's decision to dispute the correctness of the Department of Commerce's ("Commerce") original scope decision that dual-stenciled circular welded steel pipe ("dual-stenciled pipe") was included in the scope of the antidumping duty order on circular welded pipe from Thailand.

That scope language and historical record was also the basis for Commerce, upon remand in light of the Trade Court decision, to find that dual-stenciled pipe is not included within the scope of the antidumping duty order. In light of the Trade Court's initial decision, Commerce reconsidered its evidentiary record—both the scope language and the historical context of that language—and that evidentiary record was the factual basis for Commerce's ultimate conclusion on remand to render a negative scope decision with respect to dual-stenciled pipe. Wheatland Tube now seeks to dismiss this careful analysis of both the language of the order

and its historical context to reimpose Commerce's deeply flawed initial scope

determination reached before the reconsideration on remand.

This issue comes to the Court after a long history of disputes about this

product. Saha Thai Steel Pipe Public Company Limited ("Saha Thai") is an

importer and foreign producer and exporter of different types of steel pipe

produced in Thailand. One specific type of steel pipe—circular welded steel pipe

referred to as "standard pipe" —was subject to an antidumping duty investigation

brought by Wheatland Tube and others that led to an antidumping duty order

imposed in 1986 ("AD Order").

A similar antidumping order addressing imports of such circular welded pipe

known as standard pipe has previously been brought before this Court by

Wheatland Tube. *See Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (Ct.

Int'l Trade 1997), *aff'd* 161 F.3d 1365 (Fed. Cir. 1998). In that case, similar to the

instant action, Wheatland Tube requested Commerce to find that imports of line

pipe and dual-stenciled pipe from Korea, Mexico, and Brazil should be included in

the antidumping order on "circular welded non-alloy steel pipes and tubes . . .

generally known as standard pipe." *Wheatland Tube*, 161 F.3d at 1367. In that

earlier case, similar to the instant case, imports of dual-stenciled pipe were entered

under the same tariff codes as line pipe. *Id.* at 1366. In that earlier case, this Court

rejected the attempts by Wheatland Tube to expand the coverage of the relevant

antidumping order. In doing so, this Court confirmed the importance of considering the scope language as a whole and the interplay between that language and the scope of the International Trade Commission's ("ITC") finding of injury. These same key points reappear in this case.

In this case, some 34 years after the original AD Order, Wheatland Tube returned to Commerce in January 2019 to request a minor alterations circumvention investigation pursuant to 19 U.S.C. §1677j(c). Appx10171. Wheatland Tube alleged that Saha Thai had been circumventing the AD Order on standard pipe from Thailand by performing minor alterations on standard pipe, which allegedly converted the subject standard pipe into non-subject line pipe. Appx10176. As this Court reviewed in *Wheatland Tube*, "standard pipe" and "line pipe" are distinct products with different applications, and different tariff codes. *Wheatland Tube*, 161 F.3d at 1366-67. Some pipe meets both the less stringent requirements for standard pipe as well as the more stringent requirements for line pipe; such pipe has certifications as both types of pipe and is known as dual-stenciled pipe. *Id.*

Saha Thai fully rebutted Wheatland Tube's initial allegations of circumvention. Saha Thai provided Commerce with the specific import documentation to demonstrate that Wheatland Tube's underlying factual predicate for its circumvention allegation was not true because Saha Thai actually had paid

- 4 -

AD duties on 100 percent of the specific import entries identified by Wheatland Tube. Appx10265-10266. In addition, Saha Thai provided other documentation that demonstrated that since 2009 Saha Thai had been capable of producing line pipe. Appx10306-10307. Saha Thai then presented legal arguments that there were no grounds for initiating an anti-circumvention investigation of the AD Order on circular welded standard pipe from Thailand because Wheatland Tube had only demonstrated that Saha Thai had produced and exported non-subject line pipe, a product that had been affirmatively excluded from that AD Order. Therefore, as a matter of law, non-subject line pipe in any form could not be subject to a minor alteration anti-circumvention investigation. Saha Thai's argument relied expressly on the principles announced by this Court's earlier decision in *Wheatland Tube.* Appx10308 (citing *Wheatland Tube*, 161 F.3d at 1371).

In response to these facts and arguments, Commerce decided that a circumvention investigation was not appropriate. But instead of simply dismissing the circumvention petition, Commerce instead decided to self-initiate a scope inquiry to determine whether line pipe and dual-stenciled pipe were subject to the AD Order on circular welded carbon steel pipes and tubes from Thailand. Appx40000-40001. Commerce's scope inquiry led to both sides submitting extensive supporting documentation concerning the original 1985-1986 antidumping investigation and subsequent sunset reviews by the ITC. This

extensive historical record became the formal evidentiary record before Commerce in this dispute, considered by Commerce and by the Trade Court.

In February 2020, Commerce, preliminarily found that line pipe is not covered by the scope of the Order, but that dual-stenciled line pipe was within the scope of the order. Appx40679-40686. Following case briefs and rebuttal briefs by all parties, in June 2020 Commerce rendered its Final Scope Ruling in which Commerce continued to find that line pipe is <u>not</u> within the scope of the AD Order, but that dual-stenciled line pipe was within the scope. Appx40762-40780.

Wheatland Tube has not appealed Commerce's scope decision concerning line pipe. But Saha Thai appealed Commerce's scope decision concerning dual-stenciled line pipe to the Trade Court.

In October 2021, the Trade Court concluded that Commerce's scope decision addressing dual-stenciled line pipe was not supported by substantial evidence and was not otherwise in accordance with law and so remanded the case to Commerce. Appx00029-00045 (*Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ("*Saha Thai I*"). And in January 2022 Commerce submitted its remand redetermination to the Trade Court in which Commerce, under protest, concluded that dual-stenciled pipe was not included in the scope of the AD Order. Appx00046-00073. In August 2022, the Trade Court reviewed and rejected Wheatland Tube's arguments challenging the remand

determination, and approved that remand determination as supported by substantial evidence. Appx00003-00028 (*Saha Thai Steel Pipe Pub. Co. v. United States*, 592 F. Supp. 3d 1299 (Ct. Int'l Trade 2022) ("*Saha Thai II*").

Saha Thai's Complaint submitted to the Trade Court provides a detailed review of the long but important history of the original Commerce investigation, the original injury proceeding before the ITC, the ITC's multiple subsequent sunset reviews, as well as the key events in the underlying Commerce scope proceeding. Appx40783-40792. In addition, the Trade Court itself recounted much of this history in its detailed and methodical decision. Appx00032-00037 (*Saha Thai I*, 547 F. Supp. 3d at 1281-1289). In the interest of brevity, Saha Thai will not repeat that full history here. Saha Thai believes, however, that the following three largely undisputed facts from that more detailed history are particularly critical for this Court's understanding of the case.

Fact #1:    The original antidumping petition was explicitly amended to exclude all "line pipe"; that is, the original antidumping petition (as amended) only sought duties on circular welded steel pipe known as "standard pipe." Appx40585-40610; Appx00033 (*Saha Thai I*, 547 F. Supp. 3d at 1283). The petitioners clarified that point in a later letter to Commerce. Appx40612-40613. Accordingly, the actual scope language of the AD Order refers to circular-welded pipe "known as" or "referred to" as standard pipe and only included those tariff codes that cover

standard pipe. Appx00034, Appx00039-00040 (*Saha Thai I*, 547 F. Supp. 3d at 1284, 1292-93). Wheatland Tube acknowledges withdrawing the petition with respect to line pipe, but asserts that this action withdrawing part of original scope somehow did not change the scope. Wheatland Tube Br. at 7.

Fact #2:    At the time of the amended antidumping petition and the imposition of the AD Order, dual-stenciled line pipe entered the United States under the tariff codes for line pipe. Appx40211-40217 (containing the Tariff Code definitions that were in force in 1985); Appx00033, Appx00040 (*Saha Thai I*, 547 F. Supp. 3d. at 1282, 1293). Wheatland Tube argues this fact does not matter but does not dispute the accuracy of this fact. Wheatland Tube Br. at 27-28.

Fact #3:    The original injury determination made explicit that its investigation and findings only included standard pipe—not line pipe—in its original injury analysis. Appx40064-40065; Appx00033-00034, Appx00041-00042 (*Saha Thai I*, 547 F. Supp. 3d. at 1283-84, 1295-96). Moreover, the ITC repeatedly reaffirmed this conclusion in subsequent ITC sunset reviews. Appx00033-00034, Appx00042-00043 (*Saha Thai I*, 547 F. Supp. 3d. at 1285-86, 1297-98). Wheatland Tube concedes the original ITC injury finding was against "standard pipes" from Thailand. Wheatland Tube Br. at 8. Wheatland Tube, however, argues that this fact does not matter and subsequent ITC commentary about the scope of its original injury finding also do not matter. *Id*. at 28-31.

As Saha Thai shows below, these facts—extensively discussed in the Trade

Court decision—are fatal to Wheatland Tube's argument before this Court.

## SUMMARY OF ARGUMENT

Wheatland Tube's flawed arguments about the scope language and the various (k)(1) factors should be rejected and the Trade Court's decision sustaining Commerce's remand redetermination regarding dual-stenciled pipe should be affirmed.

Wheatland Tube's arguments to consider only the scope language and to ignore the (k)(1) factors suffer two fundamental flaws. First, Wheatland Tube addresses only the part of the scope language defining the size and dimensions of the pipe, and completely ignores the remaining scope language that otherwise specifically limits the types of circular steel pipe within the scope. The scope is limited to pipe that is "known as" or "referred to" as standard pipe, and specifically excluded those tariff codes that would have covered any form of line pipe, including any dual-stenciled pipe. Wheatland Tube myopically focuses on one part of the scope language while simply ignoring the rest of the language, and has thus offered a flawed interpretation of the scope language.

Second, Wheatland Tube also ignores the relevant regulation at the time that specifically directed Commerce to consider the (k)(1) factors, and that Commerce specifically invoked in this case. That regulation stated at the time that the (k)(1) factors "will be considered" by Commerce, which is precisely what Commerce did in this case. Contrary to Wheatland Tube's argument, Commerce cannot have

impermissibly relied on the (k)(1) factors that the regulation affirmatively directed Commerce to consider.

The historical record of the AD order at issue here—which Commerce was required to consider— confirms that the scope covered only standard pipe, and not any form of line pipe. First, the petition documents confirm this reading of the scope. During the original investigation, Commerce engaged with Petitioners and sought clarification of the scope of the original petition. In response, the Petitioners expressly withdrew the petition with regard to all line pipe. That withdrawal referred both to the product category "line pipe" as well as the tariff codes that would have included any form of line pipe including dual-stenciled pipe. Wheatland Tube now seeks to rewrite that history, and narrow the exclusion of line pipe to cover only line pipe that is not dual-stenciled pipe. But that is not what happened at the time. All line pipe was excluded, and the tariff codes that would have included any form of line pipe, including dual-stenciled pipe, were dropped. As the Trade Court stressed, neither Commerce nor Wheatland Tube could find "a single reference of dual-stenciled pipe being referenced as 'standard pipe' throughout the entire history of the Thailand Order and the sunset review of *that* order." Appx00043 (*Saha Thai I*, 547 F. Supp. 3d. at 1298). Dual-stenciled pipe that meets the API definition of line pipe is line pipe. This history could not be more clear.

Second, the documents considered by the ITC during the original proceeding and subsequent sunset review determinations consistently confirm the reading of the scope adopted by Commerce in the remand redetermination at issue here. The ITC generally conducts its investigations to track the scope definition set by Commerce. So when Commerce narrowed the Thailand case to only standard pipe, the ITC conducted its injury investigation with respect to the same merchandise limiting its analysis to imports of standard pipe. Both the ITC descriptions of what it was doing and the specific data that it collected confirm the investigation covered only standard pipe from Thailand and the injury finding included only standard pipe from Thailand.

Third, in subsequent sunset reviews of this particular order, the ITC has repeatedly confirmed its understandings that (1) the AD Order on Thailand covered only standard pipe, and (2) that dual-stenciled pipe was considered line pipe for purpose of the tariff codes and for purposes of the AD Order. This historical evidence—both contemporaneous at the time of the order, and over time in repeated sunset reviews—is devasting to Wheatland Tube's arguments. There was no injury determination made by the ITC regarding imports of dual-stenciled pipe from Thailand thus there is no antidumping order on that merchandise.

Fourth, other trade actions at the time took the same view regarding whether dual-certified pipe was line pipe or standard pipe. Specifically, a safeguard action

under President Clinton imposed temporary duties on line pipe which included dual-stenciled pipe.  The analysis evident in the safeguard action was echoed by the ITC in subsequent sunset reviews, making clear that there was a broad understanding that dual-stenciled pipe is line pipe and thus not subject to any trade remedy covering standard pipe.

Wheatland Tube's argument relies on a rewriting of the scope, which is why Wheatland Tube seeks to exclude consideration of this history and what it reveals about the meaning of the scope language.  But this extensive history does not go away just because Wheatland Tube might wish to ignore it.

These factors are mutually reinforcing and should not be viewed in isolation. All of these factors—(1) the decision by Petitioners to narrow the scope of the investigation of Thailand to only standard pipe, (2) the decision by Commerce to reflect that narrower scope by including only those tariff codes that covered standard pipe and dropping those that covered line pipe, (3) the documents describing the original ITC injury investigation, and (4) subsequent interpretations of the merchandise covered by the original injury investigation in subsequent sunset determinations—should be considered together.  All of these factors consistently point to the conclusion that the AD Order on Thailand applies only to standard pipe, and cannot be expanded to include any form of line pipe.

# ARGUMENT

This case concerns an appeal of a Commerce antidumping scope determination following a decision by the Trade Court.  When reviewing Commerce antidumping determinations, this Court reviews decisions made by the Trade Court *de novo*, applying the same standard of review applied by the Trade Court, that is, upholding Commerce determinations that are supported by substantial evidence and otherwise in accordance with law.  *See JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011); 19 U.S.C. § 1516a(b)(1)(B)(i).  That stated, although this Court reviews Trade Court decisions *de novo*, it has frequently stated, "we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321, 1326 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016)); *see also ABB, Inc. v. United States*, 920 F.3d 811, 820 (Fed. Cir. 2019).

As Saha Thai details below, the careful and well-reasoned Trade Court decision should be affirmed.

## I.    CONTRARY TO WHEATLAND TUBE'S ARGUMENT, BOTH COMMERCE AND THE TRADE COURT CORRECTLY RELIED ON THE (K)(1) FACTORS WHEN ADDRESSING THE PROPER SCOPE OF THE ORDER

Wheatland Tube argues that the scope language is so clear that Commerce and the Trade Court should never have considered the (k)(1) factors as part of determining the scope of the order, but this argument suffers from two fundamental flaws. First, Wheatland Tube addresses only the part of the scope language defining the size and dimensions of the pipe, and completely ignores the remaining scope language that otherwise specifically limits the types of circular steel pipe within the scope. The scope is limited to pipe that is "known as" or "referred to" as standard pipe, and specifically excluded those tariff codes that would have included any form of line pipe, including any dual-stenciled pipe. Second, Wheatland Tube also ignores the relevant regulation at the time that specifically directed Commerce to consider the (k)(1) factors, and that Commerce specifically invoked in this case. That regulation stated that the (k)(1) factors "will be considered" by Commerce, which is precisely what Commerce did in this case. Wheatland Tube's argument to ignore the complete language of the scope and the applicable Commerce regulation should be rejected.

**A.    The Ambiguous Scope Language Does Not Expressly Include All Pipe Of A Certain Size Even If That Pipe Meets The Higher Standards For Line Pipe**

Wheatland Tube's argument relies heavily on a reading of the scope language that is simply wrong.  Wheatland Tube argues repeatedly the scope language is clear and unambiguous, Wheatland Tube Br. at 16, 20-21, but the language in anything but clear on the key issue of how to treat "dual-stenciled" pipe—pipe of a certain size that meets the requirements for both standard pipe and line pipe.  Wheatland Tube's main error—which the Trade Court stressed—was the failure to read all of the scope language.  The scope language includes more than just the dimensions of the welded steel pipe that Wheatland Tube addresses.  Appx00040-00041 (*Saha Thai I*, 547 F. Supp. 3d at 1293-94).  In particular, Wheatland Tube makes two fundamental errors regarding the scope language.

First, Wheatland Tube ignores the part of the scope language expressly limiting the scope to that pipe that is "known as" standard pipe.  Wheatland Tube cites this scope language, noting both the original phrase "known as 'standard pipe'" in the original  order and the revised phase "commonly referred to in the industry as 'standard pipe'" that Commerce drafted when the tariff codes changed and the AD Order language had to be revised, Wheatland Tube Br. at 7-8, but then never discusses what this limiting phrase in the scope language means.  Under this language, the AD Order states expressly that it is not enough for the pipe to meet

certain size dimensions. The pipe must also be "known as" or "referred to as" standard pipe. Neither line pipe nor dual-stenciled pipe qualifies under this language as standard pipe.

Second, Wheatland Tube also ignores the part of the scope language listing certain tariff codes and excluding others. The tariff codes are part of the scope language. Accordingly, the inclusion of some tariff codes and the exclusion of others provides further guidance as to what the scope language means when read as a whole. Yet, Wheatland Tube simply repeats that the scope of the HTS numbers is not dispositive as an excuse to ignore this language, Wheatland Tube Br. at 16, 27-28, and never grapples with what this language on its face means.

Although the Trade Court stressed these two points about the actual language of the scope, Appx00033-00034, Appx00040-00041 (*Saha Thai I*, 547 F. Supp. 3d at 1283-84, 1293-94), Wheatland Tube's argument to this Court does not address them at all. Wheatland Tube ignores the Trade Court's specific observation that Wheatland Tube's argument considers the language of "only about one-third of the scope, isolating the language about size and diameter from the rest of the scope." Appx00040 (*Id*. at 1293). Wheatland Tube ignores this point and simply repeats the same arguments that the Trade Court had considered and rejected. The Trade Court properly read the scope language as a whole, and

dismissed Wheatland Tube's argument to interpret the scope based on a portion of the scope language read in isolation while ignoring the rest of the language.

In ignoring the Trade Court's reading of the scope language as a whole, Wheatland Tube offers an interpretation that makes little sense. Indeed, the better reading of the scope language as whole is that is includes only standard pipe and does not include pipe that qualifies under the higher standards for line pipe. A product that meets higher standards is generally thought of as the higher quality product and not any lesser quality included products.

This interpretation that the order only covers standard pipe reflects common sense. For example, a car with many extra features necessarily includes the base features as well. No one would think of the car as being the base model—even if the sticker lists all of the base features—as opposed to the fully-loaded model. Similarly, a two-quart measuring device does not become a one-quarter measuring device simply because it can also function to measure out one quart.

This interpretation of the scope language is also consistent with the logic of the tariff codes. Under the tariff schedule, dual-stenciled pipe is classified under the tariff codes for line pipe—the higher quality product with demanding production requirements. No one has argued that the tariffs codes are dispositive as to the scope, but they are part of the language of the scope and, therefore, must be read and interpreted with the rest of the scope language. The exclusion of the

tariff codes that would have included line pipe and dual-stenciled pipe thus makes complete sense for a scope that includes only that pipe known as standard pipe. The purposeful exclusion of such products is, therefore, probative of the intended ambit of the scope.

Accordingly, Wheatland Tube's emphasis on the Venn diagram (with sections colored yellow for standard pipe, blue for line pipe, and an overlap section for dual-stenciled pipe colored green), Wheatland Tube Br. at 24 (citing Appx40752), submitted by Saha Thai misses the point. The scope—pipe "known as standard pipe" that falls within the listed tariff codes—is only that portion of the Venn diagram in yellow. Dual-stenciled pipe is different, and outside the scope, even though it can function as standard pipe. The line pipe (blue) and dual-stenciled pipe (green) are both <u>not</u> known as standard pipe and are both thus outside the scope. Again, Wheatland Tube is not challenging that part of Commerce's scope decision concluding that line pipe is outside the scope.

Wheatland Tube's argument that dual-stenciled pipe can also function as standard pipe, Wheatland Tube Br. at 23, does not change its fundamental character as higher quality pipe that is not known or referred to as standard pipe. The scope of this AD Order is not defined based on function. Even if it were defined based on function, the pipe at issue here would function in high-quality

line pipe applications, which is precisely why this pipe is not known as lower quality standard pipe.

Contrary to Wheatland Tube's argument about the absence of an express exclusion, Wheatland Tube Br. at 16, 21, 24, the absence of such an exclusion for dual-stenciled pipe is not dispositive. The limiting language in the order "known as" or "commonly referred to" as standard pipe serves the same purpose, necessarily excluding any pipe that is not known as or referred to as standard pipe and does not meet this requirement—such as line pipe and dual-stenciled pipe.

Moreover, Wheatland Tube's argument about the lack of an express exclusion ignores the significance of the tariff codes that were dropped from the scope language and how that change affected the remaining language. The Trade Court's decision below stressed this key point and noted the agreement by both Commerce and Wheatland Tube that the tariff codes that would have covered dual-stenciled pipe in 1985 had been expressly excluded. Appx00033-00034, Appx00040 (*Saha Thai I*, 547 F. Supp. 3d at 1283, 1293). Thus, the scope language (1) "known as" or "commonly referred to" as standard pipe, and the (2) the list of tariff codes that cover only single-stencil standard pipe must be understood in the context of the affirmatively excluded tariff codes that would have covered line pipe in any form, including any dual-stenciled pipe.

Even if this Court does not agree with Saha Thai's and the Trade Court's narrower reading of the scope language, at a minimum this reading establishes the ambiguity of the scope language on its face. Wheatland Tube bears the much higher burden of showing the language alone is clear and unambiguous. Any uncertainty means the language is ambiguous and that Wheatland Tube's argument about the unambiguous plain meaning fails.

### B.    The Applicable Commerce Regulation In Effect At The Time of Commerce's Determination Required Consideration Of The (k)(1) Factors

Wheatland Tube seeks to focus entirely on certain aspects of the scope language in the AD Order, and to stop the analysis there. This argument implicitly recognizes that the (k)(1) factors provide little credible support for its overbroad reading of the scope and Wheatland Tube thus does not want to consider them. Although the scope language is certainly the starting point for analysis, it does not end the analysis. Wheatland Tube's argument treats scope language like statutory text that binds Commerce. Scope language, however, is drafted by Commerce and not Congress. And Commerce itself has already provided in its regulation a legally binding approach to the proper analysis of scope language in historical context.

The applicable regulation expressly directs Commerce to consider the scope language in light of the context provided by the (k)(1) factors. At the time of the administrative determinations at issue, 19 C.F.R. §351.225(k)(1) provided that the

(k)(1) factors "will be taken into account" by Commerce in making its determination about the meaning of the scope language. That is precisely what Commerce did in its original scope determination. Commerce itself stressed the specific regulatory language "will take into account," citing Trade Court decisions to that effect. Appx40767. Under the regulation, the (k)(1) factors are thus the historical context against which the scope language should be read to confirm the meaning of that language.

That the regulatory language has since changed does not affect the regulatory requirement in effect at the time and expressly relied upon by Commerce itself in the underlying scope ruling. Wheatland Tube notes the regulatory change in 2021 that occurred after the scope determination at issue here, Wheatland Tube Br. at 12 n.3, but ignores the importance of the mandatory language in effect at the time of the agency scope determination. To ignore the (k)(1) factors would have meant that Commerce would be ignoring its own regulatory requirement that the agency "will take into account" those (k)(1) factors that provide the essential context for the scope language.

This Court's decisions have also generally recognized the importance of the considering the scope language in the context of the (k)(1) factors. The language of the scope is "cornerstone" of the analysis, but the (k)(1) materials may provide "valuable guidance." *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United*

*States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015).  Even though the scope language is "paramount," under its regulation Commerce still must consider the (k)(1) materials to determine the meaning of the scope language.  *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018).  *See also, e.g., OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020); *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1305 (Fed. Cir. 2020).

Saha Thai recognizes that some of this Court's decisions have put more weight on the scope language alone.  Commerce also recognized this point, but noted that this Court has never required the agency to ignore (k)(1) materials that are placed on the administrative record of the particular scope proceeding.  Appx40768.  The Trade Court also recognized these cases, Appx00037-00038 (*Saha Thai I*, 547 F. Supp. 3d at 1289-90), but went on to confirm the scope language was ambiguous on its face even without considering the (k)(1) factors, and the (k)(1) materials reinforced this ambiguity and disproved Commerce's original reading of the scope language.  Appx00039 (*Id*. at 1291).  To ignore such record evidence would be contrary to Commerce's basic obligation to consider all evidence on the record when making any decision.

Considered as a whole, these cases consistently stand for the proposition that the scope language itself is the most important consideration, but that the (k)(1) factors may affect the extent to which that language alone is sufficiently

unambiguous to resolve the issue. In this case, the scope language itself is ambiguous, and the (k)(1) factors simply confirm that ambiguity already apparent on the face of the order.

## II.    CONTRARY TO WHEATLAND TUBE'S ARGUMENTS, THE (K)(1) FACTORS CONFIRM THAT DUAL-STENCILED PIPE IS OUTSIDE THE SCOPE OF THE ORDER

As detailed above, the Commerce regulation governing its scope inquiry analysis, 19 C.F.R. §351.225, provides that the first step in any scope inquiry is to examine the original investigation and subsequent trade case documents to determine whether the inquiry merchandise is included or excluded from the scope of the AD Order. Specifically, 19 C.F.R. §351.225(k)(1)(2020) (the version in effect at the time of the scope inquiry) provided as follows:

> {Commerce} will take into account the following: (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of {Commerce} (including prior scope determinations) and the Commission."

19 C.F.R. §351.225(k)(1)(2020). The above language indicates that both original investigation documents and subsequent Commerce and ITC determinations must be taken into account.

As Saha Thai details below, these (k)(1) factors in this case show that the dual-stenciled pipe was excluded from the scope of the AD Order. The amendment of the original petition to exclude all forms of line pipe, the dropping of the tariff codes that would have included all forms of line pipe, the history of the

original ITC injury investigation of Thailand only including standard pipe, and later ITC commentary on the scope of the original investigation in subsequent sunset reviews all point consistently to the same conclusion—that all forms of line pipe, including dual-stenciled pipe, were excluded from the scope of the AD Order on Thailand.

### A. The Original Investigation Documents, Including The Petition and Amended Petition, Confirm That All Line Pipe – Including Dual Stenciled Pipe –Was Outside the Scope

The Commerce regulation governing its scope inquiry analysis makes clear that the Commerce original investigation documents are critical historical context for determining the scope of an order.  19 C.F.R. §351.225(k)(1) ({Commerce} will take into account "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary").  In this case, these historical descriptions about the scope are critically important.

The petition, as originally filed in February 1985, requested an investigation of both standard pipe and line pipe imports from Thailand.  *See* Appx40519-40582; *see also* Appx40536 ("The product covered by this petition is certain circular welded carbons steel circular pipes and tubes . . . includes "standard pipe" . . . the product also includes "line pipe").  Prior to its initiation, however, Commerce requested Petitioners' counsel to provide certain additional information, documentation, and clarification to support its allegations.

On March 14, 1985, Petitioners filed a letter in which Petitioners expressly amended the scope of the petition against Thailand by <u>withdrawing</u> the petition against line pipe, stating:

> Petitioners in the above designated investigations . . . hereby withdraw the following portions of the followings petitions . . . A-549-502 and C-549-501.  Certain Pipe and Tube Products from Thailand: *Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209.*

*See* Appx40612 (emphasis supplied).  Petitioners' scope amendment could not be clearer:  all pipes from Thailand that meet API specifications as line pipe and would be classified <u>under TSUS numbers 640.3208 and 610.3209</u> were to be excluded from the investigation.

There are two important takeaways from this action during the original investigation.  First, Petitioners did not place any qualification whatsoever on the exclusion of line pipe from the investigation, thereby confirming that all line pipe that also meets ASTM specifications for standard pipes (that is, "dual-stenciled" pipe meeting both sets of specifications) is also excluded.  The phrase "in so far as they concern line pipe" is broad and not a narrow exclusion of only a certain subset of pipe that meets the API definition of line pipe.

Second, the fact that Petitioners specifically excluded all of the "line pipe" tariff codes while keeping only "standard pipe" tariff codes also confirms that the exclusion covers all products that would meet "line pipe" API specifications,

without qualification.  At the time of the petition/original AD investigation, "line pipe" of the relevant sizes would enter under specific Tariff Schedules of the United States Annotated (TSUSA) items 610.3208 and 610.3209 while "standard pipe" would enter under different items, specifically 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925.  Appx40116.  The historical record is absolutely clear on this point, and Wheatland Tube ignores but does not dispute this key fact.

Specifically, the TSUSA 1985 version provided:[1]

| TSUSA Item | Included or Excluded by Amended Petition | Description |
|---|---|---|
| 61032 | | Pipes and tubes and blanks therefor, all the fore-going of iron (except cast iron) or steel: Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section, 0.375 inch or more in outside diameter |
| **610.3208-09** | Included in the original petition BUT **excluded from the amended petition** | **Conforming to A.P.I. specifications for line pipe** (Std. 5L, 5LS, or 5LX), of no more than 16 inches in outside diameter |
| 610.3216-19 | Excluded | Conforming to A.P. I. specifications for oil well tubing |
| 610.3221 | Excluded | Cold drawn pipes and tubes |
| **610.3231-64** | **Included** | **Other** |

---

[1] Appx40211-40217.

| 610.4925 | Included | **Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel, Other, Other, Not suitable for use in the manufacture of ball or roller bearings, Other than alloy iron or steel, Other, Welded, jointed, or seamed pipes and tubes, Of circular cross section** |
|---|---|---|

The tariff schedule requires that any pipe that conforms to API specifications for line pipe (5L, 5 LS or 5 LX), and of no more than 16 inches in outside diameter <u>must</u> enter the U.S. under either items 610.3208 or 610.3209. Therefore, under the 1985 TSUSA, <u>both</u> "dual-stenciled" products (i.e., pipes that would meet both ASTM specifications for standard pipe and API specifications for line pipe) and "mono-stenciled" line pipe (i.e., pipes that only conformed to API specifications for line pipe) could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209. This factual point about the coverage of the tariff codes is clear and undisputed.

On this point, Saha Thai notes that Wheatland Tube itself in a subsequent sunset review of the AD Order on circular welded steel pipes and tubes from Thailand acknowledged that "dual-stenciled" pipe is considered as "line pipe" instead of "standard pipe" in a brief to the ITC. Appx40283-40284 ("{i}t is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from <u>line pipe (whether dual stenciled or not)</u> to standard pipe.") (emphasis supplied). In this

other context, Wheatland Tube acknowledged the implications of the tariff codes and what they cover.

In its preliminary scope decision, Commerce attempted to dismiss the importance of these facts by claiming that that Customs tariff classification structure was irrelevant for purposes of determining whether dual-stenciled pipe is covered by the AD order.  Appx40685.  Such comment, however, indicated Commerce's misunderstanding of Saha Thai's argument.  Saha Thai never argued that Commerce was required to apply Customs tariff classification rules in its scope analysis or that the tariff codes on their own were dispositive.

Instead, Saha Thai's point was that Commerce's scope analysis could not ignore the following two facts: (1) "dual-stenciled" pipe was classified under TSUSA 610.3208 and 610.3209 at the time of the petition and (2) during the original investigation Petitioners explicitly excluded from the investigation all line pipe and any pipe that entered under TSUSA 610.3208 and 610.3209.  These two facts are not disputed by anyone and therefore these two facts provide important historical context for the examination of the original investigation documents.

The Trade Court largely agreed with Saha Thai's argument about the importance of the original investigation documents, including the withdrawal of the petition and the known parameters of the Customs tariff classifications.  The Trade Court's initial decision recounted this same history:

> In their first petition in 1985, the initial petitioners requested an investigation of pipe imported from Thailand under a variety of item numbers found in the Tariff Schedules of the United States at the time, including item numbers 610.3208 and 3209. {citation omitted} Dual-stenciled pipe imported as line pipe would have been imported under these numbers at the time of the original Thailand Order. {citations omitted} But after Commerce sent an inquiry asking for evidence that Thailand produced such pipes, the initial petitioners decided to expressly withdraw their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209." {citations omitted}

Appx00041-00042 (*Saha Thai I*, 547 F. Supp. 3d at 1295). As the Trade Court

recognized, these facts meant that:

> Once the initial petitioners withdrew all pipes that were importable under 610.3208 and 3209 from consideration by the ITC and Commerce, those pipes were not included in either the resulting injury investigation conducted by the ITC or the antidumping order issued by Commerce. {citations omitted}

*Id.* And then in its second decision, the Trade Court considered the comments by

the parties on the Commerce remand, including the oral arguments on this matter,

and reaffirmed its conclusion:

> The facts support Commerce's Remand Results {rendering a negative scope decision}. No line was pipe manufactured in Thailand when Commerce undertook its initial investigation almost forty years ago, and the ITC's report made no harm finding for line or dual-stenciled pipe from Thailand. Moreover, petitioners explicitly withdrew their petition as it pertained to line pipe and have admitted that their withdrawal letter specifically covered the categories under which *all* dual-stenciled line pipe would have been imported. First Tr. 7:8–22. These facts lead to the conclusion that the scope of the Thailand Order cannot now be read to include dual-stenciled line pipe.

Appx00011 (*Saha Thai II*, 592 F. Supp. 3d at 1305).

Wheatland Tube now argues that the Trade Court was wrong to find this history and the original investigation documents to be important context, including the withdrawal of the part of the petition that covered all line pipe, including dual-stenciled pipe. Wheatland Tube argues that "declining to pursue a case on line pipe did not create an exclusion for dual-stenciled pipe," Wheatland Tube Br. at 26, and that "the removal of the tariff classifications is also of no moment . . ." Wheatland Tube Br. at 27. Wheatland Tube's purported rationale for these conclusions, however, is rather underwhelming and ultimately fails. Wheatland Tube's rationale is premised only on stating legal truisms—namely, that, as general matter, tariff classifications are not dispositive for antidumping purposes and Commerce has the legal authority to adopt a scope that differs from what petitioners suggest. No one is disputing these truisms.

Such legal truisms, however, do not address the critical issue in the case about the meaning of particular scope language with a particular history as context. Given that the scope language does not contain the words "dual-stenciled pipe" or otherwise address expressly the treatment of such a product, the core issue here is whether the investigation documents help analyze the meaning of that scope language with regard to this unaddressed issue of dual-stenciled pipe. The Trade Court correctly noted that the investigation documents demonstrate that "petitioners explicitly withdrew their petition as it pertained to line pipe and have

admitted that their withdrawal letter specifically covered the categories under which *all* dual-stenciled line pipe would have been imported." Appx00011 (*Saha Thai II*, 592 F. Supp. 3d at 1305). Contrary to Wheatland Tube's arguments, such undisputed investigation document facts cannot be ignored for scope analysis purposes.

Indeed, as the Trade Court stressed, even after being pressed to do so, neither Commerce nor Wheatland Tube could find "a single instance of dual-stenciled pipe being referenced as 'standard pipe' throughout the entire history of the Thailand Order and the sunset review of *that* order." Appx00044 (*Saha Thai I*, 547 F. Supp. 3d. at 1298). Going on, the Trade Court noted "there is no record evidence of dual-stenciled pipe being considered as standard pipe for purposes of the Thailand Order." *Id*. Dual-stenciled pipe that meets the API definition of line pipe is line pipe.

**B.    The ITC's Original Injury Determination, As Reinforced By The ITC's Sunset Review Determinations, Confirm That All Line Pipe—Including Dual Stenciled Pipe—Was Excluded from The ITC's Original Injury Analysis**

The Commerce regulation governing its scope inquiry analysis makes clear that the ITC's injury determination is equally important as Commerce's original investigation documents.  *See* 19 C.F.R. §351.225(k)(1) ("{Commerce} will take into account…the determinations of {Commerce} (including prior scope determinations) and the Commission.")  Moreover, this Court has held repeatedly that Commerce may not expand the scope of an antidumping duty order to include imported merchandise that was not part of the ITC's injury determination.  S*ee Wheatland Tube,* 161 F.3d at 1371 (a scope ruling that diverges from the underlying injury determination would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation"); *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (discussing the importance of the ITC's proceedings in imposing trade remedy orders); *Eckstrom Indus. v. United States*, 254 F.3d 1068, 1075 (Fed. Cir. 2001) ("the ITC's finding of material injury was directed to fittings classifiable under HTSUS 7307.23.00, which does not cover cast fittings.").

As we detail below, the ITC's original injury determination, as reinforced repeatedly by the ITC's sunset review determinations, confirm that all line pipe— including dual-stenciled pipe—was excluded from the ITC's injury analysis.

### 1.     The ITC's original injury determination

The scope of this investigation was narrowed very early on.  In its first injury determination in this case, the ITC explicitly noted that after the original petition had been filed, and during the process of instituting the investigation, "Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe."  Appx40300.  The ITC further noted that the petition was subsequently amended to remove from the scope imports of line pipe from Thailand:

> In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe.

*Id*. (emphasis added); *see also* Appx40117.

Furthermore, the ITC noted the distinct coverage of different tariff codes. ITC determined that subject standard pipe were imported entirely under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925.  Appx40145-40146 (specifically Tables I-10

- 34 -

and I-11). Imports under TSUSA 610.3208 and 610.3209 were entirely of line pipe, which was not subject to the Thailand investigation. Appx40166-40167 (specifically Tables II-9, II-10). Because imports of dual-stenciled pipe would enter under TSUSA 610.3208 and 610.3209, dual-stenciled pipe was not considered as part of the ITC's analysis of potential injury by Thai imports of standard pipe.

Beyond this clear discussion in the ITC's determination of the specific merchandise at issue in its injury analysis, other aspects of the ITC injury determination also demonstrate that the ITC did not include any line pipe – including any dual-stenciled pipe – in its injury analysis. The most direct example is the ITC's analysis of possible injury from the *volume* of imports.

The ITC analyzes whether the subject merchandise caused the domestic industry to suffer material injury or the threat of material injury. 19 U.S.C. §1673d(b)(1). As part of this required assessment, in its original injury investigation the ITC examined the volume of imports of the subject merchandise and how the quantity of imports changed over the three-year time period. *See* Appx40074-40075. To ensure the most accurate analysis possible, the ITC includes all known imports of the subject merchandise. The ITC's import volume analysis on page I-16 of the final report for the injury investigation identifies those imports that were considered in the injury determination. Appx40144. The table

on page I-16 provides the total import quantity of "subject merchandise" (that is, "standard pipe and tubes") from each country including Thailand. *Id.* The ITC's report confirms that the source of the import quantities of "subject merchandise" are the volumes of imports that entered the United States under certain TSUSA numbers, specifically, 610.3231, 610.3232, 610.3241, 610.3242, 610.3243, 610.3244, 610.3247, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925. *Id.* Thus, the ITC's injury analysis and determination relied on a specific set of official import statistics (TSUSA numbers) for assessing the quantity and market shares of imports subject to the AD case. *Id* (noting that the data was "Compiled from official statistics of the U.S. Department of Commerce").

As discussed above, none of these TSUSA numbers included any dual-stenciled line pipe. Rather, at that time, all dual-stenciled line pipe would have been entered under different TSUSA numbers that were not included. Appx00033 (*Saha Thai I*, 547 F. Supp. 3d. at 1282-1283). This fact is not in dispute. Therefore, the ITC's final injury determination—both the general description of what products were covered and the more specific information on what import volumes were considered—demonstrates that dual-stenciled pipe was excluded from the underlying injury determination.

### 2.    The ITC's subsequent sunset determinations

The ITC's subsequent sunset reviews vis-à-vis the same case about standard pipe from Thailand confirm that dual-stenciled pipe is not subject merchandise covered by the AD Order.  This subsequent ITC commentary thus reinforces what the historical record of the ITC injury investigation already shows.

For example, in the Third Sunset Review, the ITC characterized Commerce's varying scope definitions as "formulations" and explicitly stated that "{t}his dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders." *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Sunset Review), USITC Pub. 4333 (June 2012) at 7-8.  The Trade Court took pains to note that the Third Review was on the record for review.  Appx00019 (*Saha Thai II*, 592 F. Supp. 3d at 1308-09).  Importantly, the ITC specifically cited the Court of Appeal for the Federal Circuit's decision in *Wheatland Tube* that including dual-stenciled line pipe in the circular welded pipe order on Korea, Mexico, and Brazil was unlawful, in its consideration of the scope issue.  USITC Pub. 4333 at 8 n. 41.

And in the most recent sunset review of this AD Order on circular welded steel pipes and tubes from Thailand, the ITC again made clear that line pipe and "dual-stenciled pipe, which enters as line pipe under a different subheading of the

Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is <u>not within the scope of the orders</u>." *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA- 132, 252, 271, 273, 532–534, and 536 (Fourth Sunset Review), USITC Pub. 4754 (Jan. 2018) at 6-7 (emphasis added). When discussing the product under review and providing the exact Commerce scope language for each of the orders covering circular welded pipe under review, the ITC explained:

> Tubular products frequently are distinguished by . . . end uses as defined by the American Iron and Steel Institute ("AISI").
> . . .
> {Standard pipe} is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; **however, such dual-stenciled pipe is not within the scope of the subject orders.**

*Id* at I-14-16 (emphasis added).

This ITC's explanation and conclusion in the most recent sunset review (i.e., the fourth review) is unsurprising as it is consistent with the previous sunset reviews regarding the AD Order on circular welded steel pipes and tubes from Thailand. For instance, as noted above, when providing a description of the scope of the Orders under review in the third review, the ITC stated "dual-stenciled pipe,

which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."  USITC Pub. 4333 at 8.

Moreover, in these ITC proceedings, Wheatland Tube itself acknowledged that "dual-stenciled" pipe is considered as "line pipe" instead of "standard pipe." The ITC explicitly quoted Petitioner as follows:

> It is likely that Korea, and other countries {e,g. Thailand} if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from {non-subject} <u>line pipe (whether dual stenciled or not)</u> to standard pipe.

Appx40283-40284 (emphasis supplied).  This admission should not be ignored.  In a legal proceeding that explicitly addressed considered the AD Order at issue here, <u>Wheatland Tube asserted in a certified document that line pipe and dual-stenciled pipe were not covered by the orders subject to that review</u>.  Appx40283-40284 (noting that "{i}t is likely that Korea, and other countries if no longer subject to the restrains imposed by the Standard Pipe antidumping order, will switch their production.").  In its initial scope decision, Commerce stated that this fact was not relevant because "{t}hat section of the brief focused on how Korean producers of line pipe would shift production." (emphasis supplied)).  Appx40777.  The statement contained in the brief, however, is broader and cannot be read to apply narrowly only to a specific order on a specific country.  The context makes clear that the brief was referring to the products covered by <u>all of the orders</u> under review in that proceeding, including Thailand.

Taken together these facts demonstrate that the <u>ITC's initial consideration of injury</u> and subsequent reviews of that finding <u>did not include dual-stenciled pipe</u> in the definition of subject merchandise.  And therefore Commerce's initial scope decision that dual-stenciled pipe was within the scope was an unlawful expansion the scope of the AD Order.

### 3.    The Trade Court properly concluded that the ITC's original injury determination did not include dual-stenciled pipe

In its own decisions the Trade Court broadly agreed with Saha Thai's assessment of the ITC's original injury determination and subsequent sunset review determinations.  Concerning the ITC's original injury determination the Trade Court found:

> {t}he ITC did not include line pipe or dual-stenciled pipe imported as line pipe within the description of the investigation's scope into Thailand circular welded pipes.  {citation omitted}  The only discussion of line pipe appears in the sections of the report addressing Turkish imports, and the Commissioners were cautious even in their section headings to use "line pipe" only in conjunction with Turkey. *See, e.g.*, ITC Final Determination, {citation omitted (differentiating among "standard pipe imports from Thailand," "standard pipe imports from Turkey," and "line pipe imports from Turkey").

Appx00042 (*Saha Thai I*, 547 F. Supp. 3d. at 1296).  And concerning the ITC's subsequent sunset reviews, the Trade Court found:

> the ITC's sunset reviews reinforce the Court's finding that dual-stenciled, or API stenciled pipe of any kind, was not included in the Thailand Order's scope.  {citation omitted}  Every sunset review of the Thailand Order treats dual-stenciled pipe as {excluded} line pipe.

Appx00042-00043 (*Id.* at 1297). And then, after methodically walking through each sunset review determination, the Trade Court concluded: "{n}o review, original or sunset, has determined that dual-stenciled or API stenciled pipe from Thailand injures a domestic industry." Appx00043 (*Id.* at 1298).

### 4.    Wheatland Tube's arguments about the ITC's original injury determination miss the mark and are unavailing

Wheatland Tube now argues that the Trade Court's conclusions about the ITC's injury determination and subsequent sunset review decisions are somehow wrong. Wheatland Tube's argument, however, does not really address the substance of the Trade Court's discussion.

At the outset Saha Thai notes that, before this Court, Wheatland Tube is no longer pursuing the vigorous arguments made to the Trade Court that it was not allowed to examine the ITC's sunset review determinations. Although such arguments were central to Wheatland Tube's approach before the Trade Court, Wheatland Tube is no longer pursuing this claim.

Instead, Wheatland Tube now actually addresses the content of the ITC's original injury determination and the ITC's sunset reviews, but advances the rather remarkable argument that Trade Court was wrong not to recognize that the ITC itself allegedly made mistakes in its own sunset review determinations concerning which merchandise was and was not included in the ITC's injury analysis.

Wheatland Tube recognizes that the ITC was very explicit in stating: "{d}ual-stenciled pipe, which enters as line pipe under a different subheading of Harmonized Tariff Schedule . . . for U.S. customs purposes, is not within the scope of the orders."  Wheatland Tube Br. at 29 (citing the ITC's sunset review decision). Wheatland Tube then argues that the Trade Court was wrong not to view this explicit statement as a "mistake" by then ITC.  *Id* at 30.

The suggestion that the ITC was somehow confused about which imported merchandise was actually part of its original injury analysis is preposterous on its face, and has no support in the record or the law.  The ITC has more than four decades of experience in analyzing possible injury from imports in antidumping and countervailing duty cases and therefore is very skilled in distinguishing between those imports that are subject to any petition and those imports that are not.  Moreover, as the Trade Court noted, in the very injury analysis at issue the ITC undertook painstaking care to distinguish between subject imports from Turkey (which included line pipe) and subject imports from Thailand which did not.  Appx00042 (*Saha Thai I*, 547 F. Supp. 3d. at 1296) ("the Commissioners were cautious even in their section headings to use 'line pipe' only in conjunction with Turkey. {citation omitted}(differentiating among 'standard pipe import from Thailand,' 'standard pipe imports from Turkey,' and 'line pipe imports from Turkey')").

In short, the ITC's original injury determination for Thailand is critical to understanding the proper scope of the AD Order circular welded pipe from Thailand. The content of the ITC's original injury determination, as confirmed by the subsequent ITC's sunset reviews, makes clear that no line pipe nor dual-stenciled pipe was part of the ITC's injury analysis for Thailand. Accordingly, Commerce had no legal basis to expand the scope to include dual-stenciled pipe and its remand redetermination reflects that legal conclusion.

> **5.** **Contrary to Wheatland Tube's argument, the inclusion of dual-stenciled pipe in the safeguard remedy on line pipe provides important context**

As part of its review of the required (k)(1) analysis the Trade Court considered what the ITC understood the ambit of "dual-stenciled" pipe to be in the context of the First and Second Sunset Reviews. Appx00042-00043 (*Saha Thai I*, 547 F. Supp. 3d at 1297-98). The Trade Court also found that the ITC's discussion in the sunset reviews of certain safeguard provisions applicable to line pipe showed the ITC "consistently understood those duties to apply to dual-stenciled pipe, not just mono-stenciled line pipe, and *not to apply* to standard pipe." Appx00043 (*Id.* at 1297) (citing *First Sunset Review* at 28; *Second Sunset Review* at Overview-5 n.1). The Trade Court returned to this point when considering the Commerce redetermination. Appx00025 (*Saha Thai II*, 592 F. Supp. 3d at 1312). The Trade Court concluded that since the safeguard measures on line pipe covered dual-

stenciled pipe and the various standard pipe orders did not, the injury

determination discussed by the ITC in those sunset review decisions could not

include dual-stenciled pipe.

Wheatland Tube argues that the ITC's discussion of the orders subject to

those Sunset Reviews was either mistaken or not intended as a statement for the

clarifying the scope of the AD Order at issue here, Wheatland Tube Br. at 28, but

this argument attacks a strawman. The issue is not the safeguard determination

itself, but how the ITC relied upon the safeguard determination when describing

the scope of the AD Order covering Thailand in the sunset reviews of that specific

order. The Trade Court highlighted the ITC's discussion of the safeguard

provisions covering line pipe in its sunset determinations as additional support as

to the question of whether the ITC itself considered "dual-stenciled pipe" to be

"line pipe" and thus not subject to the AD orders covering standard pipe. That is

what the discussion shows. The ITC's discussion could not plausibly lead to the

conclusion that dual-stenciled pipe is somehow standard pipe within the context of

the AD Order on Thailand. Accordingly, the ITC made no injury finding with

regard to those excluded products in its original injury investigation, and the scope

of the Order on Thailand cannot now be read to cover those products.

Any other interpretation of the ITC's analysis in the Sunset Reviews would

lead to absurd results. As the Trade Court stated:

> {i}f dual-stenciled pipe is standard pipe and is only excluded from
> antidumping orders on standard pipe when it is expressly excluded in
> the language of those orders' scopes, then dual-stenciled pipe would
> have fallen under neither the antidumping orders that excluded it nor
> the safeguard duties imposed by President Clinton that covered line
> pipe. But dual-stenciled pipe *was* treated as falling under the
> safeguard duties imposed by President Clinton, even though the
> proclamation only mentions "line pipe."

Appx00043 (*Saha Thai I*, 547 F. Supp. 3d at 1297); *see also* Appx00025 (*Saha Thai II*, 592 F. Supp. 3d at 1312). The ITC's analysis in conjunction with the safeguard provisions covering line pipe, therefore, confirms what Saha Thai has argued all along: for purposes of trade cases dual-stenciled pipe is line pipe. That was the interpretation when the initial petition was filed, that interpretation has been followed consistently in four sunset reviews. The safeguard provisions covering line pipe therefore provides important additional context for the core scope interpretation language at issue here.

## C. Contrary to Wheatland Tube's Approach, The (k)(1) Factors Should Not Be Analyzed In Isolation

Wheatland Tube considers each of the (k)(1) factors one-by-one in isolation, Wheatland Tube Br. at 25-35, but that approach ignores how the various (k)(1) factors actually reinforce each other. Just as the scope language should be considered in its entirety, the (k)(1) factors should be considered as a whole. In particular, Saha Thai notes the following key points about the interaction of the various (k)(1) factors.

First, the language of the original petition, the follow up from Commerce and the subsequent decision to narrow the scope of the petition led Commerce to drop specific tariff codes from the scope language. Wheatland Tube treats the language of the petition, the amendment of the petition, and the tariff codes as separate issues, but they are actually intertwined. Commerce dropped the specific tariff codes that cover all forms of line pipe, both line pipe and dual-stenciled pipe, precisely because the Petitioners at the time had withdrawn the petition against line pipe. The action of withdrawing the petition thus directly shaped the language of the AD Order—the tariff codes included in that language. The inclusion of some tariff codes and the exclusion of others thus should be read in the context of this history.

Second, the ITC has returned to its injury finding numerous times since 1986 and has repeatedly reaffirmed that all forms of line pipe were not part of its original injury finding. Although Saha Thai believes the original ITC determination is quite clear on this point, any possible doubt has since been resolved by the discussion of this issue in subsequent ITC sunset reviews. Both sets of ITC historical material – the original determination and the subsequently commentary on that determination -- point consistently to the same conclusion— that all forms of line pipe, including dual-stenciled pipe, were excluded from the

injury determination that serves as the necessary legal foundation for the AD Order.

Finally, the histories of what happened before Commerce and the ITC reinforce each other. The ITC was following Commerce's decisions about the scope of the investigation. The ITC did not investigate any form of line pipe because it understood Commerce to have excluded all forms of line pipe from the scope of the investigation.

These factors all point consistently to the same conclusion—that the scope of the AD Order never included any form of line pipe and cannot now be expanded to include that distinct product for which no injury finding has ever been made. Wheatland Tube's efforts to isolate these factors and dismiss them individually should be rejected.

## III.    COMMERCE'S ORIGINAL SCOPE DETERMINATION WAS CONTRARY TO THIS COURT'S *WHEATLAND TUBE* PRECEDENT

This Court has previously addressed efforts by Wheatland Tube to expand the scope of an antidumping order improperly. As noted above, this Court's *Wheatland Tube* decision affirmed the Trade Court's rejection of Wheatland Tube's attempts to expand the scope of different antidumping duty orders on imports of standard pipe (from Korea, Mexico and Brazil) to include line pipe and dual-certified pipe. *Wheatland Tube*, 161 F.3d at 1366-67.

Although the details vary somewhat and the specific legal issue may be different in certain respects, the core principles from this Court's decision in *Wheatland Tube* continue to apply and confirm that Commerce's initial scope determination improperly expanded the scope of the AD Order at issue here. The Trade Court properly applied these basic principles from *Wheatland Tube*. Wheatland Tube in its arguments, on the contrary, basically ignores this key precedent confirming the fundamental principles that the scope of the order cannot be expanded (1) to include merchandise that the scope language excludes and (2) to include merchandise for which there has been no proper finding of injury by the ITC.

The Trade Court correctly applied these legal limitations on the scope of an order. The Trade Court noted the exclusion of all forms of line pipe from the order, a conclusion that Commerce itself concurred with and which Wheatland Tube has not challenged. Appx00041 (*Saha Thai I*, 547 F. Supp. 3d at 1295). The Trade Court also noted that both U.S. law and U.S. international obligations allow an antidumping order to cover only that merchandise for which there is a proper injury finding regarding that merchandise. Appx00038 (*Id*. at 1290). The Trade Court then emphasized that the scope of an order cannot include "products intentionally omitted from the ITC's injury investigation." Appx00042 (*Id*. at 1296) (citing *Wheatland Tube*, 161 F.3d at 1371). Note this language does not

focus on an express exclusion set forth in the language of the order, but rather on the act of excluding products from the relevant injury investigation and the implications of doing so for the ITC injury analysis.

Wheatland tries to defend its overbroad scope as consistent with the ITC injury finding, Wheatland Tube Br. at 34-36, but those arguments all fail. First, Wheatland Tube mistakenly narrows the scope of the ITC determinations arguing that since Thailand was not exporting line pipe, the ITC could not have examined dual-stenciled pipe at the time. Wheatland Tube Br. at 34. This argument misses the point. The injury determination was limited to standard pipe and did not include any line pipe—not line pipe with a single certification, and not line pipe with dual-stenciling—because Wheatland Tube had specifically withdrawn its petition against any such line pipe. The Trade Court specifically reviewed this history. Appx00041-00042 (*Saha Thai I*, 547 F. Supp. 3d at 1295-96). That the ITC could not have investigated such line pipe from Thailand does not change the basic fact that the ITC did not investigate line pipe and did not make any injury finding covering line pipe from Thailand in any form.

Second, Wheatland tries to expand the scope of an ITC injury finding to include products not mentioned in the analysis, Wheatland Tube Br. at 34, but this argument mischaracterizes this Court's decisions on that point. Wheatland Tube cites *Shenyang Yuanda*, 776 F.3d at 1351, but this case provides no support for

Wheatland's position. On the contrary, this Court in *Shenyang Yuanda* stressed the distinction between those products included within the scope and investigated by the ITC, compared to situations like *Wheatland Tube* and this case where the products were excluded from the scope and the ITC investigation. *Shenyang Yuanda*, 776 F.3d at 1356-57. This Court also specifically quoted ITC language that included the aluminum curtain wall units at issue in that case. *Id*. at 1358. In this case, on the contrary, the record shows that the ITC injury investigation and determination did not cover the line pipe that had been excluded from the scope of the injury investigation.

Third, Wheatland Tube's argument about the distinct nature of Commerce and ITC determinations, Wheatland Tube Br. at 35, raised an self-evident but irrelevant point. The two agencies make separate determinations. The issue here, however, is the legal relevance of the ITC determination for determining the permissible outer limits of the scope of the AD Order against Thailand. Commerce does not have the legal authority to define the scope to include products for which the ITC has not made a proper injury determination and this Court has consistently recognized that limit. It should do so in this case as well.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For these reasons, we respectfully request that this Court affirm the Trade Court's final judgment that Commerce's negative scope determination was supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel to Plaintiff-Appellee Saha Thai Steel Pipe Public Company Limited*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  22-2181

**Short Case Caption:**  Saha Thai Steel Pipe Public Company Limited v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes ___11,141___ words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _1/13/2023_____

Signature:  /s/ Daniel L. Porter

Name:  Daniel L. Porter