# United States Court of Appeals for the Federal Circuit

---

**SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**WHEATLAND TUBE COMPANY,**
*Defendant-Appellant*

---

2022-2181

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00133-SAV, Judge Stephen A. Vaden.

---

Decided: May 15, 2024

---

JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, argued for plaintiff-appellee. Also represented by JAMES BEATY, DANIEL L. PORTER.

CHRISTOPHER CLOUTIER, Schagrin Associates, Washington, DC, argued for defendant-appellant. Also represented by MICHELLE ROSE AVRUTIN, NICHOLAS J. BIRCH, ELIZABETH DRAKE, WILLIAM ALFRED FENNELL, JEFFREY DAVID GERRISH, LUKE A. MEISNER, ROGER BRIAN SCHAGRIN.

————————————

Before LOURIE, REYNA, and CHEN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* CHEN.

REYNA, *Circuit Judge*.

Wheatland Tube Company appeals a decision of the U.S. Court of International Trade, which affirmed the U.S. Department of Commerce's remand determination as to the scope of an antidumping duty order concerning certain steel pipes imported from Thailand. For the following reasons, we reverse.

## BACKGROUND

This appeal concerns whether certain imports of steel pipes from Thailand fall within the scope of an existing antidumping duty order. As background, we provide a brief overview of the antidumping duty framework and the initial, underlying antidumping duty investigation, before turning to the scope of the order at issue.

The U.S. trade statutes generally provide that an interested party may petition the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC") to initiate antidumping duty investigations and, if the investigations result in affirmative determinations, impose antidumping duties on the particular imported merchandise that was subject to the investigations. 19 U.S.C. §§ 1673,[1] 1673a(b). Commerce's role in an antidumping investigation is to determine whether the

————————————

[1]     Section 731 of the Tariff Act of 1930, codified in 19 U.S.C. § 1673, sets forth the general framework for the imposition of antidumping duties.

merchandise subject to the investigation (subject merchandise) is being, or likely to be, sold in the United States at less-than-fair-value ("LTFV"), an unfair trade practice commonly referred to as dumping. *Id.* §§ 1673, 1673b(b)(1)(A). Concurrently, the ITC investigates whether a U.S. domestic industry producing like or similar merchandise as those under Commerce's investigation is materially injured, or threatened with material injury, by virtue of the dumped imports. *Id.* §§ 1673, 1673b(a)(1)(A). If Commerce's and the ITC's investigations both lead to affirmative final determinations, namely Commerce's final LTFV determination and the ITC's final determination of material injury or threat of material injury, Commerce issues an antidumping duty order imposing antidumping duties on the imports of the subject merchandise. *Id.* §§ 1673, 1673d(c)(2).

An antidumping duty order describes the specific merchandise subject to the order and antidumping duties. This description is paramount. Given the realities in the marketplace and everchanging varieties of merchandise, questions frequently arise as to whether a particular product is subject to or falls within the scope of an antidumping duty order. 19 C.F.R. § 351.225(a). Consequently, U.S. trade law provides that an interested party may request that Commerce issue a scope ruling to clarify whether a particular product falls within the scope of the order. *Id.* This appeal involves such a ruling.

I.    The Initial Antidumping Duty Investigation

In February 1985, a coalition of domestic manufacturers of steel pipes, including Appellant Wheatland Tube Company ("Wheatland"), petitioned Commerce and the ITC to initiate antidumping duty investigations on certain circular welded carbon steel pipes and tubes ("CWP") imported from Thailand. *Petition for the Imposition of Antidumping Duties[:] Certain Welded Carbon Steel Circular Pipes and Tubes from Thailand* (Feb. 28, 1985),

J.A. 40519–56.[2]  The petition identified Thai manufacturers producing the imported pipes, including Appellee Saha Thai Steel Pipe Public Company Limited ("Saha"). J.A. 40563.

In the original February 1985 petition, as required under the regulations, the petitioners provided a detailed description of goods the petitioners believed should be investigated, including their technical characteristics, uses, and tariff classifications. J.A. 40536–39.  Specifically, the petition asserted that the subject merchandise was "certain circular welded carbon steel circular pipes and tubes, .375 inch or more but not over 16 inches in outside diameter." J.A. 40536.  The petition continued to state,

> The product *includes "standard pipe,"* which is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. . . . (These products are generally produced to [the American Society for Testing & Materials ("ASTM")] specifications A-120, A-53, or A-135.)  The product *also includes "line pipe,"* which is produced to [the American Petroleum Institute ("API")] specifications for line pipe, API-5L or API5X.[3]

> . . . Small diameter pipes with a wall thickness greater than .065 inch are now classified [under the

---

[2]   Typically, petitioners requesting the initiation of an antidumping duty investigation simultaneously request the initiation of a countervailing duty investigation, as was the case here.  *See, e.g.*, J.A. 40519.  This appeal is limited to the scope of the antidumping duty order resulting from the antidumping duty investigation.

[3]   As noted *infra*, ASTM and API are both industry standards organizations in the steel industry.

Tariff Schedules of the United States Annotated ("TSUSA")] in 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, and 610.3258. Circular pipe with a wall thickness less than .065 inch is now classified in 610.4925.

J.A. 40536–37 (emphasis added). According to the petition, the subject merchandise was produced using the same process worldwide, and the finished products were identical. J.A. 40538–39; *see also* J.A. 40537–38 (quoting description of the manufacturing process the ITC formulated in previous CWP investigations).

The petition described the U.S. domestic industry producing the subject merchandise as consisting of U.S. producers of *both* standard pipes and line pipes. J.A. 40545–46. Most domestic producers, according to the petition, produced both standard and line pipes using the same equipment. *Id.*

In March 1985, the petitioners partially withdrew their petition "insofar as they concern *line pipe*, TSUS numbers 610.3208 and 3209."[4] J.A. 40612 (emphasis added). According to the petitioners, they had ascertained that no Thai company was licensed at that time to produce steel pipes to API specifications. *Id.* Despite the partial withdrawal, the petitioners maintained that "the appropriate domestic industry for injury determination purposes [was] the industry producing [both] standard and line pipe[s]." J.A. 40613.

Commerce and the ITC initiated and conducted their respective investigations. *See Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand; Initiation of*

---

[4]     Relevant here, under the TSUSA (1985), line pipes conforming to API specifications would be classified under items 610.3208 and 3209. *See* J.A. 40212.

*Antidumping Duty Investigation*, 50 Fed. Reg. 12068, 12608 (Mar. 27, 1985) ("*Commerce Initiation Notice*"); *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, 50 Fed. Reg. 10866, 10866 (Mar. 18, 1985). Commerce's LTFV investigation reached an affirmative preliminary determination in September 1985, and an affirmative final determination in January 1986. *Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand; Preliminary Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 40427, 40428 (Oct. 3, 1985); *Antidumping: Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 3384, 3384 (Jan. 27, 1986) ("*Final LTFV Determination*"). In the *Final LTFV Determination*, Commerce described the subject merchandise under its investigation as encompassing

> certain circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the *Tariff Schedules of the United States Annotated*.

*Final LTFV Determination*, 51 Fed. Reg. at 3384. Commerce determined that imports of the subject merchandise from Thailand were being, or were likely to be, sold in the United States at less than fair value. *Id.*

The ITC's injury investigation resulted in an affirmative preliminary determination in April 1985. *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela, Determinations of the Commission*, Inv. Nos. 701-TA-242, 731-TA-252, -253, USITC Pub. 1680 (Apr. 1985) (Preliminary) ("*Preliminary Injury Determination*"). Subsequently in February 1986, the ITC issued an

affirmative final determination that the investigated imports from Thailand materially injured or threatened material injury to a domestic industry. *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand, Determinations of the Commission*, Inv. Nos. 701-TA-253, 731-TA-252, USITC Pub. 1810 (Feb. 1986) (Final) ("*Final Injury Determination*"). In the *Final Injury Determination*, the ITC evaluated the injury effects of standard pipes imported from Thailand, and the injury effects of both standard pipes and line pipes imported from Turkey. *Id.* at I-1, II-1.

Following its practice in previous CWP investigations, the ITC treated standard and line pipes as two separate like products, and correspondingly, found two domestic industries, a domestic standard pipe industry and a domestic line pipe industry. *Final Injury Determination* at 6–7; *see also Preliminary Injury Determination* at 6–8. The ITC concluded that "domestically produced standard pipe[s] [were] like imported standard pipe[s]" and that the domestic standard pipe industry included domestic producers of standard pipes, some of which simultaneously produced line pipes. *Final Injury Determination* at 6–7, I-5–I-6, II-4; *see also Preliminary Injury Determination* at 8–9, A-8–A-9.

In its analysis, the ITC described how steel pipes are manufactured, used, and classified in the industry. *Final Injury Determination* at I-1 & n.1 (referencing product description in a previous investigation involving steel pipes from Korea), II-1. The ITC explained that in the industry, steel pipes can be divided based on the method of manufacture, welded or seamless, and each category can be further divided based on the grades of steel.[5] *Id.* at I-1. Relevant

---

[5]    In the steel industry, for the most part, the terms "pipes" and "tubes" can be used interchangeably. *Final*

here, the American Iron & Steel Institute distinguishes among various pipes based on six end uses, including standard pipes, line pipes, mechanical tubing, and others.[6] *Id.* Additionally, steel pipes are generally produced to standards, or specifications, established by industry standards organizations such as ASTM and API. *Id.* Each specification has its corresponding requirements for chemical and mechanical characteristics, which a product must satisfy in order to comply with that specification. *Id.* at I-2, II-1.

For the standard pipes under its investigation, the ITC stated,

> [t]he imported pipe and tube products that are the subject of these investigations are circular welded carbon steel pipes and tubes over 0.375 inch but not

--------

*Injury Determination* at I-1. The parties generally refer to the products at issue in this case as "pipes," and we do the same.

[6]    Standard pipes are generally used for "the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases," such as in plumbing and heating systems and air-conditioning units. *Final Injury Determination* at I-1. Line pipes are used for "the transportation of gas, oil, or water, generally in pipeline or utility distribution systems." *Id.* at II-1.

The manufacturing processes for line pipes and standard pipes are nearly identical, and they can be produced using the same equipment. *Id.* The principal difference between the two is that line pipes are made of higher-grade steel and may require additional testing to ensure conformance to API specifications. *Id.* The ITC provided similar comparative descriptions of standard pipes and line pipes in its *Preliminary Injury Determination*. *See Preliminary Injury Determination* at A-5–A-8.

over 16 inches in outside diameter, which are *known in the industry as standard pipes* and tubes. . . . They are most commonly produced to ASTM specifications A-120, A-53, and A-135.

*Id.* at I-1–I-2 (emphasis added). The ITC concluded that "an industry in the United States [was] materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes," which Commerce found to be sold in the United States at less than fair value. *Id.* at 2.

## II.    The Thailand Antidumping Duty Order

In March 1986, following the affirmative final determinations of Commerce and the ITC, Commerce issued the Thailand antidumping duty order, imposing antidumping duties on standard pipes imported from Thailand. *Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8341, 8341 (Mar. 11, 1986) ("Thailand Order" or "Order"). According to the scope language of the Order,

> [t]he products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness.
>
> These products, which are commonly referred to in the industry as "*standard pipe*" or "structural tubing" are hereinafter designated as "pipes and tubes."
>
> The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and

Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

J.A. 40763 (citations omitted) (paragraphing and emphasis added); *see also Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand; Preliminary Results of Antidumping Duty Administrative Review*, 55 Fed. Reg. 42596, 42596 (Oct. 22, 1990) ("*1990 Administrative Review*").

In 1989, the scope language in the 1986 Order was updated to conform to the new tariff nomenclature framework, the Harmonized Tariff Schedule of the United States ("HTSUS").[7] *See 1990 Administrative Review*, 55 Fed. Reg. at 42596 (noting the 1989 transition to the HTSUS). As shown above, the current scope language maintains the same physical description of the subject merchandise and lists tariff codes under the new HTSUS framework. The Order also clarifies that "the written description of the merchandise subject to the order is dispositive," and the listed tariff codes are "provided for convenience and

_____

[7]    As originally issued in 1986, the Thailand Order provides,

> [t]he products under investigation are certain circular welded carbon steel pipes and tubes (referred to in this notice as "pipes and tubes"), also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, of any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the *Tariff Schedules of the United States Annotated* (TSUSA).

51 Fed. Reg. at 8341.

purposes of" the U.S. Customs and Border Protection ("CBP"). J.A. 40763; *1990 Administrative Review*, 55 Fed. Reg. at 42596 ("The written product description remains dispositive.").

Consequently, all standard pipes imported from Thailand and falling within the scope of the Order became subject to antidumping duties.

### III.    The Present Case

In January 2019, Wheatland, along with a group of other domestic producers, filed a request with Commerce seeking an antidumping circumvention ruling against Saha. J.A. 10169. The domestic producers alleged that Saha was exporting "standard pipe[s] with minor alterations in form or appearance" or "misclassified as line pipe[s]" that circumvented the Thailand Order and evaded antidumping duties. J.A. 10171–72, 10172 n.1. The domestic producers' request covered what is central to this appeal, dual-stenciled pipes.[8] J.A. 10173. According to the domestic producers, the specifications for standard pipes and line pipes "often require engineering characteristics that overlap," so a pipe may be dual-stenciled or dual-certified. *Id.* That is, such pipes were "stamped to indicate compliance with" both an ASTM specification and an API specification. *Id.* (citing *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -532–534, -536, USITC Pub. 4754 (Jan. 2018) ("*Fourth Sunset Review*")).

---

[8]    The domestic producers' request broadly covered pipes produced by Saha and identified as "line pipe[s]," which included pipes singularly stenciled as line pipes *and* those dually stenciled as both standard and line pipes. *See* J.A. 10173–76; *see also* J.A. 40631–32.

Commerce initiated a scope inquiry to determine whether "line pipe" and "dual-stenciled standard and line pipe" were covered by the Thailand Order. J.A. 40631. With respect to the latter, Commerce explained that standard pipes may be "dual-stenciled," namely "identified to indicate compliance with two different specifications, as conforming to industry standards for both standard pipe[s] and line pipe[s]." J.A. 40635. Before Commerce, Saha argued that the Thailand Order did not cover line pipes because during the initial 1985–86 antidumping duty investigation, the petitioners partially withdrew their petition concerning line pipes from Thailand. J.A. 40769. To Saha, *all* line pipes, including those dual-stenciled as both standard and line pipes, were excluded from the scope. *Id.*

### A.   Commerce's Scope Ruling

In June 2020, Commerce reached a final scope ruling, which determined that the Thailand Order did not cover line pipes, and thus Saha's line pipes did not fall within the scope of the Thailand Order. *Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe*, J.A. 40762–80 ("*Scope Ruling*"). Commerce determined, however, that the Thailand Order covered dual-stenciled pipes so that the imports of Saha's dual-stenciled pipes fell within the scope of the Order and were subject to antidumping duties.[9]  J.A. 40780.

In reaching its determination, Commerce first looked to the scope language of the Order covering "circular welded

---

[9]   The focus of the proceedings before the Court of International Trade and the instant appeal before this court is whether dual-stenciled pipes fall within the scope of the Thailand Order. Commerce's determination that line pipes fall outside of the scope of the Thailand Order is not at issue in this appeal.

carbon steel pipes and tubes," commonly referred to as "standard pipe[s]," "limited by the dimensional requirements stated in the scope of the Order."  J.A. 40763; J.A. 51.  While the Order did not cover "line pipe[s]," Commerce determined that the Order included dual-stenciled pipes. J.A. 40775. Commerce reasoned that dual-stenciled pipes were certified as "standard pipe[s]" under ASTM specifications and that they also met the physical description of merchandise included in the scope of the Order. *Id.*; J.A. 51.  To Commerce, if a pipe is certified as "standard pipe," it is "standard pipe" and subject to the Order "regardless of whether it is also certified as line pipe." J.A. 40775.

Commerce next examined the criteria listed in 19 C.F.R. § 351.225(k)(1) (2020),[10] the so-called (k)(1) factors or (k)(1) materials, and other evidence, and it found the record information did not support that dual-stenciled pipes were not covered by the Order. *See* J.A. 40773–78; J.A. 51–53. Commerce considered that the petitioners withdrew their petition concerning line pipes from Thailand and that both Commerce's and the ITC's investigations were limited to standard pipes and did not cover line pipes. J.A. 40773–75. Commerce determined that dual-stenciled pipes were not excluded. J.A. 40775. Commerce reasoned that, in contrast to other CWP investigations leading to orders that explicitly excluded dual-stenciled

---

[10]    Under 19 C.F.R. § 351.225(k)(1) (2020), in determining whether a particular product falls within the scope of an order, "[Commerce] will take into account the following: (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [ITC]."  The regulation has since gone through revision.  Because the 2020 version governs at time relevant to this case, parties cite to this version and we do the same.

pipes, here neither Commerce's *Final LTFV Determination* nor the ITC's *Final Injury Determination* addressed dual-stenciled pipes. *Id.* Commerce thus found no basis in these determinations to find that dual-stenciled pipes were excluded from the resulting Thailand Order. *Id.*; J.A. 51.

Commerce rejected Saha's reliance on certain isolated statements in the ITC's sunset reviews evaluating various CWP orders, including the orders concerning imports from other countries, such as Brazil, Korea, Mexico, and Venezuela. J.A. 40776–77. Sunset reviews refer to the periodic evaluations of antidumping and countervailing duty orders to determine whether the orders should remain in place. *See* 19 U.S.C. § 1675(c). Since the sunset review process was established, the ITC has conducted four sunset reviews of various CWP orders.[11] Commerce explained that the sunset reviews simultaneously assessed various existing CWP orders: some explicitly excluded dual-stenciled pipes while others, such as the Thailand Order, did not.

---

[11]  *Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela,* Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -276, -277, -296, -409, -410, -532–534, -536, -537, USITC Pub. 3316 (July 2000) ("*First Sunset Review*"); *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -409, -410, -532–534, -536, USITC Pub. 3867 (July 2006) ("*Second Sunset Review*"); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -532-534, -536, USITC Pub. 4333 (June 2012) ("*Third Sunset Review*"); *Fourth Sunset Review,* USITC Pub. 4754.

J.A. 40776–77.[12] Commerce reasoned that the ITC's statements must be viewed in context and not as mechanically and equally applicable to *all* orders under review. J.A. 40776. In other words, each CWP order stands alone and certain language in one order does not "dispositively provide meaning to an order which does not include the same language." *Id.*

Further, Commerce found unsubstantiated Saha's claim that the petitioners had intended to exclude dual-stenciled pipes from the initial investigation underlying the Thailand Order. J.A. 40778. Saha based its claim on its view of the petitioners' interest and involvement in *other* CWP investigations, which occurred *years or decades later*. *See id.* Commerce determined that Saha's interpretation of the petitioners' intentions in the initial investigation leading to the instant Order were "mere speculation" and lacked support in the record. *Id.*

Accordingly, Commerce issued a *Scope Ruling* concluding that although line pipes were not covered, dual-stenciled pipes were within the scope of the Thailand Order.

## B. *Saha I*

Saha appealed Commerce's *Scope Ruling* to the U.S. Court of International Trade. *Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278, 1281 (Ct. Int'l Trade 2021) ("*Saha I*"). The Court of International Trade found Commerce unlawfully expanded the scope of the Thailand Order by determining that it covered dual-

---

    [12] For example, Commerce pointed out that the anti-dumping duty orders on standard pipes imported from Brazil, Korea, Mexico, and Venezuela explicitly state: "Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is [] not included in these orders." J.A. 40775 n.89.

stenciled pipes. *Id.* To the Court of International Trade, the Thailand Order's scope language did not address "dual-stenciled pipes," so it was unclear what qualified as "standard pipe[s]" under the Order. *Id.* at 1293–94. The Court of International Trade then reviewed the (k)(1) materials and concluded they did not support Commerce's determination that the dual-stenciled pipes fell within the scope of the Order. *Id.* at 1294–99.

In reaching its conclusion, the Court of International Trade relied on the petitioners' partial withdrawal during the initial 1985–86 investigation, which in the court's view, also withdrew dual-stenciled pipes. *Id.* at 1295. To the Court of International Trade, by withdrawing "[their] petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209," the petitioners "withdrew all pipes that were importable under 610.3208 and 3209 from consideration by the ITC and Commerce." *Id.* This withdrawal, the Court of International Trade continued, encompassed dual-stenciled pipes because they would have been imported under "TSUS numbers 610.3208 and 3209." *Id.* Accordingly, the Court of International Trade concluded that dual-stenciled pipes were not included in the subsequent injury investigation conducted by the ITC and hence omitted from the resulting Thailand Order. *Id.* at 1295–96.

The Court of International Trade asserted that its conclusion was supported by the ITC's sunset reviews. *Id.* at 1297. In the Court of International Trade's view, the ITC consistently treated dual-stenciled pipes as line pipes, and its sunset reviews referenced exclusions of dual-stenciled pipes from CWP orders. *Id.* The Court of International Trade noted that the *First* and *Second Sunset Reviews* discussed dual-stenciled pipes only in the context of a "safeguard" remedy, where President Clinton imposed increased duties on line pipe imports as defined in his

proclamation.[13]  *Id.*; *see Second Sunset Review* at Overview-5 n.16 (commenting that the safeguard measure covered "dual-stenciled" pipes but excluded "arctic grade" line pipes).  The Court of International Trade also considered that the *Third* and *Fourth Sunset Reviews* included a statement that "[d]ual-stenciled pipe, which enters as line pipe under a different subheading of the [HTSUS] for U.S. customs purposes, is not within the scope of the orders."  *Saha I*, 547 F. Supp. 3d at 1297–98 (alteration in original) (first citing *Fourth Sunset Review* at 6–7; and then citing *Third Sunset Review* at 8).  The Court of International Trade considered this statement as "unqualified and [giving] no indication that the scope language d[id] not apply to the Thailand Order."  *Id.*

The Court of International Trade thus remanded to Commerce to reconsider its *Scope Ruling* based on the court's analysis.  *Id.* at 1299.

## C.  *Saha II*

On remand, to comply with the remand order, Commerce concluded, under protest, that the Thailand Order did not cover dual-stenciled pipes.  *Final Results of Redetermination Pursuant to Court Remand*, J.A. 46–73 ("*Remand Determination*").  "Under protest" means that the Court of International Trade's decision dictated that Commerce reach a result that is contrary to what it would have reached absent the Court of International Trade's directive.  *Meridian Prods. v. United States,* 890 F.3d 1272, 1276 n.3 (Fed. Cir. 2018) ("*Meridian II*").  In its *Remand Determination*, Commerce affirmed its reasoning as stated

---

[13]    In March 2000, President Clinton issued Proclamation No. 7274, 65 Fed. Reg. 9193 (Feb. 23, 2000), imposing additional duties on line pipe imports over certain quantities each year from each supplying country for a period of three years, excluding those from Mexico and Canada.

in its *Scope Ruling* and expressed various concerns it had with the Court of International Trade's analysis.  J.A. 59–65.  Commerce believed that the Court of International Trade misunderstood the ITC's injury findings and ignored relevant statements in the ITC's sunset reviews that detracted from the Court of International Trade's conclusion. J.A. 61–65; *see also* J.A. 63–64 (noting ITC statements that CWP orders have varying scopes).

The Court of International Trade sustained Commerce's *Remand Determination*, namely the conclusion that dual-stenciled pipes were not covered by the Thailand Order.  *Saha Thai Steel Pipe Pub. Co. v. United States*, 592 F. Supp. 3d 1299, 1301 (Ct. Int'l Trade 2022) ("*Saha II*"). In its decision, the Court of International Trade maintained its reasoning in *Saha I*, stressing (1) its view that the petitioners' partial withdrawal concerning line pipes during the initial investigation encompassed dual-stenciled pipes; and (2) its view that the ITC consistently identified dual-stenciled pipes as line pipes.  *Id*. at 1305, 1312–13.  The Court of International Trade concluded that Commerce's *Remand Determination* properly complied with its remand order in finding dual-stenciled pipes not included in the Thailand Order.  *Id.* at 1313.

Wheatland appeals, contending that Commerce's *Scope Ruling* was correct and should have been affirmed by the Court of International Trade.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review the Court of International Trade's decisions de novo, applying the same standard of review used by the Court of International Trade in reviewing Commerce's scope rulings.  *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015). We affirm Commerce's scope ruling unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence means such relevant evidence that a reasonable mind may accept as adequate to support a conclusion. *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001).

In our review, we accord deference to Commerce's own interpretation of its antidumping duty orders. *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012). This deference is appropriate because determinations as to the meaning and scope of antidumping duty orders are matters "particularly within the expertise" of Commerce and its "special competence." *Id.* (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)). Our caselaw has also recognized that in conducting our review, we pay due respect to and "will not ignore the informed opinion of the Court of International Trade." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994); *see Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

Under the substantial evidence review standard, even if an inconsistent conclusion could be drawn from the record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). A party challenging Commerce's scope ruling under the substantial evidence standard "has chosen a course with a high barrier to reversal." *King Supply*, 674 F.3d at 1348 (quoting *Nippon Steel*, 458 F.3d at 1352).

DISCUSSION

I. Legal Framework

There is no specific statutory provision that governs the interpretation of the scope of an antidumping duty order. *Shenyang Yuanda*, 776 F.3d at 1354. The regulations provide an analytical framework guiding Commerce's reasoning and analysis in reaching a scope ruling. *Id.* Under

the applicable regulations at the time of Commerce's scope ruling, 19 C.F.R. § 351.225(k) (2020),[14]

---

[14]    In 2021, Commerce amended various sections of its regulations concerning antidumping and countervailing duties, including the regulations on scope rulings. *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Sept. 20, 2021) ("*2021 Revised Regulations*"). As amended, effective November 4, 2021, 19 C.F.R. § 351.225(k) provides,

(1) In determining whether a product is covered by the scope of the order at issue, [Commerce] will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.

(i) The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of [Commerce]: (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue; (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue; (C) Previous or concurrent determinations of [Commerce], . . . ; and (D) Determinations of the [ITC] pertaining to the order at issue, . . . .

(ii) [Commerce] may also consider secondary interpretive sources . . . .

in considering whether a particular product is in-
cluded within the scope of an order or a suspended
investigation, [Commerce] will take into account
the following:

> (1) The descriptions of the merchandise
> contained in the petition, the initial inves-
> tigation, and the determinations of [Com-
> merce] (including prior scope
> determinations) and the [ITC].
>
> (2) When the above criteria are not disposi-
> tive, [Commerce] will further consider:
>
>> (i) The physical characteristics of
>> the product; (ii) The expectations of
>> the ultimate purchasers; (iii) The
>> ultimate use of the product; (iv)
>> The channels of trade in which the
>> product is sold; and (v) The manner
>> in which the product is advertised
>> and displayed.

This court has considered the tiered analysis frame-
work in its review of Commerce's scope rulings. *E.g.*, *Me-
ridian Prods., LLC v. United States*, 851 F.3d 1375, 1381
(Fed. Cir. 2017) ("*Meridian I*"); *Shenyang Yuanda*, 776
F.3d at 1354; *Duferco Steel, Inc. v. United States*, 296 F.3d
1087, 1097 (Fed. Cir. 2002). We have long recognized that
the scope language of the order is the "cornerstone" of this
analysis and "a predicate for the interpretive process."
*Duferco Steel*, 296 F.3d at 1097. Although the scope of the
order can be clarified, the scope language cannot be inter-
preted or "changed in a way contrary to its terms." *Id.*
(quoting *Smith Corona Corp. v. United States*, 915 F.2d
683, 686 (Fed. Cir. 1990)).

While the terms of the order describe the merchandise
within the scope of the order, they may also expressly de-
scribe merchandise that, for whatever reason, is excluded

from the scope.  Hence, the parties may argue that a particular product is not within the scope on the ground that it falls within an explicit exclusion expressed in the order. *See, e.g., Meridian I*, 851 F.3d at 1379 (parties disputing whether merchandise at issue fell within express exclusions of the order); *Shenyang Yuanda*, 776 F.3d at 1358 (same); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) (same).  But, here, the Order contains no such express exclusions.

In addition, antidumping duty orders list tariff codes relevant to the merchandise subject to the orders or subject to the explicit exclusions in the orders, which the CBP references in regulating imports as they enter the U.S. border.[15]  Consequently, antidumping duty orders generally contain instructions that the tariff codes are for purposes

---

[15]    J.A. 40763; *see, e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Anti-dumping Duty Order*, 77 Fed. Reg. 73018, 73019 (Dec. 7, 2012), discussed in *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1304 (Fed. Cir. 2020); *Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Tissue Paper Products from the People's Republic of China*, 70 Fed. Reg. 16223, 16223–24 (Mar. 30, 2005), discussed in *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1353 (Fed. Cir. 2010); *Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms from the People's Republic of China*, 64 Fed. Reg. 8308, 8309 (Feb. 19, 1999), discussed in *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1383 (Fed. Cir. 2005).

of the CBP, and "the written description of the merchandise subject to the order is dispositive."[16]

Again, as the above indicates, Commerce must begin a scope determination inquiry with a review of the scope language of the order. *Shenyang Yuanda*, 776 F.3d at 1354. In doing so, Commerce considers how the scope language of the order describes the subject merchandise it covers. *E.g.*, *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1303 (Fed. Cir. 2013). If the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end. *Id.*[17]

If the scope language *itself* does not clearly answer the scope question, Commerce continues its interpretation to understand the meaning of the scope language by consulting criteria identified in 19 C.F.R. § 351.225(k)(1) (2020), the so-called (k)(1) factors or (k)(1) materials. *See, e.g.*, *Meridian I*, 851 F.3d at 1382. The (k)(1) materials include "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [ITC]." 19 C.F.R. § 351.225(k)(1) (2020). While these materials do not substitute for the scope language, they reflect the historical context and may provide "valuable guidance"

---

16    *See* exemplary orders identified in *supra* note 15.

17    *Cf. 2021 Revised Regulations*, 86 Fed. Reg. at 52322 (Commerce commenting that "in most straightforward cases, the agency is not required to consider the four listed (k)(1) interpretative sources if such an analysis would waste agency time and resources"); 19 C.F.R. § 351.225(k) ("In determining whether a product is covered by the scope of the order at issue, [Commerce] . . . may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.").

for the interpretation of the order. *Duferco Steel*, 296 F.3d at 1097.

The (k)(1) materials cannot control or alter the scope language of the order. Rather, they serve as interpretative aids that clarify or support Commerce's understanding of the scope language that Commerce may arrive at upon reviewing the scope language itself. For instance, in *Meridian I*, the parties disputed whether Commerce erred in its interpretation of the exclusionary term "finished goods kit" in the scope language. *Meridian I*, 851 F.3d at 1384. We concluded that Commerce correctly interpreted that exclusionary term and that its determination was further supported by the (k)(1) materials. *Id.* In *King Supply*, similarly, we determined that Commerce reasonably read the disputed language at issue as not constituting an end-use restriction, and that the (k)(1) materials supported that reading. *King Supply*, 674 F.3d at 1350–51. We thus held that Commerce's scope ruling was supported by substantial evidence and reversed the Court of International Trade's judgment to the contrary. *Id.* at 1351.

In cases where an analysis of the (k)(1) materials is still not dispositive, Commerce may proceed to consider the factors listed under 19 C.F.R. § 351.225(k)(2) (2020), the so-called (k)(2) factors. *Shenyang Yuanda*, 776 F.3d at 1354; *see also id.* at 1358 (declining to consider the (k)(2) factors because the scope language read in the context of the (k)(1) materials proved dispositive). These factors include the "physical characteristics of the product," the "expectations of the ultimate purchasers," the "ultimate use of the product," and the relevant "channels of trade" and manner of marketing. 19 C.F.R. § 351.225(k)(2) (2020).

Thus, depending on the clarity of the scope language relative to the merchandise at issue, a scope analysis may encompass varying sources. Consequently, scope analysis is "highly fact-intensive and case-specific." *King Supply*, 674 F.3d at 1345.

## II.     Analysis

We now turn to the principal issue of this appeal: whether the Thailand Order on "standard pipes" covers Saha's "dual-stenciled pipes," namely pipes certified as "standard pipes" and concurrently as "line pipes."

As noted *supra*, Commerce's *Scope Ruling* determined that the Order covered dual-stenciled pipes. The Court of International Trade, in sustaining Commerce's *Remand Determination*, reached the opposite conclusion finding dual-stenciled pipes excluded from the Order. On appeal, Wheatland contends that the Court of International Trade erred in its analysis and should have affirmed Commerce's determination in its *Scope Ruling*. Saha argues in favor of the Court of International Trade's affirmance of Commerce's *Remand Determination*. For the reasons discussed below, we hold that Commerce's determination that imports of dual-stenciled pipes from Thailand are within the scope of the Thailand Order on standard pipes is supported by substantial evidence. As a result, we reverse the judgment of the Court of International Trade that affirmed Commerce's *Remand Determination*.

Before turning to the scope language, we first address Wheatland's contention that Commerce "impermissibly relied on (k)(1) factors" in reaching its *Scope Ruling*. Appellant Br. 21–23. Commerce, in its *Scope Ruling*, rejected Wheatland's similar contention raised below. J.A. 40768. We conclude that Commerce properly considered the (k)(1) materials in reaching its *Scope Ruling*.

As Commerce pointed out, the applicable regulations provide that Commerce, in reaching a scope ruling, "will take into account" the (k)(1) materials. 19 C.F.R. § 351.225(k) (2020). Thus, the regulations at least *permit*, if not mandate, Commerce to consider the (k)(1) materials. Further, where, as here, the parties explicitly rely on the (k)(1) materials for their contradictory interpretation of an order, Commerce cannot arbitrarily ignore those

arguments and evidence on the record. *See* 19 U.S.C. § 1516a(b). If Commerce were to reject a contrary contention allegedly supported by the (k)(1) materials, Commerce must adequately explain its reasoning for that rejection. *See, e.g.*, *CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020). Commerce properly did so here.

We note the Court of International Trade's observation that this court "arguably" provided two "distinct methods" to determine "whether a scope's language is sufficiently ambiguous that Commerce must resort to additional documents" to interpret an antidumping duty order. *Saha I*, 547 F. Supp. 3d at 1289 (first citing *OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020); and then citing *Meridian II*, 890 F.3d at 1277)). According to the Court of International Trade, under the *OMG* approach, "the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous;" and Commerce considers the (k)(1) materials if "the language is ambiguous." *Id.* at 1289–90. The second approach, according to the Court of International Trade, is the *Meridian* approach. *Id.* at 1290. In the Court of International Trade's view, under the *Meridian* approach, when "reviewing the plain language of a duty order" to determine whether it is ambiguous, Commerce must consider the (k)(1) materials. *Id.*

As we outlined above, there is only one framework which, as both the *OMG* and *Meridian* decisions stress, *begins* with a review of the scope language *itself*. *OMG*, 972 F.3d at 1363; *Meridian II*, 890 F.3d at 1277; *Meridian I*, 851 F.3d at 1381. And if the scope cannot be clearly and dispositively discerned based on the scope language itself, Commerce must turn to the aid of the (k)(1) and, if still necessary, (k)(2) sources. *See, e.g.*, *OMG*, 972 F.3d at 1363; *Meridian I*, 851 F.3d at 1382. In other words, the (k)(1) materials are interpretive tools that, where needed, help clarify what the scope language means relative to the scope question at issue, namely whether a particular product

falls within the scope. But this assistance may be unnecessary if the scope language *itself* answers that scope question and thus needs no further interpretation. We note that in Commerce's recent effort to clarify the regulatory framework, Commerce expressed a similar understanding based on its practice, as now codified in the revised regulations. *2021 Revised Regulations*, 86 Fed. Reg. at 52323. The current regulations clarify that the traditional (k)(1) materials are "primary interpretive sources" that Commerce may consider "at [its] discretion," if it determines the scope language itself does not clearly and sufficiently answer the scope question. 19 C.F.R. § 351.225(k)(1)(i). The current regulations also list other "secondary interpretative sources" that Commerce "may also consider," as well as the hierarchy of these interpretative sources. *Id.* § 351.225(k)(1)(ii).

Practically, because the scope language is necessarily written in general terms, Commerce will *likely* consider the (k)(1) materials to assist in understanding the meaning of the scope language relevant to the determination of whether a particular product is within the scope. *See 2021 Revised Regulations*, 86 Fed. Reg. at 52323 (noting that "in the majority of scope inquiries, it is likely that the current (k)(1) sources would be considered" in reaching a scope ruling). This is particularly true where, as here, a scope ruling is requested, subsequently disputed, and eventually appealed to this court.

## A. The Scope Language Covers Dual-Stenciled Pipes

We now turn to reviewing the scope language at issue. We find that in its *Scope Ruling*, Commerce reasonably interpreted the Thailand Order's scope as covering standard pipes dually stenciled as line pipes. The first sentence of the Order states that it covers "certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness."

J.A. 40763. There is no dispute that Saha's dual-stenciled pipes are "circular welded carbon steel pipes and tubes from Thailand" and that they meet the physical dimensions the Order describes. *E.g.*, Appellee Br. 16–17.

In the following sentence, the Order adds that the products covered by the Order are "commonly referred to in the industry as 'standard pipe[s].'" J.A. 40763. By this limitation, the Order further explicitly refines the universe of merchandise defined by the as-described physical characteristics, limiting it to "standard pipe[s]." Recognizing the effect of this limitation, Commerce determined that, pipes singularly certified as line pipes (not as standard pipes), even if they meet the described dimensions, fell outside of the scope of the Order. J.A. 40773–75.

The same conclusion does not, as Saha contends, extend to dual-stenciled pipes. *See, e.g.*, Appellee Br. 20 (Saha interpreting the "commonly referred to in the industry as 'standard pipe[s]'" language as further excluding standard pipes dual-stenciled as line pipes). There is no dispute that dual-stenciled pipes are certified as "standard pipe[s]," suitable for standard-pipe applications and in compliance with ASTM specifications. *E.g.*, *id.* at 4, 16–17, 19. There is also no dispute that these pipes additionally meet the API specification for, and are dually stenciled as, line pipes. *Id.* at 11. But meeting an additional specification, namely API line pipe specification(s), does not strip away the qualification of these pipes as standard pipes. J.A. 40775; *see* J.A. 40765 (diagram illustrating pipes meeting overlapping industry standards). "[S]tandard pipe[s]," as recited in the Order, means what it plainly says, "standard pipe[s]." It cannot be reasonably read to mean, as Saha contends, an unidentified subset within standard pipes that remains after another unidentified subset is excluded. *E.g.*, Appellee Br. 20 (Saha asserting that the Order excludes standard pipes that are dually stenciled, leaving within the scope only those that are singularly stenciled as standard pipes).

The last part of the Order provides a listing of tariff codes under which the subject merchandise is classifiable. Saha contends that because the listing does not include those tariff codes under which dual-stenciled pipes would be imported, it shows that the Order does not cover dual-stenciled pipes. *Id.* at 18–19. We disagree.

Immediately following the listing of tariff codes, the concluding sentence of the Order explicitly instructs that the tariff codes are "provided for convenience and purposes" of the CBP, and that "the written description of the merchandise subject to the order is dispositive." J.A. 40763. As we noted above, antidumping duty orders listing tariff treatment for CBP purposes often contain the same instructions. The regulations do not require Commerce to provide an exhaustive and dispositive listing of all tariff codes covering the entirety of merchandise subject to an antidumping duty order. *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1270–71 (Fed. Cir. 2002). The listed tariff codes are thus what the Order instructs them to be, "for convenience and purposes" of the CBP. J.A. 40763. They cannot be reasonably read to exclude a subset of standard pipes, contradicting the "written description" that the Order instructs to be "dispositive." *Id.*

Accordingly, Commerce's determination in its *Scope Ruling* reasonably read the scope language to cover standard pipes that are dually stenciled as line pipes. The Thailand Order does not contain any exclusionary language, and we find Saha's attempt to read in an exclusion unsupported and unreasonable.

## B. The (k)(1) Materials Support Commerce's Interpretation

Saha alternatively argues that the scope language itself does not resolve whether the Order covers dual-stenciled pipes and that the (k)(1) materials support excluding dual-stenciled pipes from the Order. Appellee Br. 24. We disagree. Consideration of the (k)(1) materials supports

Commerce's *Scope Ruling* determination and not Saha's proposed exclusion.

As noted *supra*, Saha does not dispute that dual-stenciled pipes are certified as standard pipes, meet ASTM specifications for standard pipes, and suit the corresponding standard-pipe applications. The sole remaining dispute thus boils down to, absent an express exclusion in the scope language in the Thailand Order, whether the (k)(1) materials support an implicit exclusion of standard pipes if they are dually stenciled as line pipes. They do not.

There is a long history of antidumping proceedings involving imports of steel pipes from various countries going back to the early 1980s. *See Fourth Sunset Review* at I-4. As Commerce explained, in the industry, steel pipes are broadly classified based on end-use, and they are "generally produced according to" and "distinguishable based on" industry standards and specifications. J.A. 40773; *see also Final Injury Determination* at I-1 n.1 (referring to steel pipes descriptions set forth in *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Determination of the Commission*, Inv. No. 701-TA-168, USITC Pub. 1345 (Feb. 1983) (Final)). Throughout the initial investigation culminating in the Thailand Order, the same industry specifications and designations were consistently used to define standard pipes, with no qualifiers based on additional specifications the same pipes might also meet.

In the initial February 1985 petition, the petitioners described "standard pipe" as a "general-purpose commodity . . . commonly referred to in the industry as a standard pipe" and "generally produced to ASTM specifications."[18]

---

[18]  The particular ASTM or API specifications referenced in the historical documents are not in dispute in this case. *E.g.*, J.A. 40764 (noting that standard pipes are

J.A. 40536. Line pipes, which the petitioners originally included in the petition but later withdrew, were described as "produced to API specifications for line pipe[s]." *Id.*

When Commerce initiated the antidumping duty investigation in March 1985, Commerce described the pipes under investigation as "*commonly referred to in the industry as standard pipe* or structural tubing, [] produced to various ASTM specifications." *Commerce Initiation Notice,* 50 Fed. Reg. at 12068–12069 (emphasis added). In its injury investigation and like-product determination, the ITC adopted the same description in defining standard pipes subject to its investigation, describing that "[t]he imported pipe and tube products that are the subject of these investigations are . . . *known in the industry as standard pipes* and tubes. . . . *They are most commonly produced to ASTM specifications*." *Final Injury Determination* at I-1–I-2 (emphasis added); *Preliminary Injury Determination* at A-6.

None of the historical documents contains any qualifier restricting the definition of standard pipes or carves out any subset of standard pipes based on additional specifications they may meet. As long as the pipes meet ASTM specifications, they are considered standard pipes.[19] The

---

commonly produced to "ASTM specifications A-120, A-53, and A-135," and line pipes to "API specification 5L").

[19] The current scope language incorporates the phrase "commonly referred to in the industry as standard pipe," tracking the subject-merchandise description Commerce used when it initiated the initial investigation. *Compare* J.A. 40763, *with Commerce Initiation Notice*, 50 Fed. Reg. at 12069. Similarly, in the originally issued March 1986 Order, Commerce used the phrase "known as" standard pipes, tracking the description Commerce used in *the Final LTFV Determination* and the ITC's description in its *Final Injury Determination. Compare* 51 Fed. Reg. at

historical context of the initial antidumping duty investigation therefore supports Commerce's interpretation of the scope of "standard pipe[s]" under the Order. Because dual-stenciled pipes meet ASTM specifications for standard pipes, they constitute "standard pipe[s]" and fall within the Thailand Order's scope.

The (k)(1) materials do not support Saha's proposed clarification of the Order to exclude dual-stenciled pipes from the scope. Saha primarily relies on (1) its proposed interpretation of the petitioners' intention behind their partial withdrawal concerning line pipes during the initial investigation; and (2) the exclusions in other trade remedy proceedings, as referenced in the ITC's sunset reviews. Appellee Br. 11–13. Neither is persuasive. At bottom, Saha would have us inject an implicit exclusion into the scope language based on a supposed implicit inclusion that Saha reads from certain (k)(1) materials. That is backwards and ignores the paramount weight the scope language carries that the (k)(1) materials do not. *E.g.*, *Duferco Steel*, 296 F.3d at 1097. While the (k)(1) materials may aid in clarifying the scope of an order, they cannot rewrite or change the scope of the order, and they do not here. *Id.*

During the initial investigation, in March 1985, the petitioners partially withdrew their petition "insofar as they concern line pipe[s], TSUS numbers 610.3208 and 3209." J.A. 40612. Saha now interprets this statement to indicate that the petitioners intended to broadly exclude *all* pipes that "meet[] the API definition of line pipe[s]," regardless

---

8341, *with Final LTFV Determination*, 51 Fed. Reg. at 3384 *and Final Injury Determination* at I-1–I-2. The historical context clarifies that these phrases describe pipes "produced to [various] ASTM specifications" and contain no limitation based on other criteria. *See, e.g.*, *Commerce Initiation Notice*, 50 Fed. Reg. at 12068–12069; *Final Injury Determination* at I-1–I-2.

of whether they meet the specifications of other pipes. Appellee Br. 26. According to Saha, at the time of the initial investigation, dual-stenciled pipes would have entered under "TSUS numbers 610.3208 and 3209." *Id.* at 28. Based on these propositions, Saha claims that the petitioners had intended to exclude dual-stenciled pipes from the initial investigation and the resulting Thailand Order. *Id.* We disagree.

It is Commerce, "not those who initiated the proceedings," that "determine[s] the scope of the final orders." *Duferco Steel*, 296 F.3d at 1097. As discussed above, while limiting the initial investigation to standard pipes, Commerce incorporated no restriction excluding standard pipes dually stenciled as line pipes. Further, as Commerce explained, in contrast to some later CWP investigations where the petitioners specifically excluded dual-stenciled pipes, the petitioners "made no similar statement or clarification" during the initial investigation underlying the Thailand Order. J.A. 40778. Here, the petitioners' partial-withdrawal statement made no reference to, let alone excluded, dual-stenciled pipes. J.A. 40612. We find no support in the petitioners' statement, or Saha's interpretation of the petitioners' statement, that Commerce excluded dual-stenciled pipes from the initial investigation or the scope of "standard pipe[s]" in the resulting Order.

For similar reasons, we reject Saha's attempt to extrapolate its interpretation of the petitioners' withdrawal of line pipes to how the ITC supposedly limited the merchandise underlying its injury investigation in 1985–86. *See* Appellee Br. 35–36. As explained above, in its injury investigation and the resulting affirmative determination, the ITC described the product under its investigation and causing injury as "standard pipes" produced to ASTM specifications. *Final Injury Determination* at I-1; *Preliminary Injury Determination* at 5, 7; J.A. 62 (Commerce explaining that the ITC "expressly found ASTM stenciled pipe (standard pipe) from Thailand injur[ed] the domestic industry").

The ITC did not reference or somehow carve out any subset of "standard pipes," based on other specification(s) these pipes might have simultaneously met. Nor did the ITC do so in defining "like product" or the domestic standard pipe industry that it determined to be injured by the imported standard pipes. *See Final Injury Determination* at 6–7; *Preliminary Injury Determination* at 6–9.

Saha's reliance on other investigations and CWP orders, as referenced in the ITC's sunset reviews, is similarly unavailing. As Commerce explained, the sunset reviews summarize the ITC's assessment of various CWP orders resulting from separate investigations. J.A. 40776–77; J.A. 64–65; *Fourth Sunset Review* at 6 (noting CWP orders under review "vary in terms of outside wall thickness specifications and product exclusions"). The various orders under the same sunset review have different scope terms: some explicitly exclude dual-stenciled or triple-stenciled pipes, which the Thailand Order does not do. For instance, the 1992 CWP orders concerning imports from Brazil, Korea, Mexico, and Venezuela state that "Standard pipe that is *dual or triple certified/stenciled* that enters the U.S. as line pipe of a kind used for oil or gas pipelines is [] *not included in these orders*."[20] *Notice of Antidumping Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela, and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Circular Welded Non-Alloy Steel Pipe from Korea*, 57 Fed. Reg. 49453, 49453 (Nov. 2, 1992)

---

[20]    Saha's reliance on the *Wheatland* decision similarly fails. Appellee Br. 47 (citing *Wheatland*, 161 F.3d at 1366). In *Wheatland*, we addressed the same 1992 CWP orders and concluded that the scope language explicitly excluded dual-certified pipe. *Wheatland*, 161 F.3d at 1368–69. The same exclusion cannot be found in the Thailand Order.

(emphasis added). The Thailand Order, in contrast, does not contain similar exclusionary language, which Commerce properly gave effect in interpreting the Thailand Order. We reject Saha's attempt to read references to exclusions in other CWP orders as equally applying to the Thailand Order.

Saha's reliance on President Clinton's temporary safeguard duties imposed on line pipes fails for similar reasons. *See* Appellee Br. 43. The safeguard duties imposed by President Clinton represent a different trade remedy addressing *line pipes*, which came into effect in 2000 and expired in 2003.[21] It bears little relevance to, and little weight to control, how Commerce defined the scope of *standard pipes* in the 1986 Thailand Order or in the initial investigation leading up to it.

Accordingly, we conclude that the (k)(1) materials support Commerce's reasonable interpretation of the scope of standard pipes in the Thailand Order, and that Saha's proposed exclusion lacks support. The Court of International Trade reached a contrary conclusion that lacked support in the record and failed to give sufficient deference to Commerce under the substantial evidence standard of review and in matters "particularly within [Commerce's] expertise." *King Supply*, 674 F.3d at 1348. Even if two inconsistent yet reasonable conclusions could have been drawn from the record, the Court of International Trade cannot substitute its own judgment for that of Commerce. *Id.* at 1348, 1351; *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001). Here we find one reasonable conclusion, Commerce's.

---

[21] Proclamation No. 7274, 65 Fed. Reg. at 9193–9194; *see also* 19 U.S.C. §§ 2251, 2253.

CONCLUSION

We have considered Saha's remaining arguments and find them unpersuasive. There is no basis to exclude products covered by the plain text of the Order, notwithstanding that the same products have been given a different name or met additional specifications. *Mid Continent*, 725 F.3d at 1301 ("[M]erchandise facially covered by an order may not be excluded from the scope of the order unless the order can reasonably be interpreted so as to exclude it."). To conclude otherwise would allow foreign producers and exporters to circumvent antidumping duty orders by simply stamping their products with an additional mark. That would take the teeth out of antidumping duty orders, depriving the domestic industry of the very relief from harm posed by unfairly traded imports that is contemplated by the U.S. trade statutes. We reject such an approach.

For the foregoing reasons, we hold that Commerce's *Scope Ruling* that imports of dual-stenciled pipes fall within the scope of the Thailand Order is reasonable and supported by substantial evidence. We reverse the Court of International Trade's interpretation and judgment to the contrary.

**REVERSED**

COSTS

Costs against Appellee.

# United States Court of Appeals for the Federal Circuit

---

**SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**WHEATLAND TUBE COMPANY,**
*Defendant-Appellant*

---

2022-2181

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00133-SAV, Judge Stephen A. Vaden.

---

CHEN, *Circuit Judge*, dissenting.

A 1986 antidumping order on pipes imported from Thailand covers "certain circular welded carbon steel pipes and tubes . . . , which are commonly referred to in the industry as 'standard pipe' or 'structural tubing.'" *Antidumping Duty Order on Circular Welded Carbon Steel Pipes & Tubes from Thailand: Final Scope Ruling on Line Pipe & Dual-Stenciled Standard & Line Pipe*, No. A-549-502 (June 30, 2020) (Final), J.A. 40763 (*Scope Ruling I*); *Antidumping Duty Order: Circular Welded Carbon Steel Pipes & Tubes from Thailand*, 51 Fed. Reg. 8341, 8341 (Mar. 11,

1986) (*Thailand Order*).  This appeal raises the question of whether the *Thailand Order* encompasses dual-stenciled pipes and, in particular, whether "dual-stenciled pipe" is *also* "commonly referred to in the industry as 'standard pipe.'"  *Scope Ruling I*, J.A. 40763.  In my view, it is far from clear from the face of the *Thailand Order* whether people in the relevant industry refer to dual-stenciled pipe as standard pipe.

The record reflects the existence of three types of circular welded carbon steel pipes that are referred to as standard pipes, line pipes, and dual-stenciled pipes.  Standard pipes typically satisfy American Society for Testing & Materials (ASTM) specifications A-53, A-120, or A-135, while line pipes typically satisfy the requirements of American Petroleum Institute (API) specifications API-5L or API-5X.  *Certain Welded Carbon Steel Pipes & Tubes from Turkey & Thailand*, Inv. Nos. 701-TA-253, 731-TA-252, USITC Pub. 1810, at I-2 (Feb. 1986) (Final) (*Final Injury Determination*); *Scope Ruling I*, J.A. 40764.  Compared to standard pipes, line pipes are made from higher grade steel, require additional testing to ensure they satisfy API specifications, and may contain a higher content of carbon and manganese.  *Final Injury Determination* at II-1.  To ensure compliance with ASTM and API specifications, respectively, standard pipes and line pipes are "inspected and tested at various stages in the production process."  *Id.* at I-2, II-1.  Dual-stenciled pipes—the products central to this dispute—are "stamped to indicate compliance with" both ASTM and API specifications.  *Certain Circular Welded Pipe & Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand & Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -532 to -534, -536, USITC Pub. 4754, at 6 (Jan. 2018) (*Fourth Sunset Review*).

The Department of Commerce (Commerce) and the Court of International Trade (Trade Court) vigorously contest how to answer the question of whether the *Thailand Order* covers such dual-stenciled pipes, with Commerce

insisting that the *Thailand Order*'s reference to "standard pipe" covers dual-stenciled pipes, and the Trade Court maintaining the opposite. *Scope Ruling I*, J.A. 40775–78; *Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 547 F. Supp. 3d 1278, 1291–92 (Ct. Int'l Trade 2021) (*Saha I*); *Antidumping Duty Order on Circular Welded Carbon Steel Pipes*, No. A-549-502 (Jan. 6, 2022) (Final), J.A. 58–65 (*Scope Ruling II*); *Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 592 F. Supp. 3d 1299, 1305 (Ct. Int'l Trade 2022) (*Saha II*). I agree with the Trade Court's position and thus would have affirmed its decisions in both *Saha I* and *Saha II*.

The plain language of the *Thailand Order* is unclear as to whether the relevant industry commonly refers to dual-stenciled pipes as standard pipes. That is, does dual-stenciled pipe go by two different names or just one? That ambiguity requires us to consider the interpretative materials under 19 C.F.R. § 351.225(k)(1) (2020), i.e., the (k)(1) materials. These (k)(1) materials contain substantial evidence supporting only the conclusion that the *Thailand Order* does not cover dual-stenciled pipes. For example, among numerous other pieces of evidence from the (k)(1) materials that support the Trade Court's conclusion that the *Thailand Order* excludes dual-stenciled pipes, the International Trade Commission's (ITC) reviews of antidumping orders for circular welded pipes—including the *Thailand Order*—indicated that the *Thailand Order* does not cover dual-stenciled pipes, expressly stating that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, *is not within the scope of the orders*." *Certain Circular Welded Pipe & Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand & Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -532 to -534, -536, USITC Pub. 4333, at 8 (June 2012) (*Third Sunset Review*) (emphasis added); *see Fourth Sunset Review* at 6–7. I, therefore, respectfully dissent.

I. THE PLAIN LANGUAGE OF THE *THAILAND ORDER*'S SCOPE

"[T]he question of whether the unambiguous terms of [an antidumping order] control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." *OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020) (first alteration in original) (quoting *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017)). "[W]e consider ambiguity in the context of the merchandise at issue in this case." *Id.* at 1364 (citing 19 C.F.R. § 351.225(a)).

The *Thailand Order* requires the covered merchandise to be "commonly referred to in the industry as 'standard pipe' or 'structural tubing'"—the "commonly referred to" requirement. *Scope Ruling I*, J.A. 40763. The appellant Wheatland Tube Company, Commerce, and the majority simply assume this requirement covers any pipe having the same certification as "standard pipe." Appellant's Opening Br. 21–22; *Scope Ruling I*, J.A. 40775; Maj. Op. 28; *see also* Oral Arg. 3:22–3:35 (available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-2181_11072023.mp3). But neither the "commonly referred to" requirement nor any part of the *Thailand Order* speaks directly to the certifications of the covered merchandise; instead, the *Thailand Order* simply mandates that the pipes are "commonly referred to in the industry as 'standard pipe.'" *Scope Ruling I*, J.A. 40763. Although I agree with the majority that one reasonable view is that this requirement encompasses any pipe *certified* as standard pipe, including dual-stenciled pipes, Maj. Op. 28, I believe an equally reasonable view is that this requirement encompasses only pipes *commonly called* "standard pipe" and that dual-stenciled pipes commonly go by a different naming convention: "dual-stenciled pipe." Moreover, it seems at least reasonably plausible that "standard pipe" would be a confusing misnomer for dual-stenciled pipe that provides an incomplete and misleading understanding of the nature of dual-stenciled pipe. I

accordingly would have held that the *Thailand Order* is ambiguous as to whether dual-stenciled pipes are covered.

The majority says little as to the order's "commonly referred to" requirement, asserting that "meeting an additional specification, namely API line pipe specification(s), does not strip away the qualification of [dual-stenciled] pipes as standard pipes." Maj. Op. 28. It is true, as the majority notes, that the *Thailand Order* does not contain any language expressly excluding dual-stenciled pipes. *Id.* at 29. But this is not dispositive. *Cf. Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) ("Commerce cannot find authority in an order based on the theory that the order does not deny authority."). Though the *Thailand Order* does not expressly exclude dual-stenciled pipes, the "commonly referred to" requirement nonetheless is open to interpretation as to what types of pipes may be included. *Cf. Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) ("[O]rders cannot be extended to *include* merchandise that is not within the scope of the order as reasonably interpreted . . . ."); *Duferco Steel*, 296 F.3d at 1095–96 (explaining that an order, which did not expressly exclude certain merchandise, could not "reasonably be interpreted to include" that merchandise).

The majority's interpretation of the *Thailand Order* disregards dual-stenciled pipes' additional certification to API specifications. Because this additional certification could change how the industry commonly refers to such pipes, I do not believe we can determine, as a matter of law, whether this interpretation is unreasonable from merely looking at the plain language of the *Thailand Order*. *Meridian Prods.*, 851 F.3d at 1381–82 (describing that while "we grant Commerce 'substantial deference' with regard to its interpretation of its own antidumping duty and countervailing duty orders," this deferential review is tempered by the fact that "the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo").

In the present case, Commerce could have characterized the covered pipes in terms of certifications, but, for whatever reason, it did not. The *Thailand Order* instead requires an inquiry into what "standard pipe" refers to in industry circles.

The tariff numbers listed in the *Thailand Order* call further attention to the ambiguity in its plain language. *See Scope Ruling I*, J.A. 40763. According to the majority, these tariff numbers cannot reasonably be read to exclude dual-stenciled pipes. Maj. Op. 29. This is because, the majority explains, the *Thailand Order* specifies that the "written description of the merchandise subject to the order is dispositive." *Id.* (quoting *Scope Ruling I*, J.A. 40763). Although I agree with the majority that these tariff numbers cannot override any dispositive written description elsewhere in the order, the *Thailand Order*, in my view, does not preclude the list of tariff numbers from being probative of whether the written description is ambiguous and of whether the "commonly referred to" requirement encompasses dual-stenciled pipes. *See Mid Continent Nail*, 725 F.3d at 1298, 1305 (permitting Commerce to interpret an antidumping order in light of the listed tariff numbers, notwithstanding the order expressly stating "[w]hile the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of [the order] is dispositive" (alterations in original) (quoting *Notice of Antidumping Duty Order: Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 44961, 44961–62 (Aug. 1, 2008))). The listed tariff numbers do not cover dual-stenciled pipes, and this list does not include the numbers under which dual-stenciled pipes would have been imported at the time the *Thailand Order* was issued. *Saha I*, 547 F. Supp. 3d at 1293. These tariff numbers further signify that the written description is unclear as to whether the *Thailand Order* encompasses dual-stenciled pipes.

Certification and name are two different concepts. An additional certification can change the name we call

something.[1]  The majority's perspective is that the "commonly referred to" requirement of the *Thailand Order* can only be reasonably understood to encompass dual-stenciled pipes in spite of the fact that dual-stenciled pipes possess API certifications that standard pipes do not have.  But an equally reasonable perspective is that this requirement excludes dual-stenciled pipes because the industry does not commonly refer to dual-stenciled pipes as standard pipe in view of the additional API certifications of dual-stenciled pipes.  The majority regards such a possibility as "unreasonable."  Maj. Op. 29.  I disagree and thus would have held that the *Thailand Order* is ambiguous as to whether it covers dual-stenciled pipes.  *Meridian Prods.*, 851 F.3d at 1381 n.7 ("The relevant scope terms are 'unambiguous' if they have 'a single clearly defined or stated meaning.'" (quoting *Unambiguous*, Webster's Third New International Dictionary of the English Language Unabridged (1986))).  We therefore must consult the (k)(1) materials to determine whether the *Thailand Order* excludes or includes dual-stenciled pipes.

## II. The (k)(1) Materials

If the language of an antidumping order is ambiguous, Commerce turns to the regulatory history of the order, i.e., the (k)(1) materials, including the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of Commerce and the ITC.  19 C.F.R. § 351.225(k)(1)(i); *Mid Continent Nail*, 725 F.3d at

---

[1]    In an example relevant to the jurisdiction of this court, those who have completed the registration requirements of the U.S. Patent and Trademark Office (PTO) may be called "patent agents."  When patent agents also complete the requirements of a state bar, they may be called "patent attorneys."  But even though patent attorneys have completed the PTO registration requirements, patent attorneys are generally not called patent agents.

1302.  Commerce's analysis of the (k)(1) materials "produces 'factual findings reviewed for substantial evidence.'" *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020) (quoting *Meridian Prods.*, 851 F.3d at 1382).  Here, substantial evidence does not support Commerce's determination in *Scope Ruling I* that the *Thailand Order* covers dual-stenciled pipes and instead supports only Commerce's determination in *Scope Ruling II* that the *Thailand Order* does not cover dual-stenciled pipes.

A.

Commerce in *Scope Ruling I* failed to offer any evidence from the (k)(1) materials affirmatively supporting a finding of inclusion.  Commerce at best attacked the evidence proffered by the plaintiff Saha Thai Steel Pipe Public Company Ltd. (Saha) in support of a finding of exclusion. *See* J.A. 40776–78.  But despite adducing no affirmative evidence supporting inclusion, Commerce found the *Thailand Order* encompassed dual-stenciled pipes.  *Id.* at 40778.

The majority adopts the same erroneous line of reasoning, rebuffing each piece of evidence Saha and the Trade Court offered in support of a finding of exclusion but then failing to counter with any evidence in support of inclusion, short of a stray reference in the ITC's reviews of antidumping orders on circular welded pipes—discussed in greater detail below—that acknowledged the reviewed orders had varying express exclusions.  *See* Maj. Op. 29–35.  In doing so, the majority also overlooks clear evidence to the contrary in which the ITC unequivocally indicated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."  *Third Sunset Review* at 8; *see Fourth Sunset Review* at 6–7.  Despite the dearth of evidence in support of inclusion, the majority concludes "that the (k)(1) materials support Commerce's reasonable

interpretation . . . and that Saha's proposed exclusion lacks support." Maj. Op. 35. This conclusion seems rooted in the majority's earlier determination that the "commonly referred to" requirement unambiguously covers dual-stenciled pipe. *See id.* at 31–32 ("The [(k)(1) materials] therefore support[] Commerce's interpretation of the scope of 'standard pipe[s]' in the [*Thailand Order*]." (third alteration in original) (quoting *Scope Ruling I*, J.A. 40763)). But as discussed above, I believe the plain language of the *Thailand Order* is ambiguous. Because nothing in the (k)(1) materials appears to affirmatively suggest the *Thailand Order* includes dual-stenciled pipes, I agree with the Trade Court's assessment that nothing in the (k)(1) materials supports Commerce's determination in *Scope Ruling I* that the *Thailand Order* covers dual-stenciled pipes. *Saha I*, 547 F. Supp. 3d at 1299 ("[T]he absence of evidence is indeed evidence of absence. Substantial evidence does not support the Commerce Department's scope determination.").

### B.

The (k)(1) materials in fact provide numerous examples affirmatively supporting a finding that the *Thailand Order* excludes dual-stenciled pipes. To start, the initial investigation and injury determination for the *Thailand Order* provide substantial evidence backing a finding of exclusion. The majority contends that "the petitioners' partial-withdrawal statement [before Commerce issued the *Thailand Order*] made no reference to, let alone excluded, dual-stenciled pipes." Maj. Op. 33. I disagree with the majority's reading of these materials and, in fact, believe these materials affirmatively suggest the *Thailand Order* excludes dual-stenciled pipe imported as line pipe.

First, the petitioners' withdrawal of tariff codes under which dual-stenciled pipes were imported at the time of the final order—namely, Tariff Schedules of the United States (TSUS) (the precursor to the HTSUS) numbers 610.3208

and 610.3209—suggests that Commerce's deletion of these same tariff codes in the final antidumping order was deliberate. *Saha I*, 547 F. Supp. 3d at 1295. As the Trade Court recounted, the initial petition underlying the *Thailand Order* requested investigation of pipes imported under various TSUS numbers, including 610.3208 and 610.3209. *Id.* The petitioners subsequently withdrew their "petitions insofar as they concern[ed] line pipe, TSUS numbers 610.3208 and 3209." *Id.* (quoting J.A. 40612). As a result, the ITC exclusively evaluated injury resulting from standard pipe and did not evaluate injury from any pipes importable under the withdrawn tariff numbers—including both line pipe and dual-stenciled pipe imported as line pipe. *Id.* This backdrop indicates that Commerce intentionally omitted the tariff codes associated with dual-stenciled pipes in its final antidumping order, thereby supporting a finding that the *Thailand Order* excludes dual-stenciled pipes. *Id.*

Second, as evidenced by their subsequent investigations, Commerce and the ITC understood the difference between the given name for a pipe and the certifications associated with that pipe. Commerce described its investigation scope by stating that "[t]hese products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A-53 or A-135," and the ITC described its investigation scope in a similar manner. *Certain Circular Welded Carbon Steel Pipes & Tubes from Thailand; Initiation of Antidumping Duty Investigation*, 50 Fed. Reg. 12068, 12069 (Mar. 27, 1985); *Final Injury Determination* at I-1 to I-2. Put differently, these scope descriptions referred to both a name of a pipe ("standard pipe") and ASTM specifications ("A-152," "A-53," "A-135"). Yet, Commerce's final antidumping order did not refer to the ASTM specifications, instead mentioning only the name of the covered pipe, i.e., "standard pipe." This omission suggests Commerce knew how to define the scope of the *Thailand Order* in terms of certifications to the ASTM specifications but

declined to do so. The majority nevertheless interprets the "commonly referred to" requirement in the *Thailand Order* as defining the certifications of the covered merchandise. This interpretation is contrary to the evidence from Commerce's and the ITC's investigations leading up to the final antidumping order.

For these reasons, as the Trade Court found, the (k)(1) materials for the initial investigation and the injury determination support the conclusion that the *Thailand Order* excludes dual-stenciled pipe imported as line pipe.

## C.

The ITC's four subsequent sunset reviews of the *Thailand Order*—which no party disputes are (k)(1) materials— support a finding of exclusion. *See generally Certain Pipe & Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey & Venezuela*, Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -276, -277, -296, -409, -410, -532 to -534, -536, -537, USITC Pub. 3316 (July 2000) (*First Sunset Review*); *Certain Pipe & Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand & Turkey,* Inv. Nos. 701-TA-253, 731-TA-132, -252, -271, -273, -409, -410, -532 to -534, -536, USITC Pub. 3867 (July 2006) (*Second Sunset Review*); *Third Sunset Review*; *Fourth Sunset Review*.

The *First Sunset Review* and *Second Sunset Review* reflect the ITC's understanding that standard pipes are distinct from dual-stenciled pipes. For example, in measuring the discernible adverse impact of potential revocation of the antidumping order for Mexican imports, the *Second Sunset Review* rejected the argument that multiple-stenciled line pipe that "satisfie[d] ASTM specifications for [circular welded pipe]" would affect the same industry as a "product that satisfie[d] ASTM specifications but not API specifications." *Second Sunset Review* at 13 n.66. According to the ITC, "multiple-stenciled line pipe requires [more] steel than [circular welded pipe] to meet [API]

specifications applicable to line pipe.  At current steel prices, this would require that a multiple-stenciled product be sold at a considerable price premium over a product that satisfies ASTM specifications but not API specifications." *Id.*  As the Trade Court explained, this discussion demonstrates that the ITC recognized that dual-stenciled pipes and pipes singularly certified to ASTM specifications (i.e., standard pipes) affected different industries and thus considered dual-stenciled pipes to be distinct from standard pipes.  *See Saha I*, 547 F. Supp. 3d at 1297.

Moreover, the *First Sunset Review* and the *Second Sunset Review* acknowledged that President Clinton's safeguard duties—imposed on imports of line pipes from certain countries—encompassed dual-stenciled pipes even though President Clinton's proclamation initiating these duties expressly mentioned only line pipe, not dual-stenciled pipe.  *See First Sunset Review* at 28; *Second Sunset Review* at OVERVIEW-5 n.16; *Proclamation 7274: To Facilitate Positive Adjustment to Competition from Imports of Certain Circular Welded Carbon Quality Line Pipe*, 65 Fed. Reg. 9193, 9193–94 (Feb. 18, 2000).  While I agree with the majority that the safeguard duties "represent a different trade remedy addressing *line pipes*," Maj. Op. 35, the ITC's acknowledgement that these duties covered dual-stenciled pipes, notwithstanding the absence of express language in the proclamation, reflects the ITC's understanding that dual-stenciled pipes are closer in kind to line pipes than to standard pipes.

The *Third Sunset Review* and the *Fourth Sunset Review* further confirm that the ITC regarded dual-stenciled pipes to be distinct from standard pipes.  The *Third Sunset Review*—in defining the scope of the orders under review— explicitly described that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders." *Third Sunset Review* at 8.  The *Fourth Sunset Review* described the scope of the orders under review in a nearly

identical manner. *Fourth Sunset Review* at 6–7. As the Trade Court determined, "[b]oth statements are unqualified and give no indication that the scope language does not apply to the Thailand Order." *Saha I*, 547 F. Supp. 3d at 1298.

The majority fails to engage with these statements, instead placing outsized weight on express exclusions that appear in other antidumping orders covered in the sunset reviews but that do not appear in the *Thailand Order*. Maj. Op. 34–35. For instance, as the majority observes, antidumping orders for Brazil, Korea, Mexico, and Venezuela expressly excluded dual-stenciled pipes, stating that "[s]tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in these orders." *Id.* at 34 (emphases omitted) (quoting *Notice of Antidumping Orders: Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico & Venezuela*, 57 Fed. Reg. 49453, 49453 (Nov. 2, 1992)). But in addition to expressly excluding dual-stenciled pipes, these orders expressly excluded "line pipe, oil country tubular goods, boiler tubing, mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished conduit." *Notice of Antidumping Orders*, 57 Fed. Reg. at 49453. These other orders, as the majority seems to acknowledge, at best confirm that the *Thailand Order* and these other orders do not contain the same express exclusions.[2] Maj. Op. 34–35. I

---

[2]    To the extent the majority argues that the express exclusion of dual-stenciled pipes in these other orders affirmatively establish that the *Thailand Order* covers dual-stenciled pipes because the other orders expressly exclude dual-stenciled pipes while the *Thailand Order* contains no express exclusions, such an argument would be logically inconsistent with the undisputed understanding that the *Thailand Order* excludes line pipes. These other orders

fail to see, however, how these express exclusions preclude the *Thailand Order* from being interpreted to exclude dual-stenciled pipes, particularly in view of the ITC's direct statements in the *Third Sunset Review* and *Fourth Sunset Review* averring that the covered orders exclude dual-stenciled pipes.

For these reasons, I agree with the Trade Court that the ITC's sunset reviews further support a finding that the *Thailand Order* excludes dual-stenciled pipes.

### D.

In view of the foregoing, I would have found that the (k)(1) materials do not provide substantial evidence supporting Commerce's view in *Scope Ruling I* that the *Thailand Order* includes dual-stenciled pipes. Furthermore, I would have found that the (k)(1) materials provide substantial evidence supporting Commerce's determination under protest in *Scope Ruling II* that the *Thailand Order* excludes dual-stenciled pipes.

### CONCLUSION

Accordingly, I would have affirmed the Trade Court's decisions in both *Saha I* and *Saha II*. I respectfully dissent.

---

contain express exclusions of line pipes while the *Thailand Order* does not, but no one contends that the *Thailand Order* would accordingly include line pipes. Oral Arg. 23:20–23:27.